IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* JANA GARZA, | § <br> § <br> § | |
| Plaintiff, | § <br> § <br> § | |
| v. | § <br> § <br> § | CIVIL ACTION NO. 1:22-CV-000467<br>JUDGE MICHAEL TRUNCALE |
| SOUTHWEST KEY PROGRAMS, INC.,<br>ALYSSA HERNANDEZ,<br>DIEGO NARANJO,<br>DIVINE FAMILY CARE, PLLC,<br>EDER FRANCISCO HERNANDEZ,<br>FANNY ROSA FIGUEROA,<br>GERALDO RIVERA,<br>MIGDAL EDER, LLC,<br>TRINITY HEALTH SERVICES, PLLC,<br>DIEGO NARANJO dba UC HEALTH<br>CONSULTANTS, and<br>VALLEY MED URGENT CARE, PLLC, | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | JURY TRIAL DEMANDED |
| Defendants. | § <br> § | |

**<u>RELATOR JANA GARZA'S FIRST AMENDED COMPLAINT</u>**

Plaintiff/Relator Jana Garza ("Garza" or "Relator") brings this action pursuant to the False Claims Act, 31 U.S.C. § 3729–3732, and seeks to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States of America and on her own behalf.

## I.    INTRODUCTION

1.    Southwest Key Program ("Southwest Key" or "SWK"), the largest migrant shelter provider in the United States, claims that its mission is "[o]pening doors to opportunity so individuals can achieve their dreams." But as Relator Jana Garza came to learn, the "opportunities" the leadership at Southwest Key cares most about are those that enrich themselves, family, and friends. "Compadrismo"—which is the Spanish equivalent to the English word "cronyism"—is a way of life at the organization.

2.    This case involves fraudulent schemes by Defendants and their collaborators to steer Southwest Key's lucrative medical provider contracts for its largest shelters to friends, family, and personal associates in clear violation of conflict of interest, self-dealing, and anti-kickback prohibitions. These schemes revolved around Diego Naranjo, who served as SWK's Assistant Director of Medical Services, and  Eder Hernandez, a physician assistant that Southwest Key used to recruit medical providers. The kickbacks in this case consisted of Federal health care dollars from a program to provide health care to Unaccompanied Children (UC) housed in shelters financed by the Office of Refugee Resettlement (ORR), an agency component of the Federal Department of Health and Human Services (HHS). Because those dollars were used in part to pay kickbacks, each such claim for payment to the government was a violation of the False Claims Act, 31 U.S.C. §§ 3729. *See* the Federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b).

## II.    JURISDICTION AND VENUE

3.    Jurisdiction and venue are proper in the Eastern District of Texas under the False Claims Act (31 U.S.C. § 3732(a)), because Relator's claims seek remedies on behalf of the United States for multiple violations of 31 U.S.C. § 3729, some of which occurred in the Eastern District of Texas. Defendants transact business in the Eastern District of Texas and are subject to general and specific personal jurisdiction under 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of 31 U.S.C. § 3729.

4.    There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relator is an original source as defined therein. To the extent that any allegations or transactions herein have been publicly disclosed, Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and voluntarily provided this information to the United States prior to filing a complaint. Relator provided this information by submitting a *Voluntary Pre-Filing Disclosure Statement* to the United States on October 14, 2022.

5.    Relator filed the original complaint under seal on October 26, 2022.

## III.    PARTIES

### A.    Plaintiff-Relator Jana Garza

6.    Plaintiff-Relator Jana Garza is a resident of the State of Texas.

7.    Garza obtained a Bachelor of Science in Nursing and a Master of Science in Nursing at Texas A&M University (Corpus Christi), and in 2015, she obtained a Doctorate of Nursing Practice from the University of the Incarnate Word (San Antonio).

8.    Garza has been a family nurse practitioner for over 10 years. She is the founder and owner of Nutrix Medical Worx, PLLC. She is currently an adjunct clinical professor at Texas

Women's University, where she provides master's level didactic and clinical teaching to nurse practitioners.

### B.    Defendant Southwest Key Programs, Inc.

9.    **Defendant Southwest Key Programs, Inc. ("Southwest Key" or "SWK")** is incorporated in the State of Texas. The registered agent on file with the Texas Secretary of State is Eleanor Benmenashe, 6002 Jain Lane, Austin, Texas 78721. SWK's principal office is located at 6002 Jain Lane, Austin, Texas 77821. SWK provides programs through four divisions, Youth Justice Services, Immigrant Children's Services, Promesa Public Schools, and Workforce Solutions. The Immigrant Children's Services division administers its Unaccompanied Minor Program, and oversees the operation of the shelters, including its Medicals Services department. SWK's leadership structure includes the top-ranking position of Senior Vice President or Vice President for each of its divisions, except for Workforce Solutions.

### C.    The Naranjo Defendants and Related Participants and Entities

10.    **Defendant Diego Naranjo ("Diego" or "Naranjo")** is a resident of the State of Texas. Naranjo's address is 832 Abrahamson Drive, Brownsville, Texas 78526. Naranjo was the former Assistant Director of Medical Services for SWK, a position he held until his departure in early 2019.

11.    As he was leaving the employ of Defendant SWK, Naranjo formed Trinity Health Services PLLC on March 28, 2019. Naranjo later formed Divine Family Care, PLLC on October 30, 2019. Naranjo is also either the owner or a co-founder of UC Health Consultants.

12.    **Defendant Trinity Health Services PLLC ("Trinity")** is incorporated in the State of Texas. The registered agent on file with the Texas Secretary of State is Diego Naranjo, 832

Abrahamson Drive, Brownsville, Texas 78526. Trinity Health Services' principal office is located at 832 Abrahamson Drive, Brownsville, Texas 78526.

13.     **Defendant Divine Family Care, PLLC ("Divine")** is incorporated in the State of Texas. The registered agent on file with the Texas Secretary of State is Diego Naranjo, 832 Abrahamson Drive, Brownsville, Texas 78526. Divine Family Care's principal office is located at 832 Abrahamson Drive, Brownsville, Texas 78526.

14.     **Defendant Diego Naranjo dba UC Health Consultants ("UC Health Consultants")** is an unincorporated company in the State of Texas. SWK awarded UC Health Consultants a consulting contract around March 2020, which extended until October 2021.

   D.     <u>The Hernandez Defendants and Related Participants and Entities[1]</u>

15.     **Defendant Eder Francisco Hernandez aka Eder Hernandez ("Eder")** is a resident of the State of Texas. Eder's address is 1180 Cieba Cir, Brownsville, Texas 78521. Eder formed a company, Migdal Eder, LLC, on December 17, 2017, for the purposes of obtaining kickbacks from Garza and probably others.

16.     **Defendant Migdal Eder, LLC** is incorporated in the State of Texas. The company's mailing address is 4 Sweetwater Ct., Sugar Land, TX 77479. The registered agent on file with the Secretary of State is Bawla & Bawla LLC and the registered agent address is also 4 Sweetwater Ct. in Sugar Land.

17.     Also located at 4 Sweetwater Ct. are two companies connected with Defendant Diego Naranjo. Naranjo formed Tight Line Consulting LLC on December 19, 2018. He is its registered agent, and the registered agent's mailing address is 4 Sweetwater Ct. On July 12, 2022,

---

[1] The first name of each Hernandez defendant is utilized to avoid confusion.

Naranjo formed Dos Naranjos Construction Corp. Its registered agent is Bawla & Bawla LLC, also at 4 Sweetwater Ct.

18.     **Defendant Alyssa Hernandez ("Alyssa")** is a resident of the State of Texas. Alyssa's address is currently unknown. Alyssa was involved in the kickback agreement that Eder proposed to Garza in August 2018. Sometime around 2019, Alyssa was hired by SWK as an employee.

19.     Related party Annelise Hernandez is a resident of the State of Texas. Annelise's address is currently unknown. Annelise was involved in the kickback agreement that Eder proposed to Garza in August 2018.

20.     In August 2018, Defendant Eder Hernandez attempted to use **Defendant Migdal Eder, LLC** as part of the kickback arrangement he was trying to form with Relator Garza to obtain payments from federal health care dollars generated by claims for medical services supplied to UC by plaintiff Garza and her company, Nutrix Medical Worx, LLC.

## E.      Other Defendants and Related Participants and Entities

21.     **Defendant Fanny Rosa Figueroa ("Fanny" or "Figueroa")** is a resident of the State of Texas. Figueroa's address is 32 August Drive, Laguna Vista, Texas 78578. Figueroa was the former Director of Medical Services for SWK, a position she held until her departure on December 8, 2019.

22.     **Defendant Geraldo Rivera ("Rivera")** is a resident of the State of Texas. Rivera's address is 32 August Drive, Laguna Vista, Texas 78578. Rivera is married to defendant Figueroa. In 2018, Rivera was the Vice President of Immigrant Children's Services for SWK. Sometime in 2019 or 2020, SWK promoted Rivera to Senior Vice President of Immigrant Children's Services. Rivera then became the Chief Program Officer for SWK. In 2023, Rivera retired from SWK.

23.    **Defendant Valley Med Urgent Care PLLC ("Valley Med")** is incorporated in the State of Texas. The company's mailing address is 4 Sweetwater Ct., Sugar Land, TX 77479. The registered agent on file with the Secretary of State is Bawla & Bawla LLC and the registered agent address is also 4 Sweetwater Ct. in Sugar Land. Valley Med Urgent Care's principal office is located at 2534 Boca Chica Blvd, Brownsville, TX 78521. Dr. Rauf employed or contracted Eder at Valley Med during 2017 through at least 2018 and continue to have a business association. Eder and Diego worked with Dr. Rauf at Valley Med and currently use its company offices. Further, the address on file with the State for their supervising physician, Dr. Juan Garcia, is Valley Med's principal office at 2534 Boca Chica Blvd.

24.    Related party Daniel De La Cruz ("De La Cruz") is a resident of the State of Texas. De La Cruz's address is 2394 San Bernardo, Brownsville, Texas 78521-3922. De La Cruz was the former Medical Service Coordinator for SWK and concurrently the Lead Medical Coordinator for Casa Padre. Sometime in 2019, SWK promoted De La Cruz to Interim Director of Nursing for the Southwest Region (Arizona and California). On December 8, 2019, De La Cruz was promoted to Interim Director of Medical Services until his departure in March 2020. Sometime after that, De La Cruz went to work with Naranjo under Trinity.

25.    Related party Dr. Juan Garcia is a family practice physician in South Texas. He became the supervising physician over Eder Hernandez and Diego Naranjo on March 25, 2019, around the time that Naranjo was leaving SWK as an employee and forming his own operations to provide medical care to UC at the SWK shelters. Both Eder and Naranjo are listed in public records as operating from 101 E. Expressway 83, McAllen, Texas.

## IV.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY

26.    Any and all acts alleged herein to have been committed by the Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Defendants and within the course and scope of their employment, and with actual and apparent authority, or by corporate predecessors, to whom successive/successor liability applies.

