**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* JANA GARZA<br><br>Plaintiff,<br><br>v.<br><br>SOUTHWEST KEY PROGRAMS, INC., *et. al.*,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:25-cv-00305-ADA-SH |

**NARANJO DEFENDANTS' MOTION TO DISMISS**

Defendants Diego Naranjo; Divine Family Care, PLLC; Trinity Health Services, PLLC; and Diego Naranjo d/b/a UC Health Consultants (collectively, "Naranjo Defendants") hereby file this Motion to Dismiss the First Amended Complaint ("Complaint") with Prejudice for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Even if the facts alleged in Relator's Complaint were true (they are not), Relator failed to state a claim on which relief can be granted.

## I. BACKGROUND

Diego Naranjo is a certified Nurse Practitioner who has devoted his life to caring for others, particularly those in his local community in Brownsville, Texas and the surrounding area. Living in a border city, Mr. Naranjo has used his education and resources to care for some of the population's most vulnerable: unaccompanied children apprehended by federal immigration authorities. To care for these children, Mr. Naranjo has worked with Southwest Key Programs ("SWK")—formerly, a leading provider of juvenile immigration services—both before and after becoming a nurse practitioner.

Relator sued Naranjo Defendants and alleges that Mr. Naranjo improperly received contracts with SWK because he previously worked there and had a good relationship with SWK. But that is not fraud. Rather, Relator's lawsuit is a frivolous and vexatious attempt to harass Naranjo Defendants, who were Relator's competitors. Relator's allegations against Naranjo Defendants are as follows:[1]

- In July 2018, Mr. Naranjo was the Assistant Director of Medical Services at SWK. Relator spoke to him and Fanny Figueroa before she received medical provider contracts with SWK. *Id.* at ¶¶ 92 and 102–04.

- In September 2018, Relator asked Mr. Naranjo if she had to partner with Eder Hernandez on the SWK contracts, and Mr. Naranjo told Relator that she did not need to work with Mr. Hernandez. *Id.* at ¶¶ 117–19. Mr. Naranjo told Relator that Mr. Hernandez "had only provided her name as a potential provider in Houston." *Id.* at ¶ 119.

- In "mid to late 2018," Mr. Naranjo told Relator that he was planning on taking the board exam (nurse practitioner exam) after finishing school and that he was planning on working with Mr. Hernandez once he graduated. *Id.* at ¶ 127.

- In "early 2019," Mr. Naranjo told Relator that he was going to "divide the Houston region." Relator would keep one shelter and receive two more, and "to be fair" Mr.

[1] While many of Relator's allegations are false, Naranjo Defendants do not address the falsity of the allegations here because even if taken as true, Relator's factual allegations fail to state a claim. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Naranjo was taking one shelter from Relator and giving it to Dr. Rauf. Dr. Rauf would receive two other shelters. *Id.* at ¶ 129.

- Mr. Naranjo's division of the market plan allegedly violated the conflict-of-interest prohibitions in the Cooperative Agreement between SWK and ORR, which precluded Mr. Naranjo from "using his position as a SWK insider for personal financial benefit." *Id.* at ¶ 130.

- On February 22, 2019, Mr. Naranjo obtained his APRN-CNP license in Texas. *Id.* at ¶ 145.

- On March 18, 2019, Ms. Figueroa asked Relator to take over one of the shelters that previously had been given to Dr. Rauf. *Id.* at ¶ 132.

- On March 21, 2019, Mr. Naranjo "thanked Garza for helping to see children from [the shelter previously given to Dr. Rauf] 'in the interim basis.'" *Id.* at ¶ 134. Mr. Naranjo then officially offered Relator two other SWK shelters. *Id.*

- On March 25, 2019, Mr. Naranjo retained Dr. Garcia as his supervising physician. *Id.* at ¶ 150.

- On March 28, 2019, Mr. Naranjo incorporated Trinity Health Services, PLLC. *Id.* at ¶ 146.

- On April 11, 2019, Ms. Figueroa told Relator that the entire Houston region would be transferred to Relator, including the shelters that had previously been assigned to Dr. Rauf. *Id.* at ¶ 139.

- In April or May 2019, Mr. Naranjo left SWK. *Id.* at ¶ 148.

- Around May 2019, SWK awarded Mr. Naranjo, through Trinity Health Services, PLLC, the medical provider contract at Casa Padre in Brownsville, Texas. *Id.* at ¶¶ 93 and 148–50. Trinity Health Services allegedly obtained the Casa Padre contract due to Mr. Naranjo's "close personal and professional ties" to then-SWK management.

- As of June 6, 2019, Relator officially took over all six SWK Houston-area shelters. *Id.* at ¶ 143.

- On October 3, 2019, Daniel De La Cruz told Relator that Mr. Hernandez and Mr. Naranjo "where the ones in charge of everything." *Id.* at ¶ 122.