## V.    STATUTORY, REGULATORY, AND CONTRACTUAL BACKGROUND

### A.    Overview of Pertinent Federal Agencies

27.    The Unaccompanied Children (UC) Program is managed by the Office of Refugee Resettlement (ORR) within the Administration for Children and Families (ACF), an operational division of the U.S. Department of Health and Human Services (HHS).

#### 1.  Department of Health and Human Services

28.    The mission of HHS is to enhance the health and well-being of all Americans, by providing for effective health and human services and by fostering sound, sustained advances in the sciences underlying medicine, public health, and social services.

29.    HHS has 12 Operating Divisions (OPDIV), which consists of nine agencies in the U.S. Public Health Service and three human services agencies.

30.    In support of its mission, HHS awards grants under more than 300 programs, making it the largest grant-awarding agency in the Federal government. HHS grant programs are the responsibility of the 12 OPDIVs, each of which has grant-awarding power.

#### 2.  Administration for Children and Families (ACF)

31.    The Administration for Children and Families (ACF) is a division of the Department of Health & Human Services. ACF promotes the economic and social well-being of families, children, individuals, and communities.

32.    ACF is one of the 12 OPDIVs with grant-awarding power.[2] ACF grant awards are subject to the requirements of the Health and Human Services Grant Policy Statement, which covers basic grants processes, standard terms and conditions, and points of contact, as well as important agency-specific requirements.

### 3.  Office of Refugee Resettlement (ORR)

33.    Under the Homeland Security Act of 2002, Congress transferred the care and custody of unaccompanied children to ORR from the former Immigration and Naturalization Service (INS) to move away from the adult detention model. In the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA of 2008), which expanded and redefined HHS's statutory responsibilities, Congress directed that each child must be promptly placed in the least restrictive setting that is in the best interest of the child, subject to considerations of whether the child is a danger to self or others.

34.    The Director of the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS) has responsibility for the care and placement of unaccompanied children (UC) in accordance with Section 462 of the Homeland Security Act of 2002 (HSA of 2002), 6 U.S.C. § 279.

### 4.  Division of Unaccompanied Children's Operations (DUCO)

---

[2] HHS Grant Policy Statement (hereinafter HHS GPS), Page I-1.

35.     The Office of Refugee Resettlement Division of Unaccompanied Children's Operations (ORR/DUCO) within the Administration for Children and Families (ACF) provides temporary shelter care and other child welfare-related services to UC in ORR custody.

36.     Within ORR, the Division of Unaccompanied Children's Operations (DUCO) has delegated authority for the care and placement of UC.

37.     DUCO's primary objectives are to provide a safe and appropriate placement in the least restrictive environment for UC while in ORR custody—taking into consideration the risk of harm to the UC or others, harm to the community, and the risk of flight—until they are released to a sponsor, obtain immigration legal relief, age out, or are discharged to the Department of Homeland Security (DHS).

### B.      Overview of the Unaccompanied Children Program

#### 1.   Role of ORR

38.     Unaccompanied children are referred to ORR by another federal agency, usually the Department of Homeland Security (DHS). Most children are placed into ORR care because they were apprehended by immigration authorities while trying to cross the border; others are referred after coming to the attention of immigration authorities at some point after crossing the border. HHS plays no role in the apprehension or initial detention of UC prior to their referral to HHS custody, and HHS is not a party to the child's immigration proceedings.

39.     ORR may place a child in a shelter facility, foster care, or group home (which may be therapeutic), staff-secure or secure care facility, residential treatment center, or other special needs care facility.

40.     There are two types of placement decisions: (1) the initial placement into an ORR care provider facility or other setting, and (2) transfer placement between ORR care providers.

Although the circumstances and procedures for initial placement and transfer vary, ORR applies the same child welfare model to both types of care delivery.

41.    After ORR requests a placement in a particular facility, the care provider may only deny ORR's request for placement based on the following reasons:

- Lack of available bed space.

- Placement of the unaccompanied child would conflict with the care provider's State or local licensing rules.

- Placement of an unaccompanied child with a significant physical or mental illness for which the referring Federal agency does not provide a medical clearance and/or medications that would conflict with the care provider's State or local licensing requirements.

### 2.  Influx Shelters

42.    Historically, ORR has experienced periods when DHS apprehends a significantly greater number of unaccompanied children than at other times of the year. These periodic intervals are called an "influx." In addition to an influx, a natural disaster or other emergency may prevent the prompt (within 24 hours), initial placement of unaccompanied children in care provider facilities. ORR has procedures in place to make sure that care providers are available to accommodate these influx intervals and make initial placements as quickly as possible while successfully providing the range of services that ORR requires for every unaccompanied child.

### 3.  Role of Care Provider (Shelter Provider)

43.    Care provider facilities are State-licensed and must meet ORR requirements to ensure a high level of quality care. The facilities, which operate under cooperative agreements and contracts, provide children with classroom education, health care, socialization/recreation, vocational training, mental health services, access to legal services, access to Child Advocates where applicable, and case management. They also undertake ongoing efforts to identify and assess relatives or other individuals in the United States as sponsors to whom children can be safely

released. Care provider facilities' case management teams use standardized screening tools to assess children for mental health and victims of trafficking issues.

### C.    Overview of Cooperative Agreements

44.    The Federal Grant and Cooperative Agreement Act of 1977, 31 U.S.C. § 6301, defines the cooperative agreement as an alternative assistance instrument to be used in lieu of a grant whenever substantial Federal involvement with the recipient during performance is anticipated. The difference between grants and cooperative agreements is the degree of Federal programmatic involvement rather than the type of administrative requirements imposed. Therefore, statutes, regulations, policies, and the information contained in agency policy statements that are applicable to grants also apply to cooperative agreements, unless the award itself provides otherwise.

45.    When an OPDIV expects to be substantially involved in carrying out the project/program, it awards a cooperative agreement rather than a grant. Substantial involvement pertains to programmatic involvement rather than administrative oversight.

46.    ORR provides residential care and services through contracts or through the competitive or noncompetitive grant process to organizations incorporated under State law that have demonstrated child welfare, social service, or related experience and are appropriately licensed to provide care and related services to dependent children.

### D.    The Applicable Contracts, Grants, and Cooperative Agreements

#### 1.  The SWK Shelters

47.    SWK has agreements with the federal government to provide residential services (shelter services) to unaccompanied children in three states: Texas, Arizona, and California. SWK

11

divides Texas into two regions: the South Texas region and the Houston-San Antonio-El Paso region (now known as the Central Texas region).

    a.   <u>The Houston (Central Texas) Shelters</u>

48.    SWK operated the following shelters in Houston:

| Shelter Name | Location | Capacity |
|---|---|---|
| Quetzal | 7407 North Freeway<br>Houston, Texas | 236 |
| Mesa | 7900 Mesa Drive<br>Houston, Texas<br>**Closed 2022** | 54 |
| Montezuma | 15101 Interstate 10 East<br>Channelview, Texas | 191 |
| Reliant | 1550 La Concha Lane<br>Houston, Texas | 200 |
| Sunzal | 419 Emancipation<br>Houston, Texas | 222 |
| Casa Conroe | **Closed September 2019** | |

    b.   <u>Other Central Texas Shelters</u>

49.    SWK currently operates the following shelters in Central Texas:

| Shelter Name | Location | Capacity |
|---|---|---|
| Canutillo | 400 Talbot<br>Canutillo, Texas | 90 |
| Casita del Valle | 1855 Lee Moor Road<br>Clint, Texas | 75 |
| Casa Franklin | 315 E. Franklin<br>El Paso, Texas | 45 |
| Casa Trail House | 4561 Oleary Dr.<br>El Paso, Texas 79938 | 512 |
| Casa Blanca | 27102 Enchanted Avenue<br>San Antonio, Texas | 44 |

    c.   <u>The South Texas Shelters</u>

50.    SWK currently operates the following shelters in South Texas.

| Shelter Name | Location | Capacity |
|---|---|---|
| El Presidente | 1 Ted Hunt Blvd. Suite A<br>Brownsville, TX 78521 | 413 |
| La Esperanza | 508 E. Elizabeth Street<br>Brownsville, Texas | 75 |
| Nueva Esperanza | 321 Lorenaly Drive<br>Brownsville, Texas | 200 |
| Casa Padre | 7480 Padre Island Highway<br>Brownsville, Texas | 600 |
| Casa Norma Linda | 30788 TX-100<br>Los Fresnos, TX 78566 | Unknown |
| Casa Oasis | 5101 N. Jackson Rd<br>McAllen, Texas | 89 |
| Casa Rio Grande | 401 E. Business Highway 77<br>San Benito, Texas | 160 |
| Casa Antigua | 502 E. Expressway 83<br>San Benito, Texas | 201 |
| Casa Sueno | 1110 S. Airport Drive<br>Weslaco, Texas | 56 |

d.   The Arizona Shelters

51.    SWK currently operates the following shelters in Arizona:

| Shelter Name | Location | Capacity |
|---|---|---|
| Glendale | 5125 W Myrtle Avenue<br>Glendale, Arizona | 68 |
| Kokopelli | 723 East 2nd Avenue<br>Mesa, Arizona | 200 |
| Las Palmas | 421 W Brown Road<br>Mesa, Arizona | 120 |
| Campbell | 2613 W. Campbell<br>Phoenix, Arizona | 128 |
| Casa Fortaleza | 1201 S 7th Avenue<br>Phoenix, Arizona | 376 |
| Lighthouse | 2932 N 14th Street<br>Phoenix, Arizona | 74 |
| Estella Del Norte | 1601 N Oracle Road<br>Tucson, Arizona | 200 |
| Casa Amanecer | 12030 N 113th Avenue<br>Youngstown, Arizona | 139 |

e.  The California Shelters

52.  SWK currently operates the following shelters in California:

| Shelter Name | Location | Capacity |
|---|---|---|
| Pleasant Hill | 808 Grayson Road Pleasant Hill, California | 26 |
| San Diego | 1160 Broadway El Cajon, California | 74 |
| San Diego | 9780 Dunbar Lane El Cajon, California | Unknown |

## 2.  The SWK Cooperative Agreements

53.  SWK operates the aforementioned shelters under various cooperative agreements that it had or currently has with the Office of Refugee Resettlement. Following is a list of the cooperative agreements that SWK has been awarded since 2014:

| Cooperative Agreement | Start | End | Federal Funds |
|---|---|---|---|
| 90ZU0148 | 10/1/2014 | 9/29/2018 | $547,121,683 |
| 90ZU0153 | 10/1/2014 | 9/29/2018 | $375,107,777 |
| 90ZU0149 | 10/1/2014 | 9/29/2018 | $110,557,320 |
| 90ZU0218 | 2/1/2017 | 12/31/2020 | $16,542,873 |
| 90ZU0259 | 9/30/2018 | 9/30/2022 | $197,905,767 |
| 90ZU0257 | 9/30/2018 | 9/30/2022 | $374,827,172 |
| 90ZU0256 | 9/30/2018 | 9/30/2022 | $216,013,041 |
| 90ZU0253 | 9/30/2018 | 9/30/2022 | $459,913,485 |
| 90ZU0258 | 9/30/2018 | 9/30/2022 | $245,750,554 |
| 90ZU0254 | 9/30/2018 | 9/30/2022 | $399,219,216 |
| 90ZU0252 | 9/30/2018 | 9/30/2022 | $212,932,761 |
| 90ZU0354 | 1/1/2021 | 12/31/2023 | $18,131,580 |
| 90ZU0399 | 9/30/2021 | 12/31/2023 | $6,543,910 |
| 90ZU0407 | 12/1/2021 | 9/30/2022 | $66,781,310 |
| 90ZU0409 | 12/1/2021 | 9/30/2022 | $82,772,080 |

54.     As an example, SWK obtains funding to operate Casa Sunzal (which is located at 418 Emancipation, Houston, TX) under Cooperative Agreement 90ZU0256, which is a four-year agreement that commenced on September 30, 2018, and ended September 30, 2022.