- October 30, 2019, Mr. Naranjo created Divine Family Care, PLLC. *Id.* at ¶ 157. During this time, Mr. Naranjo and Mr. Hernandez had offices located inside Valley Med Urgent Care, which is owned by Dr. Rauf. *Id.*

- On November 25, 2019, Mr. Hernandez obtained a physician assistant license in Arizona through Divine Family Care. *Id.* at ¶ 158.

- Between December 2019 and February 2020, SWK awarded medical provider contracts in Arizona to Divine Family Care, PLLC. Around this time, Nelson Lozana told Relator that Ms. Figueroa gave the Arizona shelters to "Diego and Eder" and that Ms. Figueroa awarded Mr. Naranjo the Casa Padre shelter as well as two other shelters in McAllen. *Id.* at ¶¶ 159–60.

- On March 25, 2020, Relator received an email from UC Health Consultants attaching a document containing SWK's intake policy to address COVID-19. *Id.* at ¶ 167–68. The document metadata shows that it was authored by Mr. Naranjo and Ms. Figueroa. *Id.* at ¶ 168. Mr. Naranjo and Ms. Figueroa allegedly "did not bring anything to the table in terms of medical knowledge that [SWK's] institutional employees or third-party medical providers did not already possess." *Id.* at ¶ 170.

- SWK permitted Mr. Naranjo to use an official SWK email account, which was a privilege no other medical provider possessed. *Id.* at ¶ 174. This "suggested to the *public*" that Mr. Naranjo was still a representative of SWK. *Id.* (emphasis added). At the same time, Mr. Naranjo was signing documents as a representative of UC Health Consultants. *Id.*

- In March 2021, Lisdel Guerrero told Relator that SWK had hired Mr. Naranjo, Mr. Hernandez, and Dr. Garcia as medical coordinators at an influx shelter in Midland, Texas. *Id.* at ¶ 176. Relator determined that SWK had contracted with Divine Family Care as the medical provider and that a child transferred from the influx shelter had been under the care of Dr. Garcia, Mr. Naranjo, and Mr. Hernandez. *Id.*

- In October 2021, Gary Wilder, the procurement specialist for SWK, instituted a bidding process for the medical provider contracts for 2022. *Id.* at ¶ 178. Relator found this new bidding process "odd" because, among other things, Ms. Figueroa and Mr. Naranjo had single-handedly awarded Relator contracts. *Id.*

- On December 13, 2021, the deadline for submitting proposals was extended from December 17, 2021, to January 5, 2022. *Id.* at ¶ 180. On January 3, 2022, Mr. Wilder sent a reminder to SWK providers, "which curiously did not include Trinity Health Services and Divine Family Care." *Id.* at ¶ 183.

- On June 15, 2022, Mr. Wilder sent Relator an award letter for two shelters and a termination letter for three shelters. *Id.* at ¶ 186. The termination letter asked Relator to work with Trinity Health Services to transition the shelters to Trinity, which would take over those shelters on July 18, 2022. *Id.* at ¶ 187. SWK awarded the largest Houston shelters to Mr. Naranjo. *Id.*

- On June 17, 2022, Lisdel Guerrero informed Relator that SWK terminated its contracts with Dr. Roncallo and awarded the shelters to Mr. Naranjo as well as another shelter SWK had recently acquired. *Id.* at ¶ 191.

- SWK awarded Mr. Naranjo medical provider contracts for 13 facilities in Texas and Arizona as well as shelters in California. *Id.* at ¶ 192.

Relator makes conclusory allegations that Naranjo Defendants violated the False Claims Act ("FCA") by violating the Anti-Kickback Statute ("AKS") (Counts I and III), violating conflict of interest requirements (Count II), and retaliating against Relator (Count IV). Relator does *not* allege that Naranjo Defendants were unqualified or failed to appropriately provide or bill for services.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a plaintiff's pleading to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

When a claim arises under the FCA, Rule 9(b)'s heightened pleading standard applies. *See U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009). To state an FCA violation, a relator must allege: "(1) a claim to the government to pay out money, (2) that is false or the product of a fraudulent course of conduct, (3) made or carried out with the requisite scienter, and (4) that was material to the government's decision to pay." *United States v. Senseonics Holdings, Inc.*, No. SA-20-CV-00657-FB, 2023 WL 2354915, at *4 (W.D. Tex. Mar. 3, 2023) (cleaned up).

Where kickbacks are alleged under the FCA, the elements of the AKS "must also be pleaded with particularity under Rule 9(b)[.]" *U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 F. App'x 890, 894 (5th Cir. 2013).

Rule 9(b)'s particularity requirement for claims of fraud requires that, "[a]t a minimum . . . a plaintiff [must] set forth the 'who, what, when, where, and how' of the alleged fraud." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997). More precisely, because "false statements or claims for payment presented to the government" are

"among the circumstances constituting fraud" under the FCA, "the complaint must set forth the 'time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby,' in order to satisfy Rule 9(b)." *U.S. ex rel. Foster v. Bristol-Myers Squibb Co.*, 587 F. Supp. 2d 805, 819 (E.D. Tex. 2008) (quoting *U.S. ex rel. Doe v. Dow Chem. Co.*, 343 F.3d 325, 329 (5th Cir. 2003)).