### E.     Material Contractual Requirements

55.     SWK receives ACF grant awards through Cooperative Agreements to operate the shelters. ACF grant awards are subject to the requirements of the Department of Health and Human Services Grant Policy Statement (HHS GPS). Accordingly, SWK is required to comply with the HHS GPS and the terms of the Cooperative Agreement.

### 1.   HHS Grants Policy Statement

56.     The Department of Health and Human Services Grants Policy Statement (HHS GPS) contains the general terms and conditions of HHS discretionary grant and cooperative agreement awards. In addition to, or in lieu of, the standard terms and conditions of awards specified in the HHS GPS, the OPDIV may use terms and conditions for program-specific or award-specific reasons.

57.     In the case of a conflict, statutes, and regulations take precedence over requirements or restatements of statutory or regulatory requirements in the HHS GPS, and OPDIV or award-specific requirements take precedence over Part II of the HHS GPS.

### 2.   ORR Cooperative Agreements

58.     The Office of Refugee Resettlement enters into Cooperative Agreements with care providers to provide a safe and appropriate placement in the least restrictive environment for UC while in ORR custody until they are released to a sponsor, obtain immigration legal relief, age out, or are discharged to the Department of Homeland Security (DHS). Per the HHS GPS, the

requirements in ORR's Cooperative Agreements take precedence, in case of a conflict, over the terms and conditions found in Part II of the HHS GPS.[3]

59.    The Cooperative Agreement requires a care provider to provide the following activities: (A) Residential and Other Services; (B) Organizational Capacity and Structure; (C) Management of Personnel and Volunteers; (D) Code of Conduct and Conflict of Interest Requirements; (E) Training; (F) Grant Administration; and (G) Adherence to ACF Policy on Grants to Faith-Based Organizations.

60.    Section A (Residential and Other Services) requires a care provider to provide "residential shelter and services for UC in compliance with respective State residential care licensing requirements, the Flores settlement agreement, pertinent federal laws and regulations, and the ORR policies and procedures, unless otherwise expressly waived (in writing) by authorized ORR staff."

61.    Section D (Code of Conduct and Conflict of Interest Requirements), requires a care provider to abide by the following Conflicts of Interest Policy:

    a.    Care Provider staff are prohibited from taking unfair advantage of any professional or personal relationship or from exploiting their position to further their personal, religious, political, financial, or business interests.

    b.    Care Provider must establish and maintain a written Conflict of Interest policy applicable to all staff, board members, contractors, sub-contractors, sub-grantees, volunteers, and other internal stakeholders. The policy must:

- Identify and define conduct that creates a conflict of interest or a potential conflict of interest;

---

[3] HHS GPS, I-2.

- Prohibit employees from having any direct or indirect financial interests in the transactions of services of the program;
- Require staff to recuse themselves from the decision-making process if there is a conflict of interest or a potential conflict of interest;
- Require staff to disclose any conflicts of interest prior to their involvement in a decision related to or affected by the conflict; and,
- State that failure to disclose conflicts of interest or potential conflicts of interest may result in discipline or termination of employment.

62.     Defendants, through the conduct described herein, repeatedly violated these conflict-of-interest prohibitions.

### 3.  Claims for Payment for Medical Services provided to UC

63.     Relator Garza has first-hand knowledge of the system used by medical providers to submit claims for payment, and by the government to pay claims, based on her own submission of claims for payment on behalf of her company, Nutrix Medical Worx, PLLC.

64.     When a child arrives at a shelter, a shelter provider—through a medical provider— is required to perform an initial medical exam (IME) within 48 hours. At the outset, ORR issues each unaccompanied child a Medical Identification Document (ID). The ID contains the child's name, identification number, date of birth, gender, effective date, and the shelter where the child is housed. This ID permits a medical provider to perform the initial medical exam, which encompasses several pre-authorized medical services.

65.     After the initial medical examination is completed, shelter medical staff, the medical provider, or a child can request a sick consultation if a child is feeling ill and has a medical condition that requires attention.

66.     Prior to being seen by a medical provider, a shelter's medical coordinator must first request a Treatment Authorization Request (TAR) from ORR by providing a description of the

child's request. If ORR approves the request, a TAR number is issued for a consultation. Each TAR has an authorization expiration date.

67.    To bill for an IME a medical provider utilizes the ID issued by ORR. To bill for follow-up services, a medical provider must obtain a TAR. The provider will see the child and perform the authorized services.

68.    After performing the authorized services, a medical provider creates a claim for payment that contains a child's ID, gender, the medical services provided to the child (using ICD 10 codes for diagnoses and CPT codes for services rendered), and date the medical services were rendered.

69.    A medical provider submits this claim to Point Comfort Underwriters (PCU), a third party that the federal government utilizes to process claims. PCU then pays out these claims to medical providers using Federal health care dollars.

## VI.    DEFENDANTS' KICKBACKS AND FALSE CLAIMS SCHEME

### A.    <u>Garza begins working for Dr. Mirafzali and provides medical services to unaccompanied children for an SWK shelter.</u>

70.    In 2012, while Garza was working for Dr. Asim Zamir—a pediatric specialist—at Brownsville Children's Clinic in Brownsville, Texas, she met Dr. Vahid Mirafzali.

71.    Dr. Mirafzali was the owner of Boys & Girls Pediatric Clinic, P.A.[4] At the time, Boys & Girls Pediatric Clinic had locations at Brownsville, Los Fresnos, and South Padre Island, TX. Dr. Mirafzali offered Garza employment. Garza was primarily based out of the Brownsville clinic located at 5850 FM 802, Brownsville, TX 78521.

---

[4] Dr. Mirafzali is also the owner of Boys & Girls Urgent Care, P.A. This facility was under construction when Garza was employed there.

72.     In the last quarter of 2013, Dr. Mirafzali told Garza that he had "recovered" some contracts to provide medical services to unaccompanied children that were housed at SWK shelters in the region. Garza agreed to help Dr. Mirafzali.

73.     Dr. Mirafzali sometimes visited the children at the SWK shelters. However, SWK also transported children from one or more of its shelters to his Brownsville clinic in groups of 15 to 20 children at a time. Garza only assessed and treated the unaccompanied children that SWK sent to the clinic.

74.     Around May 2014, Garza's employment with Dr. Mirafzali ended. She spent a few weeks doing her clinical rotation for her Doctorate of Nursing with Dr. Kazim Hussein at JK Family Clinic in Brownsville.

**B.     Eder Hernandez Begins Trying to Recruit Garza to Work with Him.**

75.     On January 1, 2015, Garza moved to Houston, Texas. She began working with several pediatricians throughout the city.

76.     Sometime in 2015, Garza was contacted by Eder Hernandez. Eder's name was not entirely unfamiliar to Garza. When she worked for Dr. Zamir, he often complained about Eder. This was also true of Dr. Mirafzali. It was Garza's understanding that Dr. Mirafzali and Eder had some type of business association in the past, but that it had fallen apart.

77.     In a Facebook message, Eder asked Garza if she would be willing to accept a business deal working with government agencies, such as Border Patrol and Immigration and Naturalization Services (INS). In another message, Eder sent Garza a list of addresses and asked if they were located near her address. Garza later learned that many of those addresses corresponded to shelters that were controlled by SWK. Although she was not aware of it at the

time, Garza subsequently came to believe that Eder was regularly communicating with Garza because he was considering using Garza to provide medical services to UC in SWK shelters.

78.    On June 15, 2015, Garza and Eder met for lunch in Brownsville. During this time, Eder offered to get her a job, as he claimed to have a mid-level staffing agency. On June 27, 2015, Eder told Garza that he could get her a full-time job on a limited-time basis with Dr. A. Dr. A. was and is a well-known board-certified family medicine doctor and maintains a medical practice in Brownsville, TX. The talks between Eder and Garza continued for weeks, but nothing came out of those conversations, as Garza returned to Houston in July. Garza later learned from Eder that he (Eder) had a kickback arrangement with Dr. A for the latter's provision of medical services to UCs at SWK's shelter called Casa Padre, as explained more fully below.

79.    In February 2016, Garza began working full-time at Clinica Mi Doctor, where she delivered primary care to pediatric and adult patients.

80.    Sometime before the end of 2017, Eder called Garza to offer her a job working for Dr. Abdur Rauf, Eder's boss at the time. Dr. Rauf owned Valley Med Urgent Care, which operated multiple clinics in Brownsville.[5] Eder told Garza that Dr. Rauf also owned some urgent care clinics in Houston. Garza declined the offer, but Eder continued to pester her about it.

81.    To appease Eder, Garza agreed to sit down for an interview. She met with Dr. Rauf's Houston office manager. After the interview, Garza rejected the unsolicited offer to work for Dr. Rauf.

82.    At the end of December 2017, Garza left Clinica Mi Doctor to pursue another job. In January 2018, Garza began working at Doctors Clinic Houston, which operates several clinics

_____

[5] The company is incorporated in the State of Texas as Valley Med Urgent Care PLLC.

in the Houston area. While working there, Garza met Dr. Federico Valderrama-Bazan, who would go on to become her supervising physician for the company she formed.

83.    In February 2018, Garza incorporated her company, Nutrix Medical Worx, PLLC.

**C.    Eder offers Garza the role as SWK Medical Provider at Casa Sunzal and Garza meets Figueroa and Naranjo.**

84.    In June or July 2018, Eder asked to meet with Garza. Eder wanted to assess her interest in entering a business deal to become a medical provider for "INS". Garza agreed to meet him. Shortly thereafter, Eder traveled to Houston accompanied by his two sisters, Alyssa and Annelise, and Luis Ibarra, whom Eder said was his office manager.

85.    At the meeting, Eder asked Garza if she had a company. Garza informed Eder she had recently formed Nutrix Medical Worx. Eder then asked if she would be willing to accept a business deal involving shelters for immigrant minors. Eder told Garza that he wanted her to become a medical provider at a new shelter that was set to open in Houston. Eder further told Garza that to become a medical provider, she would need a supervising physician to oversee her work.

86.    Garza informed Eder that she could ask Dr. Valderrama, who worked at Doctors Clinic Houston, to be her supervising physician.

87.    In July 2018, Eder and Ibarra traveled to Houston again to meet with Garza. Eder explained some of the details of providing services for the shelters.