Conclusory allegations "'will not suffice to prevent a motion to dismiss,' and neither will 'unwarranted deductions of fact.'" *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.*, 336 F.3d 375, 379 (5th Cir. 2003) (citation omitted) (cleaned up).

## III. ARGUMENT

Relator's Complaint against Naranjo Defendants should be dismissed with prejudice as each of her claims are legally without merit and factually fail to satisfy the heightened pleading standard under Rule 9(b). Because of the significant flaws in Relator's Complaint, amendment would be futile. The Court should accordingly dismiss Relator's Complaint with prejudice.

### A. Counts I and III should be dismissed because Relator fails to allege a violation of the AKS or that a false claim was submitted as a result of an AKS violation.

Relator's entire theory of FCA liability in Counts I and III relies on vague and conclusory allegations that Naranjo Defendants violated the AKS. *See* 42 U.S.C. § 1320a-7b(b)(1)(A). Count I and III should be dismissed because Relator fails to allege: (1) an AKS violation, or (2) that a single false claim was submitted based on an AKS violation.

Where a relator relies on the AKS as a basis for her FCA allegations (as she does in Counts I and III), she must allege that the defendant: (1) solicited, received, offered, or paid remuneration; (2) in return for referring an individual to a provider for the furnishing or arranging for the furnishing of an item or service; (3) for which payment was or might be made, in whole or in part, under a Federal health care program; and (4) the defendant acted knowingly and willfully when

soliciting, receiving, offering, or paying the remuneration. *See, e.g.*, *United States v. Medoc Health Servs. LLC*, 470 F. Supp. 3d 638, 648 (N.D. Tex. 2020); 42 U.S.C. § 1320a–7b(b)(1)(A). The relator must further allege that a claim resulting from an AKS violation was submitted to the government for payment. *See Nunnally*, 519 F. App'x at 894.

To prove a conspiracy under the False Claims Act (Count III), a relator must allege: (1) "the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the government]; and (2) at least one act performed in furtherance of that agreement." *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 343 (5th Cir. 2008) (cleaned up). Relator fails to allege an AKS violation or that any claim resulting from an AKS violation was submitted to the government.

**i. Relator fails to allege a violation of the AKS.**

Relator fails to allege the key elements of an AKS violation. *First*, Relator fails to allege that any Naranjo Defendant offered, paid, solicited, or received remuneration—or agreed with anyone to do so—in exchange for a referral. *Second*, Relator fails to allege that any claim was submitted to a "federal health care program." *And third*, Relator fails to allege that any Naranjo Defendant acted knowingly and willfully.

a. Naranjo Defendants did not offer, pay, solicit, or receive money—or agreed with anyone to do so—in exchange for a referral.

Relator alleges that Mr. Naranjo violated the AKS (Count 1) and that all Naranjo Defendants conspired to violate the AKS (Count III), but she does not allege a single fact to support that any Naranjo Defendant paid, offered, received, or solicited a kickback—or agreed with anyone to do so. *See* ECF 24 at ¶¶ 78, 93–101, 119, and 206.

*First*, Relator's claims concerning Dr. A and Dr. B do not meet Rule 9(b)'s heightened pleading requirements or even Rule 8(a)(2)'s general pleading standard. While Relator alleges that

Mr. Hernandez "formed an agreement with Dr. A" (ECF 24 at ¶ 206), Relator alleges no facts that provide even a scintilla of support for a claim that Naranjo Defendants even knew about the alleged AKS violations. *See Medoc Health Servs.*, 470 F. Supp. 3d at 648. Relator's allegation is deficient for Mr. Hernandez alone, but the gap is unsurpassable when it comes to Naranjo Defendants who are left without mention whatsoever. *Id.* Relator alleges no "particular details" about the purported agreement between Mr. Hernandez and Dr. A—when the agreement started or ended, if a financial transaction occurred, or the items or services at issue. *See* ECF 24 at ¶¶ 93–97. Nor does relator allege any "particular details" about the alleged effort of two unknown individuals to obtain a kickback from Dr. B "in 2014 or 2015." *Id.* at ¶¶ 99–101. Relator does not allege that Naranjo Defendants were involved in or had knowledge of any alleged conduct related to Dr. A or Dr. B. Thus, Relator's allegations concerning Dr. A and Dr. B fail to state a claim against Naranjo Defendants under Counts I and III.

*And second*, Relator's own Complaint establishes that Naranjo Defendants had no awareness of—much less involvement in—Mr. Hernandez's alleged request for a kickback to Relator. Relator could not be clearer in refuting her own claim against Naranjo Defendants. *According to Relator*, once Mr. Hernandez allegedly requested a kickback, Relator informed Mr. Naranjo, who responded that he:

> *had no idea about Eder's kickback agreement*. Naranjo also told [Relator] that she *did not need to sign the agreement or work with Eder*, and that Eder had only provided her name as a potential provider in Houston.