88.    Eder told Garza the importance of a Treatment Authorization Request ("TAR"), which he explained was needed because a medical provider could not bill and collect payment without it. Eder stressed the importance of collecting a TAR prior to rendering any type of service.

89.    Eder asked Garza if she was familiar with Texas Vaccines for Children (TVFC) Program, to which Garza responded no. The TVFC makes vaccines available to eligible children

of Texas. These vaccines are available at no cost to providers to vaccinate eligible children (from birth to 18 years of age). Eder briefed Garza about the process to obtain a TVFC account, which was necessary to be able to provide medical services at shelters.

90.     Eder then explained to Garza that she would also need to obtain a CLIA waiver.[6] A CLIA waiver is a certification that allows a facility, primarily laboratories, to legally examine a person through waived tests in order to assess health, diagnose, and determine treatment. In the context of providing medical care to unaccompanied children, the CLIA waiver permits medical providers to do labs onsite at the shelter. Eder brought a CLIA waiver application for Garza to fill out.

91.     Eder finally told Garza that he wanted her to be a medical provider for an unaccompanied children's migrant shelter that SWK was planning to open in Houston in October 2018. While it was not apparent to Garza then, Eder had insider information about the new shelter that was not yet available to the public, including the name—Casa Sunzal—and the planned opening date.[7]

92.     Eder told Garza that he would schedule a conversation between her and Fanny Figueroa and Diego Naranjo about becoming the medical provider at Casa Sunzal. Figueroa was the Director of Medical Services and Naranjo the Assistant Director of Medical Services. Garza would learn that in those positions, both had the ability to select and award medical provider contracts.

---

[6] CLIA stands for Clinical Laboratory Improvement Amendments of 1988. While often referred to simply as a CLIA waiver, the formal name is CLIA Certificate of Waiver.

[7] It was not until September 16, 2018 that the Houston media published either piece of information. *See Casa Sunzal: Southwest Key Says it has 41 Days to Open its Immigrant Kids Center on Emancipation, Otherwise it Won't have the Money to Open at All*, Swamplot (Sept. 17, 2018, 2:45PM), http://swamplot.com/southwest-key-says-it-has-41-days-to-open-its-immigrant-kids-center-on-emancipation-otherwise-it-wont-open-at-all/2018-09-17/.

**D.    Eder shares "Master Plan" to take over SWK's shelters in Houston, Phoenix, and Brownsville.**

93.    During the July 2018 visit, Eder boasted to Garza about how much influence and power he wielded at SWK. Eder told Garza that he was responsible for getting Dr. A. the medical provider contract at Casa Padre in Brownsville, Texas. Casa Padre is SWK's largest shelter, with the capacity to house 1,400 children. Eder told Garza that he had a contract with Dr. A, but complained that Dr. A. was not honoring his end of the deal because he was only paying Eder $90 for each child he saw at Casa Padre.

94.    Garza asked Eder why he did not sue Dr. A. to enforce the contract. Eder responded , "No, we have a master plan. We're gonna take over Houston, Phoenix, and Brownsville." As Garza would later learn, this "master plan" involved Eder, Figueroa, Naranjo, and other key SWK staff acting as agents on behalf of Southwest Key and with its actual and apparent authority. Although Garza did not realize it at the time, Eder was admitting that he, Figueroa, Naranjo, SWK itself, and other SWK staff intended to manipulate their federal contracts in such a way that they could maximize their personal financial gain.

95.    As would later become clear, this "master plan" violated the prohibitions against conflicts of interest in SWK's Cooperative Agreement with ORR.

96.    In truth, had Eder or his co-conspirators pursued civil enforcement of their "arrangement" with Dr. A, they risked exposing the entire illicit scheme to collect kickbacks and submit false claims to the federal government.

97.    Eder shared that Dr. Diaz's wife confronted him about the agreement and asked why they should pay him if he was not doing anything. Eder told Garza that Dr. Diaz eventually paid him $30,000 for the Casa Padre contract. As explained in more detail below, eventually SWK replaced Dr. A with Trinity Health Services.

### E.    SWK Solicits Kickbacks from Dr. B.

98.    Even before SWK and Eder involved Dr. A. in their kickback scheme, SWK had solicited kickbacks from another medical provider in the South Texas region.

99.    Dr. B is a dentist in the Rio Grande Valley in Texas. He operates a dental practice in San Benito.

100.    In 2014 or 2015, two men visited Dr. B's dental practice and  told him that they represented Southwest Key Programs. They asked whether Dr. B was interested in "seeing their kids" for dental care. SWK operated two shelters for UCs in the San Benito area, one called Casa Rio Grande, which was capable of housing 160 UCs; and the other called Casa Antigua, capable of housing 201 UCs.

101.    During this meeting with Dr. B, the two SWK representatives told him words to the effect that the deal would be beneficial for all sides because SWK would be sending him a lot of kids and he would be making a lot of money. When Dr. B did not appear to not to pick up on the fact that they were asking him for a kickback, they asked him words to the effect of "What's in it for us?" At that point, Dr. B realized the SWK representatives were soliciting kickbacks from him for treating the UCs. Dr. B. was "upset" and told them to get out of his office. Dr. B did not enter the deal with SWK.

### F.    Figueroa asks Garza to become the Medical Provider at Casa Sunzal, then Casa Quetzal.

102.    On July 26, 2018, Garza  spoke to Figueroa and Naranjo. Later that day, Eder called Garza to tell her that Figueroa and Naranjo had decided to award Garza the medical provider contract at Casa Sunzal. Eder told Garza that SWK would pay her $75 to assess each child, and almost $200 if a child required vaccinations.

103.    No sooner was Garza brought on board to become the medical provider at Casa Sunzal, than those plans were put on hold. Sometime in early August, Figueroa told Garza to also prepare to become the medical provider at Casa Quetzal, a shelter located in North Houston. The medical provider for Casa Quetzal at the time was Jason Urtis, a physician assistant, whom Garza never met.

104.    On August 13, 2018, Garza had a conference call with key SWK staff, including Figueroa, Naranjo, Santiago Inchaurregui ("Inchaurregui"), Aleida Chavez ("Aleida"), and others. At the time, Inchaurregui was the Program Director for Casa Quetzal, and Aleida was the Assistant Program Director. On August 14, 2018, Garza had another conference call with SWK staff. Later that day, Figueroa and Garza entered into a verbal agreement for Garza to become the medical provider for SWK at Casa Quetzal and Casa Sunzal.

105.    On August 17, 2018, Garza sent a text message to Eder to relay the news that she was officially onboard as a medical provider for SWK. Eder responded by asking Garza to call Luis de la Garza, an attorney based in Brownsville, Texas. A few minutes later, Garza got back to Eder and informed him that she had spoken with the attorney, and that they would need to chat later.

106.    In August 2018, Garza began exchanging emails with Eder and Ibarra in preparation for becoming the medical provider at Casa Quetzal and Casa Sunzal. The communications also included Annelise Hernandez and Alyssa Hernandez, both of whom are Eder's sisters. Eder, Annelise, and Ibarra used accounts from ProtonMail. Eder later told Garza that he used ProtonMail because it was based in Switzerland, which would make it difficult for authorities to obtain the accounts. Annelise and Eder controlled the casasunzal38@protonmail.com account.

107. On August 15, 2018, Garza sent Eder and Annelise a W9 for Nutrix Medical Worx PLLC.

108. On August 19, 2018, the Hernandez family sent an email to Garza, which was also addressed to Eder and Alyssa Hernandez. The email contained a to-do list and supplied suggestions necessary to get up and running at Casa Quetzal and Casa Sunzal. It also showed that Eder had insider information that the opening for Casa Sunzal was delayed.

109. On August 21, 2018, the Hernandez family (casasunzal38@protonmail.com) sent an email to Garza with the subject "PLAN OF ACTION STARTED."

### G.  Eder solicits a kickback from Garza for the SWK Medical Provider contracts at Casa Quetzal and Casa Sunzal

110. On August 21, 2018, Eder called Garza to formalize their business arrangement. Previously, Eder asked Garza to make him part owner of her business, Nutrix, but Garza flatly rejected Eder's demand. This time, Eder came forward with a different proposal. Eder told Garza that he had a management company and that through it he could manage all administrative services for Nutrix, such as hiring employees for Nutrix, paying taxes and bills, and functioning as accounts receivable. Eder proposed that his sister, Alyssa, be put in charge of billing. Eder told Garza that through this business arrangement, his management company would receive 45% of billings collected and that his sister would receive 5% as compensation for billing services.

111. Garza knew what Eder was asking for was wrong: a kickback for getting her the medical provider contract for Casa Quetzal and Casa Sunzal. Garza pushed back against it and asked Eder whether such an arrangement was appropriate. Garza preferred to keep everything legal and asked for other ways to appropriately compensate him. Eder told Garza that such a deal was proper. Garza knew this was not the case and was not willing to be part of any kickback deal.

However, to appease Eder for the time being and to keep him at bay, Garza "agreed" to provide

him with 45% of the billings.

112.    On August 22, 2018, Eder sent an email to attorneys Luis de la Garza and Alejandro

"Alex" Mora, where he shared with them the conversation he had with Garza.

> **From:** migdaleder [mailto:migdaleder@protonmail.com]
> **Sent:** Wednesday, August 22, 2018 7:24 AM
> **To:** alejandro mora <alejandro@morahealthcarelaw.com>; luis.delagarza_lawyer@yahoo.com
> **Subject:** Nutrix
>
> Dear counsels, I had a good conversation last night with nutrix medical worx pllc owner Jana GARZA APN,FNP. I advised her that the fee structure was not necessary and we could do the % structure. I guess she had already thought that we couldn't do it. She came back at a 55 - 45 in her favor. I said yes and we will not go down more than that. She also to get on a conference call at 1:30 pm with ALEX to confirm our plan. I will be sending Alex the draft that Luis prepared. So we are at 55-45.
>
> Alex can we please call her at 1:30 just give her a simple point that we can do it , so we can close her off and move fwd.
>
> Thanks
>
> Sent from ProtonMail Mobile

113.    On August 23, 2018, Eder sent Garza four agreements,[8] including one called an

"Administrative Services Agreement". This Agreement was to be entered into between Garza's

company, Nutrix Medical Worx, PLLC, and Eder's company, Migdal Eder, LLC. However, it was

an illegal kickback deal masquerading as a legitimate business deal, as it required Nutrix to pay

Eder's company 45% of all gross collections received from the Federal payor:

---

[8] The three other agreements were (1) a Collaborative Practice Agreement; (2) a HIPAA Business Associate Agreement; and (3) a Medical Director Agreement.

> 4. **ADMINISTRATOR FEES:** In consideration of the administrative and support services rendered by Administrator to Medical Provider hereunder, Medical Provider shall pay 45% of gross collections from third party payor.
>   - 4.1 **FREQUENCY OF PAYMENT TO ADMINISTRATOR:** Medical Provider shall pay Administrator on a monthly basis.
>   - 4.2 **EXPENSES OF ADMINISTRATOR:** Administrator shall borne the cost of all billing software, all travel related expenses that are not related to Locum Healthcare Practitioner duties, and costs for any third-party contractors that assist Administrator in rendering administrative and support services.