ECF 24 at ¶ 119 (emphasis added). Relator alleges that after this exchange, Mr. Naranjo informed Relator that SWK was awarding her even more contracts. *See id.* at ¶ 129. Far from alleging that a Naranjo Defendant violated the AKS, Relator's own allegations are that Naranjo Defendants were unaware of and not involved in any alleged kickback scheme.

Relator fails to state a claim against Naranjo Defendants under Counts I and III.

b. No "federal health care program" was involved.

Relator's claims also fail because the AKS is inapplicable here as the Office of Refugee Resettlement ("ORR") does not qualify as a "federal health care program" under the AKS. Under the AKS, Relator must assert that a defendant knowingly and willfully solicited, received, offered, or paid remuneration to induce the referral of a health care service *paid for by a "Federal health care program*." 42 U.S.C. § 1320a-7b(b)(1)(A) (emphasis added); *United States v. Sanjar*, 876 F.3d 725, 746 (5th Cir. 2017). Relator does not and cannot meet this statutory element as a matter of law.

According to Relator, "medical providers" provide medical services to unaccompanied children ("UC") and then submit their claims to the ORR through a third party—Point Comfort Underwriters—that pays the claims "using Federal health care dollars."[2] *See* ECF 24 at ¶¶ 63–69. The question is not whether federal funds were used to pay for health care, but whether funds were paid by a "*federal health care program*." 42 U.S.C. § 1320a-7b(b)(1)(B) (emphasis added). The answer to that relevant question is a resounding no: the ORR is *not* a federal health care program. This conclusion follows from the text of the AKS, the caselaw interpreting it, analogous statutory definitions, regulatory guidance, and the federal source of funding for the ORR.

Beginning with the text, the AKS defines "federal health care program" as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government." 42 U.S.C. § 1320a-7b(f)(1). Rather than providing "health benefits" to UCs, ORR—like the Federal Bureau of

[2] Relator alleges that this was her personal experience. ECF 24 at ¶¶ 63–69. But she does not allege that any Naranjo Defendant submitted any claim to any entity. Nor does Relator allege that any money was paid to any Naranjo Defendant, much less, that any money paid to a Naranjo Defendant was the result of a false claim.

Prisons—simply provides time-limited medical assistance to UCs while they are in ORR's custody. *See* ECF 24 at ¶¶ 42–43. Indeed, Relator makes only a conclusory allegation at the end of the Complaint that the "program covering UCs in ORR custody constitutes a 'Federal health care program' . . .." *Id.* at 201. Other than this conclusory statement, Relator does not allege that the time-limited medical services provided to UC's in ORR custody constitute "health benefits" for purposes of the AKS. Put simply, Relator does not and cannot allege that the ORR is a "federal health care program" as the AKS requires.

Additional statutory authority undermines Relator's attempt to shoehorn the ORR in as a "federal health care program." Specifically, 42 U.S.C. § 14402(d)(1) identifies the federal health care funding programs to include Medicare, Medicaid, the Indian Health Care Improvement Act, Tricare, health services for Peace Corps volunteers, and Medical Services for Federal Prisoners, to name a few. But noticeably absent from this list is the ORR. *See* 42 U.S.C. § 14402(d)(1). As the Eleventh Circuit held, the fact that a program is not designated in this statute entitled "Federal health care funding programs" is telling. *See United States v. Ruan*, 966 F.3d 1101, 1144–45 (11th Cir. 2020) (noting the failure of "42 U.S.C. § 14402(d), the statute listing Federal health care funding programs, like Medicare and Medicaid," to list a federal insurance plan, supports the conclusion that the insurance plan was not a "federal health care program") (cleaned up).

Moreover, the relevant regulatory authority does not support Relator's sweeping view that the AKS applies to ORR. In 2013, the then-Secretary of the Department of Health & Human Services concluded that the Affordable Care Act ("ACA") does not qualify as a federal health care program, and thus does not fall under the purview of the AKS, even though the ACA itself provides federal funding for medical services. *See United States v. Patel*, No. 19-CR-80181-RAR, 2021 WL 2550477, at *7 (S.D. Fla. June 22, 2021) (discussing the October 30, 2013, letter from HHS

Secretary Kathleen Sebelius to Senator McDermott in which she declared the ACA does not constitute a "federal health care program" as defined under 42 U.S.C. § 1320a–7b(f), after a careful consideration of that definition). The fact that the ACA does not qualify as a "federal health care program" strongly counsels against finding that the ORR qualifies as one.

Finally, ORR's source of federal funding supports that it is not a "federal health care program." The ORR is funded through yearly congressional appropriations, in which the money comes from a general Treasury fund. *See, e.g.*, Further Consolidated Appropriations Act. Pub. L. No. 118-47, 138 Stat. 460, 664–65 (2024). Thus, none of the money that funds the ORR, or the ORR's subsequent grants, is sourced from a federal health care program. *See id*.