114.    The agreement further provided that "[Migdal Eder] shall prepare, process and submit claims to third party government payors." Thus, the nexus between the payments of Federal health care dollars and the kickbacks to Eder and his company was direct.

115.    The terms Eder demanded in the kickback agreement were exorbitant. First, Garza estimates that her current billing costs range anywhere from four to seven percent of collections. Garza's actual billing costs tracks the United States' average cost for medical billing services. Second, the services for certifications and program enrollment that Eder provided were a one-time service to obtain two items: CLIA Certificate of Waiver and enrollment into the Texas Vaccines for Children Program. Third, Eder ultimately only made one hire for Nutrix, dispelling any notion that Eder was going to provide ongoing and long-term staffing services. Therefore, the fee that Eder sought to extract from Garza and Nutrix was astronomical in comparison to the fair market value of the services that he supposedly would be providing to them. Garza never signed the kickback agreement.

116.    On September 24, 2018, Figueroa emailed Garza to ask her if she would have the vaccines on hand to start providing services at Casa Quetzal on October 1, 2018. Garza informed Figueroa that she would not be ready, as she had only submitted an order the previous week and was still waiting on her pin number, an identification number that is required to order vaccines. Garza told Figueroa she expected to have the vaccines on hand the first few days of the month.

This marked the first time that anyone at SWK informed Garza that she needed to be ready to start on October 1, 2018.

### H. Garza rejects Eder's kickback agreement and informs Figueroa and Naranjo about it.

117.    Throughout this time, Eder's kickback arrangement continued to loom over Garza, who was experiencing great stress and sleepless nights over it. On September 28, 2018, Garza sent a  message to Naranjo, wherein she asked him if she needed to sign the deal demanded by Eder to get the SWK contract:



118.    Garza told Naranjo that she was willing to become a medical provider for SWK, but only if it was done in a legitimate manner. Garza also sent Eder a message stating she wanted no part of the kickback deal and that she did not want to keep it secret from Naranjo and Figueroa.

119.    Garza then spoke to Naranjo and Figueroa. Both claimed they had no idea about Eder's kickback agreement. Naranjo also told Garza that she did not need to sign the agreement or work with Eder, and that Eder had only provided her name as a potential provider in Houston.

120.    On October 2, 2018, Figueroa called Garza to express disappointment that Garza was not ready to see children at Casa Quetzal on October 1.

121.    Later that morning, Garza emailed Figueroa to explain the sequence of events leading to her inability to begin on October 1. Garza explained to Figueroa that it was not until August 14, 2018 that they made a verbal agreement to work together. Garza further told Figueroa that she was never given a start date, and that it was not until September 24, 2018 that Figueroa told her that she would need to be ready on October 1. Garza further informed Figueroa that she was at the mercy of waiting until the proper authorities approved the necessary certifications for her to order vaccines for the shelter. Garza concluded by asking Figueroa if she wanted her to continue as medical provider, and if so, Garza anticipated being ready by October 15, 2018.

122.    Figueroa told Garza to meet with Daniel De La Cruz so that he could review all the requirements and provide her with training to utilize the company's Electronic Medical Records (EMR) system. During this time, De La Cruz was the Medical Service Coordinator for SWK and concurrently the Lead Medical Coordinator for Casa Padre, SWK's largest shelter. On October 3, 2019, Garza met De La Cruz at Casa Quetzal. At one point during the meeting, Garza told De La Cruz about a comment that Eder made to her about Dr. A, the medical provider at Casa Padre. De La Cruz told Garza that  he (Eder) and Naranjo were the ones in charge of everything.

123.    On October 16, 2018, Eder sent a text message to Garza to inquire about the progress with Casa Quetzal. Garza informed him that she had not started providing services yet.

124.    The Hernandez family was not content with how the situation unfolded. The three members of the Hernandez family (Eder, Annelise, and Alyssa), Luis Ibarra, and Garza were in a WhatsApp group chat, which was established as a work chat for Casa Quetzal and Casa Sunzal. On October 17, 2018, Garza sent a message to the group to provide an update. Alyssa became upset that Garza did not want to provide the Hernandez family with a kickback, and lambasted Garza for wanting to keep all the patients and profits. Alyssa knew about the illicit arrangement that Eder had sought from Garza and anticipated that she was set to profit from it.

**I.    Garza begins providing medical services at Casa Quetzal and learns that she was only meant to serve as a temporary provider.**

125.    On Friday, November 16, 2018, Garza began providing medical services at Casa Quetzal. Unbeknownst to Garza, the only reason that Figueroa and Naranjo stuck with Garza (notwithstanding Garza's refusal "to pay to play") was because she was only meant to serve as a temporary placeholder. Around July 2019, Aleida Chavez, who was the Assistant Program Director of Casa Quetzal, shared with Garza a conversation she (Aleida) had with Figueroa. This conversation took place on August 13, 2018, immediately after a conference call where Aleida met Garza for the first time. The conference call was attended by Figueroa, Inchaurregui, Aleida, and Garza.

126.    According to Aleida, after the conference call ended, Figueroa told Aleida that Garza was a pilot project, meaning she was only meant to serve as a temporary provider for Casa Quetzal and Casa Sunzal. Figueroa further told Aleida to be on the lookout for Garza.

127.    Sometime in mid to late 2018, Garza met Naranjo and De La Cruz for dinner. Naranjo told Garza that he was planning on taking the board exam (nurse practitioner exam) after finishing school and that he was planning on working with Eder once he graduated.

**J.    Casa Sunzal fails to open as scheduled on October 28, 2018.**

128.    SWK's original agreement with ORR required it to open Casa Sunzal by October 28, 2018.[9] However, when the media broke the news on June 15, 2018, that SWK would be opening a shelter for young children at 419 Emancipation, the site became subject of various protests. According to the news, permitting issues caused the shelter's opening to be delayed and on September 14, 2018, SWK sued the City of Houston.[10] The shelter finally opened on March 16, 2019, with a key change: SWK decided to only house 16- and 17-year-olds.[11]

### K.    Naranjo creates a plan to divide the Houston region to steer shelters to business associates.

129.    In early 2019, Naranjo called Garza to tell her that he was going to "divide the Houston region." Naranjo told Garza she would be keeping Casa Quetzal, and he would also give her the Casa Mesa and Casa Reliant shelters. Naranjo said that to be fair, he was taking Casa Sunzal from her and giving it to Dr. Abdur Rauf. Naranjo further told Garza that he was also giving Casa Montezuma and Casa Conroe to Dr. Rauf.

130.    Naranjo's division of the market plan violated the conflict-of-interest prohibitions in the Cooperative Agreement between ORR and SWK, which, among other things, precluded Naranjo from using his position as a SWK insider for personal financial benefit.

131.    Naranjo's takeover plan, however, ran into obstacles due to Dr. Rauf's incompetence.[12] During this time, Figueroa began to share with Garza the problems she was having with transitioning the shelters to Dr. Rauf. The main point of contention was that Dr. Rauf was

---

[9] Elizabeth Trovall, *Southwest Key Sues City of Houston Over New Shelter for Migrant Children*, Hous. Pub. Media (Dec. 5, 2018 4:48PM),
https://www.houstonpublicmedia.org/articles/news/politics/immigration/2018/09/17/304366/southwest-key-sues-city-of-houston-over-new-shelter-for-migrant-children/.
[10] *Id.*
[11] *Id.*
[12] As later explained, Figueroa and Naranjo's plan eventually came to fruition in July 2022.

having extremely serious issues ordering vaccines for Casa Sunzal, Casa Montezuma, and Casa Conroe. Garza told Figueroa that she could recommend another medical provider to take over the shelters where Dr. Rauf was unsuccessful. Figueroa responded by telling Garza, "No, that's not how this works." Garza took this to mean that SWK would only consider providers who were "insiders" for the medical service contracts at SWK-controlled shelters; "outsiders" (other than Garza whom they needed to keep operations afloat on a temporary basis due to Garza's manifest competence) need not apply.

      **L.**      **Casa Sunzal opens over five months late in March 2019; Dr. Rauf is not ready to see children.**

132. On Monday, March 18, 2019, when Casa Sunzal finally opened, Dr. Rauf was not ready to provide medical services that day. To solve this major problem, Figueroa asked Garza if she could send Garza's medical team to Casa Sunzal to provide assessments and medical services in his place, to which Garza agreed.

133. The day before, on March 17, 2018, Rosalia Ortiz, Medical Service Coordinator for SWK, sent Garza a list of about 40 children that Garza would need to see at Casa Sunzal on opening day. The next day, Garza was brought in again to see another 40 children. All the children that Garza saw were 16 or 17 years of age. Garza had to work past midnight to complete the initial medical exams for all the children.

134. On March 21, 2019, Naranjo thanked Garza for helping to see children from Casa Sunzal at Casa Quetzal "in the interim basis". Naranjo then formally offered her Casa Mesa and Casa Reliant.

135. Garza immediately set out to prepare for Casa Mesa and Casa Reliant, and on March 27, 2019, she toured both shelters. Garza informed Figueroa that it would take up to six weeks to obtain a CLIA Waiver and to get the TVFC pin numbers reassigned to her. Garza said

that in the interim, she could accommodate children from the two shelters at Casa Quetzal. Figueroa thanked Garza for "temporarily helping" SWK by taking care of Casa Sunzal's minors.

136.    Nonetheless, Dr. Rauf's problems persisted. Figueroa sought out Garza for more help and asked her if she would be willing to provide medical services at Casa Sunzal, Casa Montezuma, and Casa Conroe on an extended temporary basis. Garza told Figueroa that she would be unable to do that since it would require her to hire additional staff and medical assistants. Garza explained to Figueroa that if the contracts were transitioned to her, then she would be able to make that leap.

137.    Figueroa then attempted to bring in Dr. Juan Garcia to replace Dr. Rauf as the medical provider. Dr.  Garcia was one of Eder's former employers. This plan also fell apart because Figueroa and Eder could not find a mid-level provider to work under Dr. Garcia. Dr. Garcia would later become and is currently the medical supervisor for Naranjo and Eder.

**M.    SWK begrudgingly allocates medical services at all Houston shelters by default to Garza**

138.    To work around Dr. Rauf's issues, in March and April 2019, SWK was forced to transport children who needed medical evaluations from Casa Sunzal, Casa Montezuma, and Casa Conroe to Casa Quetzal, where Garza was the designated medical provider. This led to overcrowding at Casa Quetzal, as it was already absorbing the children from Casa Mesa and Casa Reliant. Drs. Rauf and Garcia were having such difficulties placing vaccine orders that the CDC threatened to revoke SWK's vaccine accounts.

139.    On April 8, 2019, Garza started providing medical services at Casa Reliant.[13] Dr. Rauf finally began seeing patients at Casa Montezuma that day. But by that point, it was too late.

---

[13] Casa Reliant is also referred to as Casa Houston.