Relator fails to allege any nexus linking the ORR to any "federal health care program" under 42 U.S.C. § 1320a-7b(f)(1). Nor can she. The text, structure, and purpose of the AKS demonstrate that the ORR is not a federal health care program. Because Relator fails to allege that services were paid for by a federal health care program, the AKS does not apply, and Relator's claims should be dismissed.

c. Relator does not allege that Naranjo Defendants Acted "knowingly" or "willfully."

The AKS requires that a defendant act both "knowingly" and "willfully." 42 U.S.C 1320a-7b(b). "The word 'knowingly' . . . means that the act was done voluntarily and intentionally, not because of mistake or accident." Fifth Circuit Pattern Jury Instructions, Instruction 1.41 at 65 (2024). "The word 'willfully,' . . . means that the act was committed voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." *Id.* at Instruction 1.43 at 68. "Willfully" requires proof that the defendant acted with knowledge that his or her conduct violated the law. *See Ratzlaf v. United*

*States*, 510 U.S. 135, 136–37 (1994). Relator does not allege that the Naranjo Defendants acted with knowledge that their conduct violated the law.

Relator's conclusory allegations that Mr. Naranjo "intended to manipulate [] federal contracts" and the "schemes revolved around Diego Naranjo" are insufficient as a matter of law. *Compare* ECF 24 at ¶¶ 94 and 2, *with Willard*, 336 F.3d at 384–85 ("As this court has explained, in order to adequately plead scienter, 'a plaintiff must set forth specific facts that support an inference of fraud.'" (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)); *U.S. ex rel. Bennett v. Medtronic, Inc.*, 747 F. Supp. 2d 745, 785 (S.D. Tex. 2010) (dismissing AKS claims because the relator did not identify the "who, what, when, where, and how" in their complaint); *Nunnally*, 519 F. App'x at 893 (same). Like in *Willard*, Relator's conclusory allegation "fails to set forth a factual basis even upon information and belief that provides the particularity required by Rule 9(b)." 336 F.3d at 385. Therefore, Counts I and III should be dismissed.

**ii. Relator also fails to allege the submission of any claim resulting from an AKS violation.**

Relator fails to allege the submission of any claim "*resulting from*" a violation of the AKS as required for FCA liability. *See* 42 U.S.C. § 1320a-7b(g) (emphasis added). In fact, Relator's only allegations regarding claim submission relate to her own claim submission to a third-party claim processor. She does not allege that Naranjo Defendants submitted claims using this or any other process. Moreover, Relator fails to allege either an express or implied false certification of AKS compliance that could provide a basis for a FCA violation. Thus, Relator failed to allege a viable theory of FCA liability based on an AKS violation.

a. Relator failed to allege that any claim was submitted that "resulted from" an AKS violation.

Even if Relator had alleged a violation of the AKS, she failed to allege that a single claim resulting from such violation was submitted. Relator makes the vague and conclusory allegation that Dr. A paid kickbacks to Mr. Hernandez, but she fails to allege that Dr. A submitted a single claim "resulting from" those alleged kickbacks. *See* ECF 24 at ¶¶ 78, 93–98, 206–07, and 223. Next, Relator alleges that Mr. Hernandez solicited a kickback (in the form of asking Relator to hire his management company), but she rejected his request. *See id.* at ¶¶ 110–19, 124, 206–07, and 223. Further, Mr. Hernandez' request occurred *after* SWK awarded Relator the contract. Relator has not and cannot allege any claim *resulted from* the alleged kickback proposal from Mr. Hernandez. *See United States v. Regeneron Pharm., Inc.*, 128 F.4th 324, 336 (1st Cir. 2025) ("We therefore hold that, to demonstrate falsity under the 2010 amendment, the government must show that an illicit kickback was the but-for cause of a submitted claim.").

b. Relator failed to allege that Naranjo Defendants expressly or impliedly false certification of AKS compliance

Furthermore, Relator does not and cannot allege that any claim was submitted as a result of a false certification (either express or implied) that the individual submitting the claim complied with the AKS. *See Universal Health Servs., Inc. v. United States (Escobar)*, 579 U.S. 176, 194 (2016). Relator does not allege the submission of any claim—much less that Naranjo Defendants submitted any claim—that contained an express or implied certification of AKS compliance.

Because Relator (1) fails to allege an AKS violation, and (2) fails to allege the submission of a claim resulting from an AKS violation, both Counts I and III must be dismissed.

**B. Count II should be dismissed because Relator's "conflict of interest" theory fails to state a claim both legally and factually.**

Relator also fails to state a claim both factually and legally under her "conflict of interest" theory. *See* ECF 24 at Count II. Relator's claim is factually without merit because Relator does not allege facts sufficient to establish a conflict of interest. Nor does Relator allege a single claim was submitted in violation of the purported conflict of interest requirements. And even if Relator had adequately alleged these elements, Relator's allegations still fall well-short of *Escobar*'s materiality standard. *See Escobar*, 579 U.S. 176, 194 (2016).