Figueroa could not risk losing SWK's vaccine accounts at Casa Sunzal and the other shelters. On April 11, 2019, Figueroa told Garza that she would be moving forward with transitioning the entire Houston region to her, including Casa Sunzal and Casa Conroe.

140.    Garza did not immediately respond, as she was too busy trying to fix the disastrous mess that Dr. Rauf had created. Casa Sunzal was so behind, that on April 17, 2019, Garza informed Figueroa that the shelter would not be ready to run independently until mid-May. This was in spite of the fact that Casa Sunzal's opening was delayed by almost five months (from October 2018 to March 19, 2019), and therefore had the benefit of almost half a year of extra preparation.

141.    On April 26, 2019, Garza went to Casa Montezuma to begin preparing to take over that shelter.

142.    On May 28, 2019, Figueroa emailed Garza to let her know that she wanted to meet on June 6, 2019, to execute the contracts for all the Houston shelters. This came as a relief to Garza because between November 16, 2018, and June 5, 2019—a period spanning almost seven months—she worked for SWK under a verbal handshake agreement.

143.    On June 6, 2019, Garza officially took over all of SWK's Houston shelters: Quetzal, Sunzal, Montezuma, Conroe, Mesa, and Reliant. Garza executed a one-year contract for each one, which officially began June 6, 2019, and expired on June 5, 2020.

144.    Despite the obstacles, in a few months, Garza was able to demonstrate to SWK leadership that she could provide effective medical services in extremely difficult circumstances. She was also able to timely and effectively scale her company to provide medical services at more shelters. Garza thought that competence had won the day.

### N.    Naranjo becomes a licensed nurse practitioner and immediately takes over the nation's largest shelter, Casa Padre, in May 2019.

145.     In December 2018, Naranjo graduated from Walden University and obtained a Master of Science in Nursing. On February 22, 2019, Naranjo obtained his APRN-CNP license in Texas.

146.     On March 28, 2019, Naranjo incorporated Trinity Health Services PLLC.

147.     At this time, SWK's Vice President of Immigrant Children's Services was Geraldo Rivera.[14] Rivera's job title at the time indicated that he was Figueroa's direct supervisor. Rivera is also married to Figueroa, a fact that Figueroa tried to hide. Garza learned about Figueroa's marriage to Rivera when she began working for SWK. When Garza asked her about it, Figueroa denied it.

148.     In April or May 2019, Naranjo left SWK. Around May 2019, SWK awarded Naranjo, through Trinity Health Services PLLC, the medical provider contract at Casa Padre. Figueroa sent a termination letter to Dr. A.

149.     Case Padre is not only SWK's largest shelter, but it is the largest shelter in the United States and is capable of housing over 1,400 children. When viewed through the lens of profit, Casa Padre is the crown jewel, and it is SWK's most lucrative medical provider contract. In a competitive market, Trinity Health Service's takeover would represent quite a feat for an unproven company that had been in existence for only two months.

150.     The reality is that Trinity Health Services obtained the Casa Padre contract due to Naranjo's close personal and professional ties to then-SWK management.  Defendant Figueroa oversaw all medical provider contracts. Figueroa, in turn, is married to Geraldo Rivera, who at the time was not only her boss and husband—but also the Vice President over all SKW shelters and its medical department. Medical licensing records show that on March 25, 2019, while Naranjo

---

[14] Geraldo Rivera also goes by Geraldo Gabriel Rivera and Gerald Rivera.

was still working with SWK, Naranjo retained Dr. Garcia as his supervising physician (termed "prescriptive delegation" under Texas law):

DIEGO NARANJO
**APN License Number:** AP140750
**Begin Date:** 03/25/2019
**Prescriptive Delegation:** YES
**Hours Delegated:** 10
**Dangerous Drugs:** YES
**Controlled Substances:** YES
**Delegation Location Type:** Primary Practice Site
**Delegation Address:**
101 E Expressway 83 #170
Mcallen TX 78501

151.    On the same date Eder also retained Dr. Garcia as his supervising physician. Both had delegation addresses belonging to a Valley Med Urgent Care office. Ortiz later told Garza that she was sitting next to Naranjo at a SWK banquet. At the banquet, Hector Zuniga, the Associate Vice President of the South Texas Region, went to Naranjo and told him, "Everyone knows you are going to be the next provider at Casa Padre."

152.    Around this time, SWK hired Alyssa Hernandez, Eder Hernandez's sister. Alyssa was initially brought on board to serve as a nurse consultant for the South Texas region and was based out of Case El Presidente in Brownsville.

## O.    Figueroa and De La Cruz move forward with plans to take over Arizona shelters.

153.    On October 24, 2019, Garza had dinner with Figueroa at B&B Butchers in Houston. Figueroa shared that SWK was planning to bid the medical provider contracts for its shelters in Phoenix. Figueroa asked Garza, "Why don't you apply for it?". Garza responded by telling Figueroa that it was too far.

154.    On December 6, 2019, Figueroa left SWK. Figueroa represents on her LinkedIn profile that on that same month, she began working at SaluTeam, LLC as the Chief Medical Officer. State records show that Figueroa incorporated the company on November 8, 2018, and listed her address as 32 August Drive, Laguna Vista, Texas, 78578. In December 2019, Figueroa and Rivera jointly purchased a property at this address.

155.    On December 19, 2019, Garza hosted an event for Nutrix employees and SWK shelter medical staff at the Main Event in Humble. De La Cruz and Kimberlynn Luke, (who was the Director of Nursing for Houston, San Antonio, and El Paso) both attended the event.

156.    During the conference, De La Cruz bragged to Garza that he had taken a shelter away from a doctor in Phoenix. Garza asked De La Cruz to whom he gave the shelter, but De La Cruz would only share that he gave it to another medical provider. De La Cruz followed that by telling Garza "I'll be damned if I don't take all the shelters. By June, I will take them all". Then, in Spanish, he said "Se los voy a quitar. Si Geraldo queda como VP, vamos a quedar bien parados!".[15] This was a very memorable line, both because of the manner that De La Cruz expressed himself and because of the euphemism he used to proclaim that things would go well for them once Geraldo Rivera became Vice President. It also demonstrated the power that De La Cruz now wielded.

### P.    Divine Family Care becomes SWK medical provider in Arizona.

157.    Records on file with the Texas Secretary of State show that Divine Family Care, PLLC is owned by Naranjo, who formed the company on October 30, 2019. During this time, Naranjo and Eder's offices were located inside Valley Med Urgent Care, which is owned by Dr.

---

[15] This translates to, "I am going to take them (the shelters). If Geraldo ascends to VP, we are going to do very well."

Rauf. An October 2019 Google Street view photo shows that Valley Med Urgent Care's sign prominently features the names of Eder Hernandez and Diego Naranjo:



158.    Records further show that on November 25, 2019, Eder obtained a physician assistant license in Arizona through Divine Family Care, showing that Naranjo and Eder were in business together.

159.    Between December 2019 and February 2020, SWK awarded the medical provider contracts for Casa Fortaleza (Phoenix) and Casa Amanecer (Youngtown) in Arizona to Divine Family Care. On February 19, 2020, De La Cruz sent an email showing that Divine Family Care, which Naranjo owned, was a SWK provider.

160.    Around this time, Garza had dinner with Nelson Lozano, then SWK Regional Director of Nursing for the South Texas Region. Garza told Lozano that De La Cruz had bragged that he had given the Arizona shelters to another medical provider. Lozano replied, "Nombre, Fanny gave the [Arizona] shelters to Diego and Eder."[16] Lozano further told Garza that Figueroa

---

[16] While "nombre" translates into "name" in Spanish, in this context, it has the meaning of an emphatic no.

awarded Naranjo the Casa Padre shelter, along with two other shelters in South Texas (McAllen). This conversation confirmed that SWK's bidding process for the Casa Padre and Arizona shelters was a sham, and that contracting decisions were based upon personal relationships and conflicts of interest and were not based on merit.

### Q.    The Coronavirus arrives in the United States and Texas.

161.    In January 2020, Daniel De La Cruz appeared to be settling in as Interim Director of Medical Services for SWK. De Le Cruz responded to emergencies, kept Garza informed of issues that arose at other SWK shelters, and assisted Garza with resolving problems.

162.    Then the pandemic arrived. On January 20, 2020, the CDC reported the first United States case of COVID-19. On March 11, 2020, the media reported the first case in Texas.[17]

163.    On or about February 17, 2020, an email showed that Alyssa had been promoted to Medical Lead Nurse for the South Texas Region.

### R.    Naranjo and Figueroa obtain a COVID consulting contract with SWK.

164.    During March 2020, ORR continuously sent updated instructions to SWK on how to handle intakes to minimize COVID-19 risks. On March 19, 2020, at 3:18 PM, ORR sent SWK "additional field guidance to all programs to take proactive measures to limit the spread of COVID-19." At 4:18 PM, Luke sent the guidance to all SWK providers, including Garza.

165.    In two to three hours, Garza, using all the guidance she had received, proactively created an Admissions Process on how to handle intakes at the shelters to minimize COVID-19 risks. Later that evening, Garza shared this guidance with SWK staff "to help minimize risk and

---

[17] https://www.texastribune.org/2020/03/11/houston-rodeo-canceled-coronavirus-economic-impact-sxsw-austin-fiesta/

identify potential carriers of COVID-19 prior to entering the facility and before they have their [Initial Medical Exams]."

166.    On or before March 24, 2020, Garza received a call from Figueroa. She heard about the COVID guidelines Garza created and asked Garza to send them to uchc@phwd.org. Garza sent the guidelines to the email address provided by Figueroa, and subsequently received a thank you from a person who did not provide a name except UC Health Consultants:

167.    The next day, on March 25, 2020, Garza received an email from UC Health Consultants, wherein an unspecified individual informed all SWK medical providers, "I have attached our intake policy that is effective immediately."

168.    This email is notable for many reasons. First, the policy document's metadata shows that it was authored by Diego Naranjo and Fanny Figueroa:



169.    Second, there is no company that is incorporated by the name "UC Health Consultants" in the State of Texas. Third, this consulting company already had the authority to act on behalf of SWK and was utilizing SWK's official policy forms.

170.    SWK's decision to bring in a consulting company that did not have expertise in handling pandemic illnesses was  suspect. Naranjo and Figueroa did not bring anything to the table in terms of medical knowledge that its institutional employees or third-party medical providers did not already possess. For example, on March 27, 2020, Garza sent the SWK staff working at the Houston shelters new protocols for triaging and making health management decisions when faced with a COVID-infected or potentially infected minor.

**S.    Garza signs 2020 renewal contracts for all the Houston shelters.**

171.    Meanwhile, in July 2020, Garza signed one-year renewal contracts for Casa Quetzal, Casa Sunzal, Casa Montezuma, Casa Mesa, and Casa Reliant. Sometime in late 2020, SWK once again promoted Eder's sister, Alyssa Hernandez.