**i. Relator's factual allegations fail to establish a conflict of interest.**

Relator fails to allege any facts that support a conflict of interest between Naranjo Defendants and another party. Relator's insufficient allegations related to Naranjo Defendants fit into two categories: (1) alleged conduct while Mr. Naranjo worked for SWK; and (2) alleged conduct after Mr. Naranjo resigned from SWK.

*Category 1 – During Employment at SWK*: Relator alleges that Mr. Naranjo used his position at SWK to "steer shelters to business associates." ECF 24 at ¶ 129. Relator specifically claims that Mr. Naranjo informed Relator in early 2019 that "he was taking Casa Sunzal from her and giving it to Dr. Abdur Rauf." *Id.* Relator states that Mr. Naranjo also "gave" Dr. Rauf Casa Montezuma and Casa Conroe. *Id.* Relator then alleges that later, starting in October 2019, Mr. Naranjo's company, Divine Family Care, began using office space at Dr. Rauf's clinic, Valley Med Urgent Care. *Id.* at ¶ 157. Relator summarily claims that "Diego worked with Dr. Rauf." *Id.* at ¶ 23.

Relator's own alleged timeline contradicts her conflict-of-interest claim:

- Early 2019: Mr. Naranjo is working for SWK and informs Relator that Dr. Rauf has been awarded Casa Sunzal, Casa Montezuma, and Casa Conroe;
- In "April or May" 2019: Mr. Naranjo left SWK.

- June 6, 2019: Relator takes over Casa Sunzal, Casa Montezuma, and Casa Conroe from Dr. Rauf;
- October 30, 2019: Mr. Naranjo forms Divine Family Care and allegedly begins using office space at Valley Med Urgent Care, allegedly owned by Dr. Rauf.

ECF 24 at ¶¶ 129, 143, and 157. Relator's timeline illustrates that Mr. Naranjo's "connection" to Mr. Rauf—if officing in the same building can even be called that—did not occur until *after* he left SWK and *after* Relator took over Dr. Rauf's shelters. Moreover, the fact that SWK transferred to Relator all shelters previously awarded to Dr. Rauf *within months* of awarding him those contracts evidences that there was no conflict. Indeed, under Relator's own allegations, Dr. Rauf did not have any SWK contracts by the time that Mr. Naranjo began using office space at Valley Med Urgent Care.

Additionally, the lack of specific allegations is once again telling. Relator does not allege why Mr. Naranjo would have wanted to steer business to Dr. Rauf—while he simultaneously informed Relator that she was receiving an equal amount of business (*id.* at ¶ 129)—or how steering business to Dr. Rauf benefited Mr. Naranjo. *But see id.* at ¶ 61 (noting that a conflict of interest could arise if an employee exploits his position *for financial or business interests*). Nor does Relator allege when Mr. Naranjo "worked" with Dr. Rauf, how they worked together, any financial terms between them, or that they had any connection whatsoever during the few months that Dr. Rauf had SWK contracts. Relator's allegations come down to Mr. Naranjo and Dr. Rauf allegedly leasing office space in the same building after Mr. Naranjo left SWK. That is far from sufficient to claim a conflict of interest, particularly under Rule 9(b)'s heightened pleading standard. *See Willard*, 336 F.3d at 379.

*Category 2 – Post-Employment at SWK*: Relator also takes issue with Mr. Naranjo receiving contracts from SWK because Mr. Naranjo "was the former Assistant Director of Medical Services" for SWK. ECF 24 at ¶ 10. Once again, Relator's own factual allegations rebut her legal

claims. Relator received multiple contract awards while Mr. Naranjo was employed by SWK. *Id.* at ¶ 129. For years after Mr. Naranjo resigned, Relator continued to receive contract awards. *Id.* at ¶¶ 171 (2020) and 177 (2021). Relator alleges that *several years after* Mr. Naranjo's departure from SWK, SWK instituted a bidding program through which Trinity Health Services received contracts for three shelters Relator previously operated. *Id.* at ¶ 186.

Once again, Relator does not allege how Mr. Naranjo used his position—from which he resigned—to procure contracts from SWK. Relator does not allege that SWK and Naranjo Defendants had any business or financial connection. Nor does Relator allege that Naranjo Defendants had any personal or familial connections at SWK when they received contracts from SWK. Relator summarily and vaguely claims that the bidding process was a "sham" but provides no details to support this conclusory allegation. *Id.* at ¶ 178. Relator's allegations, based on conjecture, speculation, and conclusory statements, are insufficient under Rule 9(b). *See Willard*, 336 F.3d at 379.