172.    On January 27, 2021, SWK hired a replacement for Figueroa, who had departed on December 6, 2019. Tamisha Piper, a physician assistant, became the National Director of Medical Services for SWK, but with one notable change. Instead of being based in Austin, SWK's headquarters, the position was now based in Houston.[18]

173.    In February 2021, about fourteen months after Figueroa's ostensible departure from SWK, Figueroa provided training to Tamisha Piper for her new role over Zoom.

174.    SWK permitted Naranjo to use an official SWK email account, which was a privilege no other medical provider possessed. Naranjo's use of a Southwest Key email account

---

[18] When Figueroa was the Director of Medical Services, the position was headquartered in Austin, Texas.

suggested to the public that he was still a representative of SWK. At the same time, Naranjo was signing documents as a representative of UC Health Consultants.

175. In the meantime, SWK had retained an individual named Lisdel Corderi Guerrero ("Lisdel") as the Interim Lead Medical Coordinator at Caza Quetzal.

### T. Naranjo becomes medical provider at SWK's Midland influx shelter.

176. In March 2021, SWK opened an influx shelter in Midland, Texas.[19] "An influx care facility is a type of care provider facility that opens temporarily to provide emergency shelter and services for UCs during an influx or emergency. Influx care facilities are not secure facilities."[20] That month, Lisdel traveled to the Midland influx shelter. When he returned, Lisdel told Garza that he saw Naranjo, Eder, and De La Cruz at the influx shelter and told Garza that SWK had hired them as medical coordinators. When a child was transferred from that influx shelter to Sunzal, Garza was later able to determine from the accompanying records that SWK had contracted Divine as the medical provider and that the child was under the care of Dr. Garcia, Naranjo, and Eder. Geraldo Rivera personally oversaw the influx shelter's operation. During that time, he made personnel decisions about who from SWK would be transferred to and out of the facility. For example, he removed an associate program director he brought from Houston and told him "Everyone is replaceable."

### U. Garza signs 2021 renewal contracts for the Houston region.

---

[19] Joshua Skinner and Kate Porter, *Midland, Texas leaders blindsided by arrival of migrants at holding facility*, KCRG (Mar. 16, 2021), https://www.kcrg.com/2021/03/16/midland-texas-leaders-blindsided-by-arrival-of-migrants-at-holding-facility/

[20] *ORR Unaccompanied Children Program Policy Guide: Section 7*, Office of Refugee Resettlement (last updated Aug. 14, 2023) https://www.acf.hhs.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-7.

177.    In May 2021, Lisdel sent Garza the renewal contracts for the five shelters in Houston: Casa Quetzal, Casa Sunzal, Casa Montezuma, Casa Mesa, and Casa Reliant. Lisdel was now the Regional Director of Nursing for Houston, San Antonio, and El Paso. Geraldo Rivera executed the contracts on behalf of SWK.

### V.    SWK creates sham bidding process for the shelters and awards Naranjo the three largest Houston shelters.

178.    On October 6, 2021, Gary Wilder, the procurement specialist for SWK, emailed Garza to inform her that SWK was instituting a bidding process for the medical provider contracts for 2022 through which she would need to apply to be considered as medical provider for any shelter. Garza found this new bidding process to be odd for several reasons. First, she never went through a bidding process to obtain the contracts for the shelters in 2018, 2019, 2020 and 2021. Figueroa and Naranjo single-handedly awarded her the contracts, first verbally, then through a formal contract. Second, Garza called Dr. Hussain and Dr. Roncallo, who informed her that they were not asked to submit a proposal. Dr. Hussain was the medical provider for some shelters in South Texas and Dr. Roncallo was the medical provider for two shelters in El Paso. Third, in June 2020, SWK informed Garza that medical provider contracts did not need to undergo a procurement process and did not require the approval from the procurement department.

179.    Garza asked Wilder for a list of shelters where SWK was seeking medical providers utilizing this bidding process. Wilder sent Garza a list that included all five Houston shelters where she was the current medical provider. The list also included eight shelters in South Texas (including Casa Padre and Casa El Presidente, its two largest shelters), four shelters in Central Texas, eight shelters in Arizona (including Casa Fortaleza, its largest shelter in Arizona), and three shelters in California. It appeared that SWK was putting the medical provider role for all its shelters out for bid.

180.     On November 23, 2021, SWK posted the solicitation, RFP – 112321 ("RFP"), to BidNet Direct. The RFP provided that proposals were due by December 17, 2021. On December 13, 2021, SWK issued Addendum 2, which extended the deadline for proposals to January 5, 2022.

181.     On December 13, 2021, Wilder sent an email reminding all current providers to submit a proposal. Wilder followed the reminder by stating that, "Once the solicitation closes, providers who did not submit a proposal (whether currently providing care or not) may be excluded from consideration for ongoing services."

182.     During this time, Garza noticed that the RFP set out a January 2022 contract start date. Garza became suspicious that SWK was trying to terminate her preexisting contracts early, which were effective until June 2022. Garza called Geraldo Rivera, the SWK Vice President, and informed him about this fact with the hope of deterring such action. Garza also asked Rivera whether other existing medical providers were required to submit bids. Rivera feigned ignorance and told Garza that he had nothing to do with the bidding process and that the Director of Procurement was on his back.

183.     On January 3, 2022, Wilder sent out another reminder to current SWK providers, which curiously did not include Trinity Health Services and Divine Family Care.

184.     On January 5, 2022, Garza submitted Nutrix's proposal to SWK, which included "bids" for Casa Quetzal, Casa Sunzal, Casa Montezuma, Casa Mesa, and Casa Reliant.

185.     The RFP provided that SWK was to announce winning bidders in January 2022, but no such announcement was made. In February, Garza asked Wilder if any decisions had been made, and he responded that SWK was still evaluating the proposals. In May, Garza inquired with Wilder again and she received the same response.

186.    On June 15, 2022, Wilder sent Garza two letters: an award letter and a termination letter. In the award letter, SWK notified her that Nutrix was the successful bidder for Casa Mesa and Casa Reliant. In the termination letter, SWK notified her that Nutrix would not be contracted as the medical services provider for Casa Quetzal, Casa Sunzal, or Casa Montezuma:

187.    The termination letter also asked Garza to work with Trinity Health Services to transition the shelters to the company, which would take over on July 18, 2022. SWK had awarded the largest Houston shelters to Naranjo.

188.    At the meeting on June 15, 2022, Wilder stated that the decision on what providers would receive awards was made by Anselmo Villarreal, who was the CEO of SWK.

189.    SWK's bidding process for the shelters, however, was a sham, as evidenced by several facts. The RFP set out an unrealistic and unattainable timeframes wherein, in less than one month, SWK would evaluate the bids, select a winning bidder, negotiate, and finalize contracts with the winning bidder, and then the winning bidder would commence work under the contract. It would be impossible to onboard a new medical provider in such a short time given the numerous federal, state, and municipal registrations and background checks that need to be completed to start providing medical services at a shelter. At the time, obtaining a CAN background check (a child abuse and neglect background check that is required by ORR policy) took more than 90 days to complete.

**W.      SWK awards Naranjo the El Paso region shelters.**

190.    On June 15, 2022, right before Garza's Zoom meeting with Wilder, she called Dr. Roncallo to ask him if he was having a meeting with the SWK procurement department. At the time, Dr. Ruben Roncallo was the medical provider at Casa Franklin in El Paso and Casita del

Valle in Clint, Texas. Dr. Roncallo informed Garza that he was told that he did not have to submit a response to an RFP, and that he only needed to update his fingerprints.

191.    On June 17, 2022, Lisdel informed Garza that SWK terminated its contracts with Dr. Roncallo and awarded the shelters to Naranjo. In addition, Lisdel told Garza that SWK awarded Naranjo a shelter it had recently acquired, Casa Trail House in El Paso. This shelter has a 500-bed capacity.

## X.    SWK awards Naranjo and his companies the medical provider contract at other SWK shelters.

192.    In addition to the shelters in Brownsville (Casa Padre), Phoenix (Casa Fortaleza and Lighthouse), Houston (Casa Sunzal, Quetzal, and Montezuma), and the El Paso region (Casa Trail House, Franklin, and Casita del Valle), SWK has awarded Naranjo the medical provider contracts for shelters in McAllen (Casa Oasis), Weslaco (Casa Sueno) and Youngtown, Arizona (Casa Amanecer). SWK also awarded Naranjo the medical provider contract for its Midland influx shelter. It is also Garza's understanding that Naranjo has been awarded the medical provider contracts for shelters in California.

## Y.    Conclusion

193.    Since at least 2018, SWK has put into a motion a fraudulent scheme to award its largest medical provider contracts to one person: Diego Naranjo. SWK has used Eder Hernandez as a middleman to recruit medical providers, and Eder has been soliciting kickbacks for years.

194.    Thus, SWK has awarded Naranjo (through Trinity Health Services, UC Health Consultants and Divine Family Care) the medical provider contracts at Casa Padre, Fortaleza, Lighthouse, Sunzal, Quetzal, Montezuma, Trail House, Franklin, Casita del Valle, and the Midland influx shelter. SWK has also awarded Naranjo the medical provider contracts of at least three other shelters: Casa Oasis, Casa Sueno, and Casa Amanecer. This scheme is in violation of the Conflicts

of Interest provision found in SWK's Cooperative Agreement with the ORR. As a result of the false and fraudulent scheme described throughout this complaint, each claim that Naranjo and the other Defendants submitted to ORR, through its agent Point Conform Underwriters, for payment of medical services for each shelter is false and fraudulent, and actionable under the False Claims Act.

195.    Defendants SWK and the other named Defendants have penalized Garza for her refusal to participate in their scheme or to engage with them in False Claims Act submissions. Garza is not a former SWK employee and does not have a close personal or familial relationship with the decision makers at SWK or the individuals and companies that are being awarded medical provider contracts. Presently, SWK has restricted Dr. Garza's medical provider contract to a single shelter, Casa Reliant. These reprisals amount to retaliation for her whistleblowing, in violation of 31 U.S.C. § 3730(h).

196.    Through this fraudulent scheme and restraint of trade, SWK, through Eder Hernandez and Valley Med Urgent Care, solicited kickbacks from Dr. A for the Casa Padre medical provider contract and from Garza for the Casa Sunzal and Casa Quetzal medical provider contracts. This scheme is in violation of the Conflicts of Interest provision found in its Cooperative Agreement with the ORR. This scheme is also in violation of the Federal Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b).

197.    Relator Garza alleges that all claims submitted for medical services under these medical provider contracts are false and actionable under the False Claims Act.

## VII.    THE FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 *ET SEQ.* AND THE ANTI-KICKBACK STATUTE (AKS) 42 U.S.C. § 1320A-7B(B)

198.    The False Claims Act, 31 U.S.C. §§ 3729(a)(1) provides in pertinent part:

[A]ny person who—

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G);

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104–410 [1]), plus 3 times the amount of damages which the Government sustains because of the act of that person.

199. The so-called "Anti-Kickback Statute" or "AKS" supplements the FCA by prohibiting the payment, receipt, or solicitation of kickbacks involving federal health care programs. The statute is codified at 42 U.S.C. § 1320a–7b, with the full title of "Criminal penalties for acts involving Federal health care programs."