**ii. Relator's allegations cannot satisfy *Escobar*'s materiality standard.**

Even if Relator had pleaded sufficient facts to allege a conflict of interest, those facts do not meet *Escobar*'s materiality standard. 579 U.S. at 194. The FCA "is not 'an all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 672 (2008)) (cleaned up); *see U.S. ex rel. Steury v. Cardinal Health, Inc. (Steury II)*, 735 F.3d 202, 205 (5th Cir. 2013) ("The FCA is not a general 'enforcement device' for federal statutes, regulations, and contract."). Relator does not allege that any defendant submitted a single claim with an "express certification" of compliance with any conflict-of-interest obligation. *See generally* ECF 24 at ¶¶ 209–20. Thus, Relator's Complaint could, at most, be predicated on an "implied certification" theory of liability. Accordingly, Relator's conflict of interest allegations "do not

allege a violation of the False Claims Act unless the allegations additionally satisfy the [] requirements articulated in [*Escobar*].” *United States ex rel. BakerRipley v. Kids U US, Inc.*, No. 23-CV-1124, 2024 WL 3541499, at *6 (S.D. Tex. July 25, 2024).

*Escobar* only recognizes the implied certification theory as a basis for liability where at least “two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant’s failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.” *Escobar*, 579 U.S. at 190. Relator’s allegations fail under this test. First, Relator makes no allegation whatsoever about the contents of any claim (other than her own claims) submitted to the government. *But see Escobar*, 579 U.S. at 194 (holding that Universal Health was representing through its payment codes that it was providing services through licensed staff); *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019) (holding that statutory face-to-face requirements were expressly identified as conditions of payment and thus submitting claims represented compliance with the same). Second, Relator fails to allege materiality. Under *Escobar*, when determining materiality under the False Claims Act, courts should consider whether: “‘(1) the alleged violations are conditions of payment;’ (2) ‘the Government would deny [d]efendants reimbursements payments if it had known of these alleged violations;’ and (3) noncompliance is minor or substantial.” *United States ex rel. Integra Med Analytics, LLC v. Creative Sols. in Healthcare, Inc.*, No. SA-17-CV-1249-XR, 2019 WL 5970283, at *7 (W.D. Tex. Nov. 13, 2019) (quoting *Escobar*, 579 U.S. at 194). “No one factor is dispositive, and the analysis is holistic.” *Id.* (citing *Lemon*, 924 F.3d at 159). Relator’s Complaint fails to allege sufficient facts to establish materiality under *Escobar*.

**a. Condition of Payment.**

The condition of payment inquiry strongly favors Naranjo Defendants. Relator cites no federal statute or regulation that makes conflict-of-interest compliance a condition of payment. *See generally* ECF 24 at ¶¶ 209–20. Instead, Relator claims that "the respective corresponding cooperative agreements" contained conflict-of-interest requirements. ECF 24 at ¶ 216. But Relator does not cite a single clause in those cooperating agreements that conditions payment on compliance with any conflict-of-interest provision. *See id.*; *Willard*, 336 F.3d at 382.

Finally, Relator runs into the Rule 9(b) pleading standard yet again. Relator's conclusory allegations are patently insufficient under Rule 9(b).

**b. Continued Payment.**

Relator likewise fails to allege sufficient facts to raise a "reasonable inference" that the government would "deny payment if it knew about" the alleged conflict of interest. *See Lemon*, 924 F.3d at 162. Relator's claim that the government would not have provided reimbursement is predicated on citation to a single, vague sentence in a Government Accountability Office Report, which states that an ORR grantee *nearly* had its license revoked due to a financial conflict of interest. ECF 24 at ¶ 217 n.21. This lone allegation—based on a third-party report devoid of context—is far from what courts have recognized as sufficient for pleading that the government would have denied payment if it had known of a violation. *Cf. Lemon*, 924 F.3d at 162. Indeed, this reference actually supports the conclusion that the government did *not* refuse to pay based on a conflict of interest, which is "very strong evidence that those requirements are not material." *Escobar*, 579 U.S. at 195. Relator's allegations are insufficient under *Escobar*'s second materiality element.

**c. Minor Noncompliance.**

Relator fails to allege that any alleged noncompliance was more than minor. Relator does not allege any misrepresentations concerning the goods or services provided. The Fifth Circuit has rejected FCA claims in similar circumstances. For example, the Fifth Circuit affirmed the dismissal of claims brought under the FCA where the defendants allegedly submitted claims while misrepresenting the ownership of the hospital, because, "[i]mportantly nothing about the alleged misrepresentation here suggests that *goods or services were falsely certified or improperly provided*." *United States ex rel. Patel v. Cath. Health Initiatives*, 792 F. App'x 296, 301 (5th Cir. 2019) (emphasis added).

And the Fifth Circuit also affirmed the dismissal of a claim under the FCA where the relator alleged that a coordinated care organization committed fraud by employing licensed practical nurses, rather than registered nurses, as care and case managers. *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 241 (5th Cir. 2020). Importantly, once again, Relator makes no allegation that services were improperly provided or billed. *See id.* Therefore, even if Relator had alleged a conflict of interest, such allegation would only rise to the level of minor noncompliance, similar to the claims in *Patel* and *Porter* that were dismissed. *See Patel*, 792 F. App'x at 301; *Porter*, 810 F. App'x at 241.