200. "Federal health care program" is defined in subsection (f) of the statute as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government…."

201. The program covering UCs in ORR custody constitutes a "Federal health care program" because it is a plan or program that provides health benefits to the UCs and is funded directly by the federal government through HHS and its ORR component.

202. The AKS prohibits knowingly and willfully soliciting, receiving, offering, or paying any remuneration (including any kickback, bribe, or rebate) to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a federal health care program. Thus, for example, when Eder Hernandez solicited and received payments from Dr. A to refer the UCs housed at Casa Padre to Dr. A for medical treatment which was paid for by ORR,

Eder violated 42 U.S.C. § 1320a-7b(b)(1)(A). Similarly, violations occurred when Eder and his sister, Alyssa, solicited payments from Dr. Garza, and when two representatives of SWK solicited payments from Dr. B.

203.     42 U.S.C. § 1320a–7b(g) provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of title 31. That chapter includes the False Claims Act, 31 U.S.C. § 3729. In short, this provision defines any claim including items or services resulting from a violation of the AKS as, *ipso facto*, a false claim in violation of the FCA. Thus, each of the claims submitted by doctors or other health care providers participating in the kickback scheme, such as those submitted by Dr. A, were false claims.

## COUNT 1 – PRESENTING FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

204.     Plaintiff restates paragraphs 1-203, as though fully set forth here.

205.     This is an action by Plaintiff Garza against Defendants Southwest Key Programs; Eder Hernandez; Migdal Eder, LLC; Valley Med Urgent Care PLLC; Diego Naranjo; Geraldo Rivera; Fanny Figueroa; and Alyssa Hernandez for the presentation of false and fraudulent claims, and for causing false and fraudulent claims to be presented, involving kickbacks of federal health care dollars in violation of 31 U.S.C. § 3729(a)(1)(a).

206.     At a time not precisely known to Plaintiff, Defendant Eder Hernandez, on behalf of himself and the other Defendants, formed an agreement with Dr. A of Brownsville, TX that Dr. A would pay Eder kickbacks from the funds paid by the federal government to Dr. A for delivering medical services to UCs at Casa Padre. Defendant Eder Hernandez also sought kickbacks from Dr. Garza, on behalf of himself and other Defendants, for SWK medical provider contracts.

207.   The kickback scheme pushed on Garza and implemented with Dr. A was likely employed with other medical providers contracted by SWK.

208.   By virtue of Defendants' actions, the United States has suffered damages in an amount to be determined at trial, and is entitled to recover treble damages, plus a civil monetary penalty for each false or fraudulent claim.

## COUNT 2 – PRESENTING FALSE CLAIMS IN VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)

209.   Plaintiff restates paragraphs 1-203, as though fully set forth here.

210.   This is an action by Plaintiff Garza against Defendants Southwest Key Programs; Diego Naranjo; Divine Family Care, PLLC; Trinity Health Services, PLLC; UC Health Consultants; Eder Hernandez; Valley Med Urgent Care PLLC; Geraldo Rivera, and Fanny Figueroa for the presentment of false and fraudulent claims, and for causing false and fraudulent claims to be presented, in violation of 31 U.S.C. § 3729(a)(1)(A).

211.   Defendant Southwest Key Programs received more than $1 billion in federal funds, through dozens of cooperative agreements with the U.S. Department of Human Services' Office of Refugee Resettlement, to operate numerous influx shelters through Texas, Arizona and California under the Unaccompanied Minors program.   Each of those agreements included a Conflicts of Interest requirement that explicitly prohibited SWK and their staff from "taking advantage of any professional or personal relationship or from exploiting their position to further their personal, . . . financial, or business interests."

212.   Defendant Naranjo is a former high-ranking SWK executive, who served as the organization's Assistant Director of Medical Services, under Defendant Figueroa, the Director of Medical Services.   Figueroa and Naranjo's responsibilities at SWK included selecting the medical providers to operate  each of SWK's residential and influx shelters.

213.    In February 2019, Naranjo became licensed as a nurse practitioner. Subsequently he created Trinity Health Services, PLLC; Divine Family Care, PLLC; and UC Health Consultants. When he departed, SWK allowed him to maintain an SWK email account.

214.    A few months after his departure, SWK began a years-long practice of awarding to Naranjo and his companies the medical provider contracts for the largest and most profitable residential and influx shelters that it operates in the country – beginning with its largest shelter, Casa Padre, in Brownsville.  SWK also awarded Naranjo the medical provider contracts for the following shelters: Fortaleza; Lighthouse; Sunzal; Quetzal; Montezuma; Trail House; Franklin; Casita del Valle; Casa Oasis; Casa Sueno; Casa Amanecer; and the Midland influx shelter. Figueroa awarded the contracts to Naranjo and his companies, and which directly benefited Eder.

215.    The medical services provided to UC under these medical provider contracts are federally funded and the medical providers are reimbursed for their services by HHS/ORR.

216.    Each of these contract awards violates the conflict of interest condition of the respective corresponding cooperative agreements. The Defendants knowingly awarded and accepted the contract awards in violation of the conflict-of-interest condition. Defendants' failure to disclose these violations when applying for ORR funds renders their applications false under the False Claims Act.  In addition, any requests for reimbursement submitted to ORR pursuant to these corrupted cooperative agreements and medical provider contracts are false claims, for FCA purposes.

217.    Defendants' compliance with the conflict of interest requirement is a material condition of payment, as evidenced by HHS's long history of denying healthcare reimbursement claims that are tainted by conflicts of interest and self-dealing. HHS/ORR enforces conflict of

interest requirements and has required repayment of funds used in violation of those requirements.[21]

218.    This concept is further exemplified by the Stark Law, 42 U.S.C. § 1395nn; 42 C.F.R. § 411.353, which prohibits providers from billing the Government for healthcare services that result from an improper referral from a physician who has (or whose immediate family member has) a financial interest in the billing provider. HHS incorporated this same criterion into the ORR's cooperative agreements, indicating its refusal to pay for any such services.

219.    When the Government is fraudulently induced to expend federal funds, the measure of damages under the FCA is the entire amount the Government paid.

220.    By virtue of Defendants' actions, the United States has suffered damages in an amount to be determined at trial, and is entitled to recover treble those damages, plus a civil monetary penalty for each false or fraudulent claim.

### COUNT 3 – CONSPIRACY UNDER 31 U.S.C. § 3729(A)(1)(C)

221.    Plaintiff restates paragraphs 1-203, as though fully set forth here.

222.    This is an action by Plaintiff Garza against Defendants SWK; Eder Hernandez; Alyssa Hernandez; Migdal Eder, LLC; Diego Naranjo; Fanny Figueroa; Trinity Health Services; and Divine Family Health Care for conspiring to submit false and fraudulent claims involving kickbacks of federal health care dollars in violation of 31 U.S.C. § 3729(a)(1)(C).

223.    From 2018 through the present, these Defendants conspired to violate the False Claims Act by pressuring Plaintiff Garza into entering their scheme to pay kickbacks of 45% of

---

[21] A 2020 report published by the Government Accountability Office (*Unaccompanied Children: Actions Needed to Improve Grant Application Reviews and Oversight of Care Facilities*) describes actions taken against several UC shelter providers. One grantee had some of its licenses nearly revoked in 2018 was required to return over $5 million to ORR in July 2019. According to a letter sent by ORR to this grantee, the agency took this action because of issues including financial conflicts of interest by executives at the organization that violated HHS regulations, and this action was unrelated to the grantee's state licensing issues.

the federal health care dollars Garza would be paid for delivering medical care to UCs at Casa Quetzal and Casa Sunzal. Plaintiff refused to join the conspiracy. Defendants successfully implemented their kickback scheme with Dr. A and likely other medical providers. They also conspired to and did engage in conflicts of interest in the award of medical provider contracts.

### COUNT 4 – RETALIATION IN VIOLATION OF 31 U.S.C. § 3730(h)

224.    Plaintiff restates paragraphs 1-203, as though fully set forth here.

225.    This a claim against all Defendants for retaliation against Plaintiff, in violation of 31 U.S.C. § 3730(h).

226.    Plaintiff Garza was a "contractor" within the meaning of 31 U.S.C. § 3730(h)(1). She engaged in protected activities when she (1) reported to Defendants Naranjo and Figueroa and others about the kickback activities of Eder Hernandez on behalf of himself, SWK, Naranjo, and Figueroa, (2) reported to Lisdel Corderi Guerrero, Kimberlynn Luke, and others about the conflicts of interest in awarding medical provider contracts.

227.    Defendants knew of the protected activities.

228.    Because Garza reported kickbacks and conflicts of interest to SWK officials and those that collaborated with them in perpetrating the above-reference fraudulent schemes, Defendants discriminated against Garza by denying her contracts to provide medical services to UCs.

229.    As a result of the unlawful retaliation experienced by Garza, she incurred financial and reputational damage.

### VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff/Relator seeks applicable relief as provided in 31 U.S.C. §3730(h)(2). Plaintiff/Relator respectfully requests that this Court enter a judgment against Defendants and award the following:

(1)     Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendants' conduct in violation of the False Claims Act.

(2)     Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

(3)     The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

(4)     All costs and expenses of this litigation, including attorneys' fees and costs of court;

(5)     All other relief on behalf of Relator or the United States that the Court deems just and proper; and

(6)     Applicable relief allowed under 31 U.S.C. § 3730(h)(2).

## IX.    DEMAND FOR JURY TRIAL

Relator demands a jury trial.

Dated: February 8, 2024                     Respectfully submitted,

Carlos Doroteo
TX Bar No. 24097616
**Milpa Law PLLC**
1415 N Loop W #618
Houston, TX 77008
(p) 832-298-0807
(e) carlos@milpalaw.com

John A. (Jack) Kolar
D.C. Bar No. 292953
*Appearing pro hac vice (Lead Counsel)*
**Government Accountability Project**
1612 K Street NW, Suite 1100
Washington, DC 20006
(p) 202-926-3311
(e) JackK@whistleblower.org

Richard Condit
D.C. Bar No. 417786
Cleveland Lawrence III
D.C. Bar No. 480462
*Appearing pro hac vice*
**Mehri & Skalet, PLLC**
2000 K Street NW, Suite 325
Washington, DC 20006
(p) 202-822-5100
(e) rcondit@findjustice.com
(e) clawrence@findjustice.com

**COUNSEL FOR PLAINTIFF-RELATOR
JANA GARZA**

## CERTIFICATE OF SERVICE

I certify that on February 8, 2024, I caused a true and correct copy of this *First Amended Complaint* to be sent via electronic mail to Merrick Garland, United States Attorney General, at Civilfrauds.quitams@usdoj.gov.

I certify that on February 8, 2024, I caused a true and correct copy of this *First Amended Complaint* to be sent via ECF to Whitney Tharpe, Assistant United States Attorney, Eastern District of Texas, at whitney.tharpe@usdoj.gov.

/s/Carlos Doroteo
Carlos Doroteo

**COUNSEL FOR PLAINTIFF-RELATOR
JANA GARZA**

I