Relator fails to allege a conflict of interest or that compliance with any conflict-of-interest provisions was material to a government payment decision. Count III must be dismissed.

**C. Count IV should be dismissed because Relator fails to state a claim of retaliation under the False Claims Act both legally and factually.**

Finally, Relator's claim of retaliation against Naranjo Defendants is both legally and factually flawed. *First*, Naranjo Defendants never employed Relator, contracted with her, nor had an agency relationship with her. Thus, they could not retaliate against her as a matter of law. *See*

*U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 324 (5th Cir. 2016) ("Defendants, then, must be those by whom plaintiffs are employed, with whom they contract, or for whom they are agents."); *Thomas v. ITT Educ. Servs., Inc.*, 517 F. App'x 259, 262 (5th Cir. 2013) (holding that a relator must prove an adverse employment action undertaken by her employer).

Second, Relator's own Complaint alleges that, while Mr. Naranjo worked for SWK, she was awarded the entire Houston region and that she was awarded more contracts after she reported Mr. Hernandez's alleged request for a kickback to Mr. Naranjo. ECF 24 at ¶ 139. It was only after nearly three years when SWK instituted a more formal bidding process that Relator lost *some*—but not all—of her contracts. *Id.* at ¶ 187. Relator fails to allege any facts that could give rise to a claim of retaliation against Naranjo Defendants, so Count IV must be dismissed.

### D. Dismissal is warranted because the qui tam provision of the FCA is unconstitutional.

The Complaint should be dismissed because the FCA's qui tam provision violates Article II's Appointments and Take Care Clauses. U.S. CONST., art. II. It is well-settled that the Appointments Clause empowers the President alone to appoint principal "Officers." *See, e.g.*, *United States v. Germaine*, 99 U.S. 508, 510 (1878); *Buckley v. Valeo*, 424 U.S. 1, 126 (1976). Relator was not appointed, but she qualifies as an "Officer," because she (1) exercises "significant authority pursuant to the laws of the United States," and (2) occupies a "continuing" position. *See U.S. ex rel. Montcrief v. Peripheral Vascular Associates*, *P.A.*, 133 F.4th 395, 411 (5th Cir. 2025) (Duncan, J., concurring) (first citing *Germaine*, 99 U.S. at 511–12, then citing *Buckley*, 424 U.S. at 126). And the Take Care Clause provides that the President alone "shall take Care that the Laws be faithfully executed." U.S. CONST., art. II., § 3. That "exclusive prerogative" includes "the choice of how to prioritize and how aggressively to pursue legal actions against defendants who violate the law." *Montcrief*, 133 F.4th at 412 (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 429,

(2021)). Yet the FCA "allows Congress to circumvent the Executive's check and to have its laws enforced directly by its own private bounty hunters." *Id.* (quoting *Constitutionality of the* Qui Tam *Provisions of the False Claims Act*, 13 Op. O.L.C. 207, 211 (1989)). The Constitution "does not allow this outsourcing of prosecutorial power to a private person." *Montcrief*, 133 F.4th at 412; *U.S. ex rel. Zafirov v. Fla. Medical Assoc. LLC*, No. 19-cv-1236 (M.D. Fla. Sept. 30, 2024).

**E. Dismissal *with prejudice* is warranted as amendment would be futile.**

Dismissal with prejudice is proper here because amendment would be futile. District courts have discretion to deny leave to amend where amendment would be futile. *See Porter*, 810 F. App'x at 243. Amendment is considered futile if, even with amendment, a plaintiff could not state a claim upon which relief could be granted. *Id.*; *United States ex rel. Jackson v. Ventavia Rsch. Grp., LLC*, 667 F. Supp. 3d 332, 365 (E.D. Tex. 2023) (cleaned up). As discussed above, Relator's claims are legally without merit. Additional facts cannot render Relator's Complaint against Naranjo Defendants sufficient under Rule 8(a)(2) or 9(b). The Court should therefore dismiss Relator's Complaint against Naranjo Defendants with prejudice.

Respectfully submitted,

**JACKSON WALKER LLP**

*/s/ Laura M. Kidd Cordova*
Laura M. Kidd Cordova
State Bar No. 24128031
lcordova@jw.com
Michael J. Murtha
State Bar No. 24116801
mmurtha@jw.com

1401 McKinney St, Suite 1900
Houston, Texas 77010
(713) 752-4449
(713) 752-4221 (Facsimile)

***Attorneys for Diego Naranjo,***
***Divine Family Care, PLLC,***
***Trinity Health Services, PLLC, and***
***Diego Naranjo dba UC Health Consultants***

## CERTIFICATE OF SERVICE

I hereby certify that on June 25, 2025, a true and correct copy of the foregoing was served electronically on all persons via the Court's CM/ECF system.

*/s/ Laura M. Kidd Cordova*
Laura M. Kidd Cordova