IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* JANA GARZA<br><br>Plaintiff,<br><br>v.<br><br>SOUTHWEST KEY PROGRAMS, INC., *et. al.*,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Case No. 1:25-cv-00305-ADA-SH |

**RELATOR JANA GARZA'S CONSOLIDATED RESPONSE IN OPPOSITION TO MOTIONS TO DISMISS BY THREE GROUPINGS OF DEFENDANTS**

# TABLE OF AUTHORITIES


**Cases** **Page(s)**

*Caperton v. A.T. Massey Coal Co.*,
556 U.S. 868 (2009) ....................3

*Casinger v. Advanced Pain Care, Inc.*,
No. 8:19-CV-1598-T-23TGW, 2021 WL 2786470 (M.D. Fla. Jan. 5, 2021) ....................37

*Colon. Oaks Assisted Living, L.L.C. v. Hannie Dev., Inc.*,
972 F.3d 684, 687 (5th Cir. 2020) ....................3

*Guilfoile v. Shields*,
913 F.3d 178 (1st Cir. 2019) ....................26

*Health Choice Alliance, LLC, on behalf of United States v. Eli Lilly and Company, Inc.*,
2018 WL 4026986 (E.D. Tex. Jul. 25, 2018) ....................31

*Healthcare Assocs. Of Tex., LLC*,
2025 WL 1885642 (N.D. Tex. July 8, 2025) ....................35

*Lampenfeld v. Pyramid Healthcare, Inc.*,
2015 WL 926154, at *4 (M.D. Pa. 2015) ....................37

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) ....................39

*Mira Safety LLC v. BTG Int'l, Inc.*,
2025 WL 1576829 (W.D. Tex. Mar. 14, 2025) ....................2, 3

*Mruz v. Caring, Inc.*,
991 F. Supp. 701 (D.N.J. 1998) ....................37

*Pace v. Cirrus Design Corp.*,
93 F.4th 879 (5th Cir. 2024) ....................2, 16

*Peterson v. Weinberger*,
508 F.2d 45 (5th Cir. 1975) ....................15

*Robertson v. Bell Helicopter Textron, Inc.*,
32 F.3d 948 (5th Cir. 1994) ....................36

*Tellabs, Inc. v. Makor Issues & Rats., Ltd.*,
551 U.S. 308, 326 (2007) ....................3

*Vander Boegh v. EnergySolutions, Inc.*,
772 F.3d 1056 (6th Cir. 2014) ....................................................................................37

*United States v. Ruan*,
966 F.3d 1101 (11th Cir. 2020) ....................................................................................8

*United States of Am. & State of Texas v. Austin Radiological Ass'n*,
No. A-10-CV-914-LY, 2012 WL 12850250 (W.D. Tex. Aug. 29, 2012) .........................16

*United States ex rel. Aldridge v. Corporate Mgmt., Inc.*,
78 F.4th 727 (5th Cir. 2023) ....................................................................................24, 30

*United States ex rel. Bias v. Tangipahoa Parish School Bd*,
816 F.3d 315 (5th Cir. 2016) ....................................................................................36

*United States ex rel. Beauchamp v. Academi Training Center*,
816 F.3d 37 (4th Cir. 2016) ....................................................................................32, 33

*United States ex rel. Campbell v. KIC Dev., LLC*,
2019 WL (W.D. Tex. Dec. 10, 2019) ....................................................................................29–30

*United States ex rel. Chorches for Bankruptcy Estate of Fabula v. American Medical Response, Inc.*,
865 F.3d 71 (2d Cir. 2017)....................................................................................39

*United States ex rel. Dekort v. Integrated Coast Guard Systems*,
705 F.Supp.2d 519 (N.D. Tex. 2010) ....................................................................................33

*United States ex rel. Dyson v. Amerigroup Tex., Inc.*,
2005 WL 2467689 (S.D. Tex. Oct. 6, 2005)....................................................................................38

*United States ex rel. George v. Bos. Sci. Corp.*,
864 F.Supp.2d 597, 609 (S.D. Tex. 2012) ....................................................................................38

*United States ex rel. Grant v. United Airlines Inc.*,
912 F.3d 190 (4th Cir. 2018) ....................................................................................38–39

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) ....................................................................................2, 3, 4, 6, 16, 25

*United States ex rel. Hart v. McKesson Corp.*,
96 F.4th 145 (2d Cir. 2024) ....................................................................................17, 18

*United States ex rel. Holmes v. Consumer Ins. Grp.*,
318 F.3d 1199 (10th Cir.2003) ....................................................................................33

*United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*,
664 F.Supp.3d 722 (W.D. Tex. 2023)....................15, 16, 26

*United States ex rel. Johnson v. Raytheon Co.*,
563 F. Supp. 3d 599 (N.D. Tex. 2021) ....................34

*United States ex rel. Kelly v. Boeing Co.*,
9 F.3d 743, 749-59 (9th Cir. 1993) ....................34

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
985 F.2d 1148 (2d Cir. 1993)....................34

*United States ex rel. Lemon v. Nurses to Go, Inc.*,
924 F.3d 155 (5th Cir. 2019) ....................3

*United States ex rel. Little v. Shell Exploration & Prod. Co*.,
690 F.3d 282 (5th Cir. 2013) ....................32

*United States ex rel. Longhi v. Lithium Power Techs., Inc.*,
575 F.3d 458 (5th Cir. 2009) ....................23, 24

*United States ex rel. Lutz v. BlueWave Healthcare Consultants, Inc.*,
853 F.3d 131 (4th Cir. 2017) ....................26

*United States v. Marlin Med. Sols.*,
579 F. Supp.3d 876 (W.D. Tex. 2022)....................6, 16

*United States v. Marlin Med. Sols., LLC*,
2025 WL 2267997 (W.D. Tex. Mar. 2, 2025) ....................25, 26

*United States ex rel. Miniex v. Houston Hous. Auth.*,
No. 21-20435, 2023 WL 6174416 (5th Cir. Sept. 22, 2023) ....................2

*United States ex rel. Montcrief v. Peripheral Vascular Assoc., P.A.*,
133 F.4th 395 (5th Cir. 2025) ....................34–35

*United States ex rel. Morsell v. Symantec Corp.*,
471 F.Supp.3d 257, 296 (D.D.C. 2020)....................22

*United States ex rel. Parikh v. Citizens Med. Ctr.*,
977 F. Supp.2d 654 (S.D. Tex. 2013) ....................6

*United States ex rel. Porter v. Magnolia Health Plan, Inc.*,
810 F. App'x 237, 240 (5th Cir. 2020) ....................2

*United States ex rel. Riley v. St. Luke's Hospital*,
252 F.3d 749 (5th Cir. 2001) ....................................................................................34

*United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*,
794 F.3d 457 (5th Cir. 2015) ......................................................................................4

*United States ex rel. Stone v. Rockwell Int'l, Corp.*,
282 F.3d 787 (10th Cir. 2002) ..................................................................................34

*United States ex rel. Sullivan v. Atrium Med. Corp*,
No. CV SA-13-CA-244-OLG, 2014 WL 12879671, at *21 (W.D. Tex. Dec. 31, 2014)........................................................................................3

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
41 F.3d 1032 (6th Cir. 1994) ....................................................................................34

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*,
848 F.3d 366 (5th Cir. 2017) ....................................................................................24

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
389 F.3d 1251 (D.C. Cir. 2004).................................................................................39

*United States ex rel. Williams v. NEC Corp.*,
931 F.2d 1493 (11th Cir. 1991) ................................................................................33

*United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*,
2019 WL 571349 (W.D. Tex. Feb. 2, 2019)..............................................................15

*United States ex rel. Zafirov v. Florida Med. Assocs.*,
751 F. Supp. 3d 1293 (M.D. Fla. 2024)....................................................................35

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016)...........................................................................................23, 25, 29

**United States Constitution**

U.S. Const. Art. II ..........................................................................................................34

**Statutes**

31 U.S.C. §3729(a)(1)(A) ...............................................................................................22

31 U.S.C. §3729(b)(4) ....................................................................................................24

31 U.S.C. § 3730(e)(4) ........ 32

31 U.S.C. § 3730(e)(4) (2006) ........ 31

31 U.S.C. § 3730(h) ........ 36

31 U.S.C. § 3730(h) ........ 37

42 U.S.C. § 1320a-7b(b)(1) ........ 5

42 U.S.C. § 1320a–7b(f) ........ 7

42 U.S.C. § 1320a–7b(g) ........ 15, 26

42 U.S.C. §1395mn ........ 28

42 U.S.C. § 14401 ........ 8

**Federal Regulations**

2 C.F.R. §200.112 ........ 27

42 C.F.R. §411.353 ........ 28

42 C.F.R. §410.1307 ........ 9

**Other Authorities**

Charles A. Wright, *et al.*, 5A FED. PRAC. & PROC. CIV. § 1298 (4th ed., updated May 20, 2025) ........ 3

Claire M. Sylvia, the False Claims Act: Fraud Against the Government § 5:6 (2020) ........ 37

James Wm. Moore *et al.*, MOORE'S FEDERAL PRACTICE § 9.03 [1] [a], at 9–16 to 9–18 (3d ed. 2005) ........ 3

# TABLE OF CONTENTS


I. The Rule 9(b) Standard in the Fifth Circuit is context specific and permits plaintiff to meet the particularity requirement by alleging the circumstances of the fraud..............2

II. Count 1 of the Amended Complaint meets Rule 9(b) and States a Claim for Relief Under the FCA by Alleging Violations of the Anti-Kickback Statute (AKS) ....................4

A. The AKS claims were Submitted to a Federal Health Program..........6

B. Relator has pled with particularity the AKS Claims tainted by kickbacks to Dr. Diaz..........9

C. Relator has pled with particularity the AKS Claims tainted by the attempted kickbacks to Relator..........12

D. Relator has pled renumeration under the AKS ..........13

E. Relator has pled that the AKS violations led to false claims..........14

F. Relator has pled sufficient facts paired with reliable indicia that lead to an undeniable inference that claims were submitted to ORR..........16

G. Relator has pled that the pertinent Defendants knowingly and willfully caused the submission of claims tainted by AKS violations ..........17

III. Count 2 of the Amended Complaint States a Claim for Relief Under the FCA by Alleging Violations Based on Conflict-of-Interest Violations of the Cooperative Agreements ..........18

A. Relator has pled with particularity the Conflict-of-Interest claims ..........18

B. Relator has pled that Defendants' violations of the Conflict of Interests provision led to false claims ..........21

C. Relator has pled sufficient facts paired with reliable indicia that lead to an undeniable inference that claims were submitted to ORR..........23

D. Relator has pled that the pertinent Defendants knowingly caused the submission of claims that violated the Conflict-of-Interest provision..........24

IV. Relator Adequately Pled a Conspiracy Claim Under the FCA..........25

V. All claims satisfy the FCA's materiality requirement ....................................................25

VI. The Amended Complaint is Not Subject to Dismissal on Public Disclosure / Original Source Grounds Because Defendants Have Not Alleged that Dr. Garza's Allegations and Transactions Had Been Publicly Disclosed Previously..........................31

VII. The Amended Complaint is Not Subject to Dismissal on Constitutional Grounds..........34

VIII. The Amended Complaint Sufficiently Pleads that Defendants Retaliated Against Dr. Garza in Response to Her Protected Activity of Attempting to Stop Defendants' Violations of the FCA..................................................................................................36

IX. Conclusion ..................................................................................................................39

Relator Jana Garza, by her undersigned attorneys respectfully submits this **Consolidated Response** in opposition to motions to dismiss (**MTD**) Relator's First Amended Complaint (cited to herein as **AC**) by three groups of Defendants.

The first MTD was filed by Defendant Southwest Key, and is on the docket as ECF 89. We refer to it below as the **SWK-MTD**.

The second MTD was filed by the group consisting of Defendants Diego Naranjo; Divine Family Care, PLLC; Trinity Health Services, PLLC; and Diego Naranjo d/b/a UC Health Consultants, who have designated themselves the "Naranjo Defendants." Their MTD is on the docket as ECF 90. We refer to it below as the **N-MTD.**

The final MTD was filed by Defendants Eder Francisco Hernandez, Alyssa Hernandez, Migdal Eder, LLC, and Valley Med Urgent Care, PLLC, who designate themselves as the "Hernandez Defendants." Their MTD is on the docket as ECF 91. We refer to it below as the **H-MTD**.

Defendants filed their motions to dismiss on June 25, 2025. Cumulatively, they total over 70 pages in length. Instead of filing three separate responses, Relator is filing a consolidated response, as many of the arguments presented by Defendants are duplicative. Further, Relator seeks leave to exceed the 20-page limit under Local Rule CV-7(D), if necessary, to file this consolidated response, noting that if she had filed three separate responses, then she would be entitled to 60 pages of combined briefing. This consolidated response is less than 60 pages in length.

## CONSOLIDATED OPPOSITION ARGUMENT

### I. The Rule 9(b) Standard in the Fifth Circuit is context specific and permits plaintiff to mee the particularity requirement by alleging the circumstances of the fraud

In their motions, Defendants depict events that unfolded over several years in isolation – in an attempt to convince this Court that Relator has failed to plead with particularity that each of the Defendants violated 31 U.S.C. §3729(a)(1)(A) and 31 U.S.C. §3729(a)(1)(C). *See* SWK-MTD at 17; N-MTD at 11; H-MTD at 11, 19. Contrary to those arguments, Relator has set forth meticulous details showing that these events are intertwined and connect all the Defendants together to establish all of the essential elements of her three separate *qui tam* causes of action: (1) presentment of claims rendered false due to underlying kickbacks; (2) presentment of false claims due to violations of conflict of interest requirements; and (3) conspiracy to defraud the Government.[1]

Defendants make the touchstone of their attack on the particularity of Dr. Garza's Amended Complaint the "who, what, when, where, and how" test. *See, e.g.*, SWK-MTD at 6–7; N-MTD at 4, 11; H-MTD at 11, 19. But the Fifth Circuit does not require relators like Ms. Garza separately to particularize each one of the five "who, what, when, where, and how" factors with exacting specificity for each alleged false claim and/or false statement. In fact, the Fifth Circuit rejected similar arguments in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009) – which is the Rule 9(b) case cited most often in this Circuit – and in numerous cases since.[2] This Court did likewise in *Mira Safety LLC v. BTG Int'l, Inc.*, 2025 WL 1576829, at *1, *2 (W.D. Tex. Mar. 14, 2025), and should do the same here.

---

[1] As explained below, Relator's retaliation claim is not required to meet Rule 9(b).

[2] *See, e.g., Pace v. Cirrus Design Corp.*, 93 F.4th 879, 891 (5th Cir. 2024); *United States ex rel. Miniex v. Houston Hous. Auth.*, No. 21-20435, 2023 WL 6174416, at *6 (5th Cir. Sept. 22, 2023); *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir.

As the Court of Appeals explained in *Grubbs*, "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b)." *Grubbs,* 565 F.3d at 190.[3] And as the Supreme Court admonished, a "court's job is not to scrutinize each allegation [of fraud] in isolation but to assess all the allegations holistically." *Tellabs, Inc. v. Makor Issues & Rats., Ltd.*, 551 U.S. 308, 326 (2007). For this reason, a relator's complaint need not particularize each allegation, or Rule 9(b) factor, inasmuch as "[n]o one factor is dispositive, and our inquiry is holistic." *United States ex rel. Lemon v. Nurses To Go, Inc.*, 924 F.3d 155, 161 (5th Cir. 2019).

The leading treatises agree.[4] As *Grubbs* explained, in Rule 9(b) cases, "context" is key. 565 F.3d at 188. This Court highlighted this point just six months ago, noting: "Rule 9(b) that applies in all contexts. . . . [A] plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' **without including all the details** . . .—it depends on the elements of the claim at hand." *Mira Safety*, 2025 WL 1576829, at *2 (quoting *Grubbs*, 565 F.3d at 188) (emphasis added).[5] Thus, "a plaintiff may sufficiently 'state with particularity

2020); *Colon. Oaks Assisted Living, L.L.C. v. Hannie Dev., Inc.*, 972 F.3d 684, 687 n.4 (5th Cir. 2020).

[3] *See United States. ex rel. Sullivan v. Atrium Med. Corp.*, No. CV SA-13-CA-244-OLG, 2014 WL 12879671, at *21 (W.D. Tex. Dec. 31, 2014), rept. & rec. adopted, No. SA-5:13-CV-244-OLG, 2015 WL 13799755 (W.D. Tex. Mar. 18, 2015).

[4] As Wright and Miller summarize, under the "holistic" test the Supreme Court articulated in *Tellabs*, "the degree of detail required ... often turns on the substantive context in which the fraud is alleged to have occurred," paying attention to "the complexity of the transaction in question," "[t]he relationship of the parties," whether a case turns on "omissions rather than affirmative misrepresentations," and other relevant factors. The most important "consideration … as to the sufficiency of a pleading for purposes of [Rule 9(b)] is the determination of how much detail is necessary to give adequate notice to an adverse party and to enable that party to prepare a responsive pleading." Charles A. Wright, *et al*., 5A FED. PRAC. & PROC. CIV. § 1298 (4th ed., updated May 20, 2025). *See* James Wm. Moore *et al*., MOORE'S FEDERAL PRACTICE § 9.03 [1] [a], at 9–16 to 9–18 (3d ed. 2005).

[5] Defendants have not distinguished or even mentioned *Mira,* as if they are "whistling past the graveyard." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 899 (2009) (Roberts, C.J., and Scalia, Thomas, & Alito, JJ., dissenting).

the circumstances constituting fraud or mistake' without including all the details . . . it depends on the elements of the claim at hand." *Grubbs,* 565 F.3d at 188.

Although these Defendants, like many other FCA defendants, protest that *Grubbs*' holistic/flexible standard might undermine the protections Rule 9(b) provides to defendants, *Grubbs* stressed that Rule 9(b) is not only "context specific [and] flexible and [but] must remain so to achieve the remedial purpose of the False Claim Act" and to "effectuate[] Rule 9(b) without stymieing legitimate efforts to expose fraud." *Grubbs*, 565 F.3d at 190; *see also*, *United States ex rel. Rigsby v. State Farm Fire & Cas. Co*, 794 F.3d 457, 466 n.5 (5th Cir. 2015). Thus, the context/holistic formulation advances the public interest by "protect[Ing] the [T]reasury," and "ensur[es] the complaint 'provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs.'" *Grubbs,* 565 F.3d at 184 (citation omitted).

## II. Count 1 of the Amended Complaint meets Rule 9(b) and States a Claim for Relief Under the FCA by Alleging Violations of the Anti-Kickback Statute (AKS).

Count 1 of Relator's Amended Complaint is a False Claims Act Presentment Count consists of two different AKS claims. The first set of claims are those tainted by kickbacks paid to Dr. Diaz.[6] The second set of claims are those tainted by the kickbacks that the pertinent Defendants solicited from Relator.

As the Amended Complaint describes, SWK's medical provider recruiter, Defendant Eder Hernandez ("Eder"), engaged in a scheme in which he steered lucrative Office of Refugee

[6] The Amended Complaint attempted to anonymize him as Dr. A but in a later paragraph disclosed his name as Dr. Diaz. His name was also fully disclosed in Relator's Original Complaint.

Resettlement ("ORR")-financed shelter contracts to providers who were willing to pay financial kickbacks and submit to SWK's control. Eder not only carried out this illegal kickback scheme to benefit himself, his companies and his family, but he did so on behalf of the other Defendants as well – which include Diego Naranjo (SWK's Assistant Director of Medical Services); Fanny Figueroa (SWK's Director of Medical Services), Valley Med Urgent Care, LLC ("Valley Med Urgent Care"); Alyssa Hernandez ("Alyssa"); and Migdal Eder, LLC ("Migal Eder"). Defendant SWK is vicariously liable, as the Naranjo and Figueroa were corporate managers with the ability to award medical provided contract for SWK. *See generally* AC ¶¶ 93–131.

Without question, Defendants' schemes violated the FCA's Anti-Kickback Statute's prohibitions, which provides that:

> (1) Whoever knowingly and willfully **solicits** or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b) (emphasis added). Contrary to what Defendants assert— the AKS statute not only reaches successful kickbacks, but attempted kickbacks as evidenced by the term "solicits." Defendants' various arguments that an unpaid kickback does not violate the FCA has no merit.

Defendant SWK argues that "Relator fails to meet any of the AKS elements regarding SWK, particularly that SWK sought or received any remuneration from any individual; nor has Relator identified any payment requests to the government that resulted from SWK violating the AKS." SWK-MTD at 16. Oddly, SWK also argues the opposite – that Relator has not properly alleged "how it was that [d]efendant provided remuneration to its clients, the form of that

remuneration, how and why [d]efendant believed that remuneration would induce new business; and how [d]efendant benefitted from the remuneration," citing *United States ex rel. Ruscher v. Omnicare, Inc.*[7] SWK-MTD at 11, 12. For their part, the Naranjo Defendants contend that "Relator alleges that Mr. Naranjo violated the AKS (Count 1) and that all Naranjo Defendants conspired to violate the AKS (Count III) [sic], but she does not allege a single fact to support that any Naranjo Defendant paid, offered, received, or solicited a kickback – or agreed with anyone to do so." N-MTD at 6.

As described below, Relator has pled each set of AKS claims with the particularity required under *Grubbs*. It is well settled in this Circuit that "[i]f the [plaintiff] plausibly alleges that a defendant received kickbacks made 'with the intent of inducing referrals, and they plead 'particular details of a scheme paired with reliable indicia that lead to a strong inference that claims were actually submitted,' the separate elements of the AKS and FCA are satisfied." *United States v. Marlin Med. Sols.*, 579 F. Supp.3d 876, 884–885 (W.D. Tex. 2022) (*quoting United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp.2d 654, 665 (S.D. Tex. 2013)) and (*citing Grubbs*, 565 F.3d at 190). Relator has done just that and thus, has therefore satisfied Rule 9(b)'s heightened pleading requirements.

### A. The AKS claims were Submitted to a Federal Health Program

Relator first responds to the Naranjo and Hernandez Defendants' assertion that Relator's AKS-based fraud allegations should be dismissed because they do not involve claims submitted

---

[7] To be clear, Relator has not alleged a kickback scheme in which any Defendant provided remuneration to SWK's clients, and therefore, SWK's discussion of *Rushcer* is largely inapplicable here. In fact, Defendant SWK's quote from *Ruscher* is glaringly incomplete. The court actually "conclude[d] that 'to allege the particulars of a scheme to **offer** kickbacks, Relator must sketch how it was that Defendant provided remuneration to its clients . . .'" *Ruscher*, 2014 WL 2618158, at *1, *10 (S.D. Tex. June 12, 2014) (emphasis added). Relator has not alleged a scheme to offer kickbacks, but instead, that Defendants **solicited** kickbacks from the medical providers they contracted with.

to a "Federal health care program." *See* N-MTD at 8–10; H-MTD at 15–16. While Defendants concede that ORR provides medical services to unaccompanied minors, they argue that ORR medical services do not qualify as "health services," *see* H-MTD at 15; N-MTD at 9–10, despite 42 U.S.C. § 1320a-7b(f), which provides:

> ORR, a component of the Department of Health and Human Services (HHS), primarily administers programs for the resettlement of refugees and care of unaccompanied minors. **These services include** housing, education, and some limited **medical screening and urgent care**, but ORR does not provide health insurance, ongoing medical care, or reimbursement for health services in a manner akin to Medicare or Medicaid.

(emphasis added).

The Amended Complaint plainly alleges that the ORR program for medical services constitutes a "Federal health care program":

> 200. "Federal health care program" is defined in subsection (f) of the statute as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government…."
>
> 201. The program covering UCs in ORR custody constitutes a "Federal health care program" because it is a plan or program that provides health benefits to the UCs and is funded directly by the federal government through HHS and its ORR component.

AC ¶¶ 200–201.

The statutory definition of "federal health care program" is a broad, functional one: it asks whether a "plan or program" provides "health benefits," and whether those health benefits are funded "by the United States Government." Nowhere does it require, nor is it determinative, that those health services be provided "through insurance," as signified by the word "otherwise." The definition also does not require, nor is not determinative, that the health services be provided as ongoing medical care or through reimbursement "akin to Medicare or Medicaid," so long as the plan or program at issue provides Government-funded *health benefits*.

Defendants have set forth an unfounded new test that has no statutory or legal basis. Defendants rely mainly on one criminal case for their extreme narrow reading of what qualifies as a Federal health care program: *United States v. Ruan*. *See, e.g.*, N-MTD at 10. In that case, an appeals court was tasked with determining whether the kickback *prescription* claims at issue were paid using federal funds. *See United States v. Ruan*, 966 F.3d 1101, 1145–46 (11th Cir. 2020). The circuit court held that the Government failed to establish beyond a reasonable doubt that the prescription claims were federally funded because the Government only produced evidence at trial that federal funds were used to pay "for physician services, not prescriptions." *Id.* at 1145. In *dicta,* the court noted that FARA, the federal longshoreman insurance program which provided the federal funds, was "not named in 42 U.S.C. § 14402(d), the statute listing Federal health care funding programs, like Medicare and Medicaid." *Id.* at 1146. But that was not the determinative reason for its holding. Furthermore, the Court's *dicta* should be ignored in light that the statutory provision it is referencing falls under Chapter 138 of Title 42, which deals with the very limited topic of funding restrictions for assisted suicide. *See* 42 U.S. Code § 14401 ("It is the principal purpose of this chapter to continue current Federal policy by providing explicitly that Federal funds may not be used to pay for items and services . . . to cause (or assist in causing) the suicide, euthanasia, or mercy killing of any individual.").

The Naranjo Defendants further attempt to rely on an October 2023 letter from then HHS Secretary Sebelius for their sweeping view that ORR does not qualify as a federal health care program. *See* N-MTD at 11. But that letter discusses privately-paid insurance plans. Nothing in the letter "strongly" counsels that ORR is not a federal health care program, because it contains no legal analysis and because the private plans referenced bear no resemblance to ORR medical services. The Naranjo Defendants further misconstrue the statutory text by arguing that ORR

claims need to be paid from a federal health care program. *See id.* at 9. But the statute clearly provides that a plan or program can be funded "directly, in whole or in part, by the United States Government" – meaning it can come from any federal source of funds.

Lastly, Defendants ignore the obvious regulatory text: the medical services that ORR provides through third parties to unaccompanied children is through a program known as "standard programs." *See* 45 C.F.R. § 410.1307. It is undeniable that the claims Defendants submitted and/or caused to be submitted for providing medical services were under an ORR program and that the source used to pay the claims at issue tainted by AKS violations were federal funds – as the Hernandez Defendants acknowledge.

In any case, at the pleading stage, this Court is required to take Plaintiff's allegations as true. *See, e.g.*, *United States ex rel. Lemon v. Nurses to Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019) ("We accept as true all well-pleaded allegations of fact in the complaint and construe them in the light most favorable to Plaintiffs.").

**B. Relator has pled with particularity the AKS Claims tainted by kickbacks to Dr. Diaz**

As to the AKS claims involving Dr. Diaz[8], Relator has alleged that Eder personally told her that he helped Dr. A obtain the Casa Padre contract. AC ¶ 93. Further, Eder admitted to Relator that Dr. A was paying him a kickback for each child he saw at Casa Padre. *Id.* Eder knew it was wrong because he did not wish to pursue legal action for Dr. A's breach of the kickback agreement. *Id.*

[8] These claims only involve Eder, Valley Med Urgent Care, Figueroa, Naranjo, and SWK.

As Relator discovered over time, at the outset SWK gave Figueroa, the Director of Medical Services, and Naranjo, the Assistant Director of Medical Services, the unilateral ability to select the medical provider for each shelter. AC ¶ 92.

Relator saw firsthand the power Naranjo wielded when he told her that he was going to divide the Houston region—and which he later did by taking away the Sunzal shelter from Dr. Garza. AC ¶ 130. After Naranjo left SWK, Figueroa unilaterally awarded Relator the Houston shelter contracts, showing that she also wielded this power. AC ¶ 143. Another SWK employee, Nelson Lozano, informed Relator that Figueroa gave Naranjo and his company, Trinity Health Services, the Casa Padre shelter, displacing Dr. A. AC ¶ 160. Naranjo and Figueroa were SWK corporate managers with decision making power over medical provider contracts, not mere employees.

If Relator did not have any other allegations connecting Eder with Naranjo and Figueroa, then Relator would agree that such events would be too isolated to demonstrate a relationship. But Relator alleged numerous other common links between them, Valley Med Urgent Care, Dr. Rauf, and Dr. Juan Garcia, and employees who confirmed it, such as Daniel De La Cruz and Lozano.

In 2017, while he was working with Dr. Rauf at Valley Med Urgent Care, Eder offered Relator a job at their Houston office. AC ¶ 80. In early 2019, Naranjo tried to replace Relator with Dr. Rauf at the Casa Sunzal shelter.[9] AC ¶ 129. When that did not work out, Figueroa tried to bring in Dr. Juan Garcia. AC ¶ 137. While both of those plain failed due to the incompetence of those other doctors besides Relator (AC ¶ 129–140), they gave Relator an insight behind the

[9] Although not part of the First Amended Complaint, in the Original Complaint the Relator alleges that she felt this was retaliation for not agreeing to Eder's kickback agreement.

curtain and showed that these Defendants had preexisting relationships. After all, Naranjo and Figueroa did not pick Dr. Rauf and Dr. Garcia out of thin air, they had the "insider" track. AC ¶ 131.

After Naranjo left SWK, he formally joined forces with Eder at Valley Med Urgent Care ( Complaint at 157), which at the time was owned by Dr. Rauf. AC ¶ 80. Naranjo and Eder both on the same date (3/25/2019) retained Dr. Garcia, as their supervising physician. AC ¶¶ 150, 151. Their delegation address was the same one belonging to Valley Med Urgent Care. *Id.* During this exact time period, Figuera tried to bring Dr. Garcia as the medical provider for Casa Sunzal. AC ¶ 137. Dr. Garcia was Eder's former employer. *Id.*

In November 2019, Eder obtained a physician license in Arizona through Naranjo's other company, Divine Family Care. AC ¶ 158. Lozano also informed Relator that Figuero had given the Arizona shelter contracts to Naranjo and Eder—showing that Eder was not some outsider. AC ¶ 160.

In 2020, Naranjo and Figueroa also joined forces under UC Health Consultants. Both and were able to obtain contracts with SWK even though the company was not even incorporated. AC ¶¶ 166–170.

Taken together along with the allegations discussed below, these are not random and isolated events or "speculation" as asserted by Hernandez (H-MTD at 15), but the linked actions and knowledge of multiple Defendants.

For these claims, Naranjo and Figueroa's actions and knowledge can be imputed to SWK under the theory of vicarious liability, as they were employed as the corporate managers at the company. Eder's actions and knowledge can be imputed to Valley Med Urgent Care, as he was employed as a pertinent decisionmaker at the company.

### C. Relator has pled with particularity the AKS Claims tainted by the attempted kickbacks to Relator

As to the AKS claims involving Relator[10], Eder, Naranjo, and SWK had knowledge of Eder's attempted kickbacks. Relator alleges that Eder requested a kickback in the form of an Administrative Services Agreement, wherein Relator's company would pay Migdal Eder LLC a 45% kickback. AC ¶ 113. Eder knew it was a kickback because the administrative costs were not in line with actual billing costs. *Id*. Eder's sister, Alyssa, was no innocent party. Eder told Relator that Alyssa would be in charge of billing. AC ¶ 110. Alyssa was in the email communications from the start to prepare for the opening of the Casa Sunzal shelter where Relator was slated to become the medical provider. AC ¶¶ 106–109. Alyssa also knew about the illegal kickbacks: in a WhatsApp group chat she became upset at Relator because Relator purportedly did not want to share the Federal health care dollars that would flow their way, but, rather, she accused Relator of wanting to keep all the patients and profits. AC ¶ 124.

Naranjo claims that Relator's owns Complaint establishes that he had no awareness of Eder's requests for kickbacks. N-MTD at 8. Naranjo's attempt to depict himself as an innocent bystander flies against the allegations in the Amended Complaint. It is to be expected that Naranjo would tell Relator he had no idea about the kickback agreement. AC ¶ 119. But events before that and everything Naranjo did after Relator informed him of this fact shows that he not only knew, but that he had no problem associating with a person he knew requested kickbacks.

In July 2018, Eder recruited Relator to become a shelter medical provider for a new SWK shelter that was slated to open. AC ¶ 85. Eder knew the name of the shelter—Casa Sunzal— and the opening date before that information became publicly available, showing that he had inside

[10] These claims only involve Eder, Migdal Eder, Alyssa, Naranjo, and SWK.

information from Naranjo and Figueroa. AC ¶ 91. Eder explicitly told Relator he would schedule a meeting with Naranjo and Figueroa. AC ¶ 92. In August 2018, Eder sent Relator an email which showed that Eder knew exactly what Casa Sunzal and Casa Quetzal needed to be operation. AC ¶ 108. Eder further knew that the opening on Casa Sunzal would be delayed, which information only insiders knew. AC ¶ 108. After confronting Naranjo about the kickbacks, Naranjo admitted that Eder had "provided" her name as a potential medical provider. AC ¶ 119. These events show that Naranjo not only knew Eder, but that he used Eder to bring in medical providers and gave him information about SWK shelters.

In early 2019, Naranjo attempted to award Eder's employer, Dr. Rauf, the Casa Sunzal contract. AC ¶ 129. In March 25, 2019, while he was still working with SWK, Naranjo and Eder both retained Dr. Garcia as their supervising physician. AC ¶ 150–151. The address they had on file was the Valley Med Urgent Care office. AC ¶ 151.

Naranjo and Eder had an office together for pediatric and adult care with Valley Med Urgent Care. AC ¶ 157. In October 2019, while they had an office together, Naranjo incorporated Divine Family Care. AC ¶ 157. A month later Eder obtained a physician assistant license in Arizona through Divine Family Care. AC ¶ 158.

These facts show that Naranjo not only knew about Eder's kickbacks, but he also endorsed and made a business association with a person he knew requested kickbacks. Naranjo utilized Eder to recruit medical providers and provided him with inside information about the shelters. Naranjo's knowledge can be imputed to SWK, as he was a corporate manager with decision making power.

**D. Relator has pled renumeration under the AKS**

As Count 1 of the Amended Complaint states, the Defendants largely perpetrated the illegal kickback scheme – which was funded with ORR dollars – as a means to control SWK's medical providers for the company's benefit . . . as well as to enrich themselves. *See* AC ¶¶ 204–208. To be sure, as noted above the AKS not only criminalizes *paying* remuneration in exchange for illegal referrals, but it also prohibits *soliciting* such remuneration. Here, in accordance with the kickback scheme, it was SWK's medical providers who paid the remuneration – namely a percentage of their reimbursement payments from the Government– in exchange for business opportunities with the federal government that SWK controlled through its leaders. *See, e.g.*, AC ¶¶ 129–192 (describing Diego Naranjo's control over distribution of SWK shelter contracts); N-MTD at 7 (acknowledging Relator's allegation that Naranjo informed Relator that she would receive additional contracts from SWK). Relator has described the particulars of multiple AKS violations, including Defendant Eder Hernandez's illicit dealings with Dr. Diaz, and with Defendant Naranjo and his company, Trinity Health Services, PLLC – which resulted in a $30,000 kickback payment from Dr. Diaz to Eder, before his shelter was taken away and awarded to Trinity. Relator has also detailed Eder's and SWK's attempts to coerce her as well as Dr. B to join the scheme; although those efforts were unsuccessful, they still violated the AKS's prohibition against soliciting bribes – and similarly resulted in Relator being punished for refusing to pay kickbacks, and having several of her shelters taken away and given to Defendant Naranjo's company, Trinity.

**E. Relator has pled that the AKS violations led to false claims**

Relator has further alleged that all reimbursement claims to the federal government that were tainted by Defendants' AKS violations are false under the FCA. *See* AC ¶¶ 193–203.

Since the kickbacks scheme resulted in violations of the Anti-Kickback Statute, *by statute*, any resulting claims for reimbursement from ORR were automatically rendered "false," for FCA purposes. *See* 42 U.S.C. § 1320a–7b(g) ("[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim."). Thus, by engaging in the kickback scheme, the Defendants ultimately **caused** each of SWK's providers who also participated to submit subsequent false reimbursement claims to ORR, in violation of section 3729(a)(1)(A). *See, e.g.*, *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975) (FCA can "reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud."); *United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*, 664 F.Supp.3d 722, 739 (W.D. Tex. 2023) ("That [the defendant] did not itself submit claims to [the government] is irrelevant because 'the FCA reaches anyone who 'causes' the submission of a false claim . . ."); *United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*, 2019 WL 571349, at *1, *5 (W.D. Tex. Feb. 2, 2019) ("The FCA allows claims to proceed against parties who can fairly be said to have caused a claims to be presented to the government. '[I]f the government proves that a kickback arrangement existed and that the kickback arrangement was as substantial factor in bringing about [a party's] submissions to Medicare and that the submissions were a normal consequence of the situation created by the kickback arrangement, the defendant may be found to have 'caused' the submissions.") (internal citation omitted).

Notably, Relator's allegation that Defendants caused SWK's providers to submit false claims does not rest on any false statements made by any of the Defendants. Indeed, she can plead "the circumstances" of this fraud scheme, as Rule 9(b) requires, without alleging any specific false statement by SWK or any other Defendant. Similarly, contrary to the Hernandez

Defendants' assertion, *see* H-MTD at 17, Relator is not required to allege the specifics of a *quid pro quo* arrangement. "All that Rule 9(b) requires are allegations that kickbacks were made with the intent of inducing referrals, coupled with 'the particular details of a scheme'; actual inducement is not required." *Marlin Med. Sols.*, 579 F. Supp.3d at 887, *quoting Parikh*, 977 F. Supp.2d at 665.

**F. Relator has pled sufficient facts paired with reliable indicia that lead to an undeniable inference that claims were submitted to ORR**

Moreover, Relator is not required to plead the particulars of SWK's providers' corresponding false claims to ORR in order to meet Rule 9(b)'s pleading requirements. The Hernandez Defendants claim that the Amended Complaint "offers no details about any claim: no dates, claim numbers, amounts, or patients." H-MTD at 19; *see* also N-MTD at 12. But these Defendants grossly overstate what is required of Relator at the motion to dismiss stage. As a sister district court recently observed, in response to the same argument:

> [A] complaint satisfies the particularity requirements of Rule 9(b) by alleging 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009); ECF No. 66-22. As the Fifth Circuit has explained, 'a plaintiff does not necessarily need the exact dollars amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted.' *Grubbs*, 565 F.3d at 190. 'To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.'

*United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*, 664 F.Supp.3d 722, 739–740 (W.D. Tex. 2023); *see also*, *Pace v. Cirrus Design Corp.,* 93 F.4th 879, 892 (5th Cir. 2024) (citing *Grubbs*); *United States of Am. & State of Texas v. Austin Radiological Ass'n*, No. A-10-CV-914-LY, 2012 WL 12850250, at *3 (W.D. Tex. Aug. 29, 2012) (same).

Relator has met this burden by offering sufficient details of the fraud scheme, while offering indicia of reliability that SWK's medical providers actually submitted reimbursement claims to the Government. Here, the kickback scheme involves SWK's HHS grant funds – a percentage of which providers illegally "kick back" to SWK employees. These HHS grant funds are managed by the ORR. AC ¶ 27. The scheme could not survive if providers did not submit reimbursement claims. Defendants have offered no reason to believe that providers did not provide necessary medical services to the thousands of unaccompanied minors in their care, nor have they asserted any basis to believe that these providers failed to bill the United States for reimbursement for those services. Indeed, SWK's shelters remained operational for years and years, receiving documented millions in HHS grant funds. Relator has therefore provided the necessary "reliable indicia that lead to a strong inference that claims were actually submitted."

### G. Relator has pled that the pertinent Defendants knowingly and willfully caused the submission of claims tainted by AKS violations

Defendants attempt to set forth a heightened mental state that has been rejected by Courts—which is that Defendants must know that they are violating the AKS statute. But as has so eloquently been set forth by the Second Circuit, that interpretation was rejected by Congress in their 2010 amendments to the FCA:

> The retention of the willfulness requirement in that context suggests that Congress still intended the term to protect against criminal liability for unwitting defendants by requiring that a defendant act with knowledge that her conduct is *somehow* unlawful, even though it eschewed any requirement that a defendant know about the **AKS** specifically.

*United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 156 (2d Cir. 2024) (emphasis added).

As explained above, Defendants are not the unwitting, innocent bystanders they have portrayed themselves to be. This not a case involving grey areas or ambiguous terms.

Defendants "engaged in conduct that was plainly illegal." *Id.* at 158. They solicited or obtained kickback from medical providers to provide health services to unaccompanied children at SWK shelters.

Further, Defendants' FCA liability is not limited to the false claims they caused SWK's medical providers to submit. Several Defendants are also subject to liability for SWK's years of false applications for new and continuing cooperative agreements with ORR, despite their knowledge of the illegal kickback schemes perpetrated by SWK and the Hernandez Defendants, and the misappropriation of HHS grant funds that were being funneled to Eder, an SWK affiliate.

## III. Count 2 of the Amended Complaint States a Claim for Relief Under the FCA by Alleging Violations Based on Conflict-of-Interest Violations of the Cooperative Agreements

Count 2 is a claims based on presentment of false claims stemming from Defendants' violation of the Conflict-of-Interest Prohibitions of the Government's Cooperative Agreements. It lies against Defendants SWK, Naranjo, Figueroa, Eder Hernandez, Trinity Health Services, Divine Family Care, UC Health Consultants, and Valley Med Urgent Care.

### A. Relator has pled with particularity the Conflict-of-Interest claims

In her Complaint, Relator alleges that the various Defendants violated Section D (Code of Conduct and Conflict of Interest Requirements Conflict of Interest Provision) of SWK's cooperative agreement with ORR, which has the following requirement:

a. Care Provider staff are prohibited from taking unfair advantage of any professional or personal relationship or from exploiting their position to further their personal, religious, political, financial, or business interests.

b. Care Provider must establish and maintain a written Conflict of Interest policy applicable to all staff, board members, contractors, sub-contractors, subgrantees,

volunteers, and other internal stakeholders. The policy must:

- Identify and define conduct that creates a conflict of interest or a potential conflict of interest;
- Prohibit employees from having any direct or indirect financial interests in the transactions of services of the program;
- Require staff to recuse themselves from the decision-making process if there is a conflict of interest or a potential conflict of interest;
- Require staff to disclose any conflicts of interest prior to their involvement in a decision related to or affected by the conflict; and,
- State that failure to disclose conflicts of interest or potential conflicts of interest may result in discipline or termination of employment.

AC ¶ 61. Relator refers to this as the Conflict-of-Interest provision. Relator also identified the a list of the cooperative agreements that SWK has been awarded since 2014. *See* AC ¶ 53.

As to the Conflict-of-Interest claims[11], Relator alleges that the she first learned about the scheme directly from Eder, who told her that he had a "master plan" to take over the SWK shelters at Houston, Phoenix, and Brownsville. AC ¶ 94. The events that unfolded demonstrated that Naranjo was part of this master plan, as SWK awarded various shelters to two of his companies, Trinity Health Services and Divine Family Care. It started when in 2019, SWK, through Figeroa, awarded Trinity Health Services the Casa Padre medical provider contract and later the Arizona shelters to Divine Family Care. AC ¶ 130. In 2021, SWK enacted a sham "bidding" process to award Trinity Health Services the most lucrative Houston shelters. AC ¶¶

[11] These claims involve all Defendants except Alyssa Hernandez and Migdal Eder.

178–189. As early as July 2018, Eder, Naranjo, and Figueroa had knowledge of this plan. AC ¶ 94.

Therefore, while he was still employed at SWK, Naranjo violated the SWK's Conflict of Interests provision by taking "unfair advantage of [his] professional or personal relationship" and by "exploiting [his] position to further [his] personal, … financial, or business interests by attempting to award Casa Sunzal to Dr. Rauf and Valley Med Urgent Care, with whom he had a relationship through Eder, whom he used to recruit medical providers.

Figeroa also had knowledge of this plan. Lozano confirmed this when he told Relator that Figeroa awarded the contracts to Naranjo's companies. AC ¶ 160. Figeroa awarded the contract to Trinity Health Services even though the company had only been in existence for two months. AC ¶ 150. Figeroa cannot claim she did not have knowledge of this because just months prior, she was Naranjo's supervisor. She also knew that Naranjo had tried to install Dr. Rauf as the medical provider for Casa Sunzal right before he left, as Figeroa shared to Relator the issues he was having with him. AC ¶ 131. When Relator tried to recommend a replacement, she responded by saying "No, that's now how it works", which showed that such contracts were not up for public grabs but cherry picked by her and Naranjo. *Id.*

Figeroa further attempted to hide she was married to Geraldo Rivera, a vice president at SWK who oversaw all its shelter and medical provider contracts. AC ¶¶ 147, 150. When Relator asked her, Figeroa denied they were married. AC ¶ 147. Naranjo and Figeroa's knew that their actions were protected by this nepotistic relationship. Daniel De La Cruz, who replaced Figeroa, also shared to Relator the benefits they had with Rivera as vice president. AC ¶ 156.

Therefore, since its inception SWK—through Figeroa, Naranjo, and Rivera—had knowledge that it was awarding contacts to Naranjo's companies in violation of the Conflict of Interest policy.

Furthermore, SWK awarded the most lucrative Houston medical provider contracts to Trinity in a sham "bidding" process. As Relator alleges, SWK set for a request for production with unrealistic and unattainable timeframes for any outsider medical provider to achieve, meaning it was done with a predetermined outcome in mind. AC ¶ 189. Wilder, the procurement specialist for SWK who oversaw the process, informed Relator that the decision had been made by SWK's CEO, Anselmo Villareal. AC ¶ 188. SWK's CEO personally picked Naranjo's companies, establishing that the company had knowledge that it was violating the Conflict-of-Interest provision.

**B. Relator has pled that Defendants' violations of the Conflict of Interests provision led to false claims**

Defendant SWK argues that Relator "cannot identify any false or fraudulent statement SWK made to the government in connection with a payment by the government to SWK." SWK-MTD at 10. This is not true. Certainly, as the Amended Complaint lists, SWK has received at least 10 cooperative agreements since Relator informed the company about Eder Hernandez's role in the kickback scheme. Relator has discussed these tainted contracts in more than sufficient detail – including dates, locations and dollars amounts – *see* AC ¶¶ 11–14, to put Defendants on notice of the fraud allegations against them. SWK and the Defendants who controlled it applied for these federal funds with, at best, reckless disregard for the truth or falsity of their applications with respect to how the funds would ultimately be used.

As noted above, Defendant SWK knowingly received numerous cooperative agreements involving ORR contracts for shelters that were steered to Defendant Diego Naranjo and several

of his companies – Defendants, Trinity Health Services PLLC, Divine Family Care, PLLC. and UC Health Consultants – in violation of the conflicts of interest provision incorporated into those agreements. The Defendants then submitted claims for providing medical services to unaccompanied minors. These claims included SWK's false representations that the company would abide by its conflicts policy, and prevent and report any self-dealing involving its employees.

As Relator alleged, Defendants' "master plan," AC ¶¶ 94–95, was that the Naranjo Defendants would acquire SWK's largest and most lucrative shelter contracts, despite their limited experience providing direct services to patients. Once that plan was executed, it became clear that SWK's promises to ORR that it would abide by the conflicts of interest policy were false and illusory at the time they were made. Thus, SWK is liable under the FCA for presenting false claims that fraudulently induced the United States to award cooperative agreements for shelters that SWK knew would go to the Naranjo Defendants. *See* 31 U.S.C. §3729(a)(1)(A); *see also, e.g.*, *United States ex rel. Morsell v. Symantec Corp.*, 471 F.Supp.3d 257, 296 (D.D.C. 2020) ("There are, in turn, 'two major variations of the fraudulent inducement theory.' One of these 'requires that a party make[ ] promises at the time of contracting that it intends to break' while the other 'requires that false statements induced the government to make the initial contract or caused it to agree on particular contract terms or modifications.'") (internal citations omitted).

Moreover, by perpetrating the conflicts of interest violations – particularly given Defendant Diego Naranjo's leadership position within SWK; Trinity Health Services PLLC; Divine Family Care, PLLC.; and UC Health Consultants – the Naranjo Defendants not only caused SWK's false claims to be presented, in violation of the FCA. *See* 31 U.S.C.

§3729(a)(1)(A), but they also subsequently submitted tainted, false claims seeking reimbursements for their own services. *See Escobar*, 579 U.S. at 187 (stating that when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided.").

**C. Relator has pled sufficient facts paired with reliable indicia that lead to an undeniable inference that claims were submitted to ORR**

Relator has satisfied Rule 9(b)'s pleading requirements, as she has identified each of those SWK contracts and the locations of the corresponding shelter facilities throughout the Amended Complaint, while describing when and how those contracts were improperly awarded to various of the Naranjo Defendants, and who the decisionmakers were. *See* AC ¶¶ 47-54, 145–192.

Therefore, there is no doubt that the various defendants caused false claims to be submitted to ORR for providing medical services for the following shelters: *See* AC ¶ 194 ("Thus, SWK has awarded Naranjo (through Trinity Health Services, UC Health Consultants and Divine Family Care) the medical provider contracts at Casa Padre, Fortaleza, Lighthouse, Sunzal, Quetzal, Montezuma, Trail House, Franklin, Casita del Valle, and the Midland influx shelter. SWK has also awarded Naranjo the medical provider contracts of at least three other shelters: Casa Oasis, Casa Sueno, and Casa Amanecer.").

The Naranjo Defendants attempt to paint a red herring by stating that "Relator does not allege that Naranjo Defendants were unqualified or failed to appropriately provide or bill for services." N-MTD at 4. But that is wholly irrelevant and in fact does not take away any culpability for the false claims. In *United States ex rel. Longhi v. Lithium Power Techs., Inc.*, the defendant urged the Court to find that the Government was not damaged because it complied

with the contracts at issue. *See* 575 F.3d 458 (5th Cir. 2009). However, the Court was not moved because it found that Defendant deprived an eligible small business from receiving a federal grant. *Id.* at 473. ("The BMDO and the Air Force''s intangible benefit of providing an "eligible deserving" business with the grants was lost as a result of the Defendants' fraud."). In the same vain here, Defendants' fraud caused other eligible business, including Relator, from the benefit of receiving a medical provider contract free of conflicts and fraud. In any case, Defendants' argument is more of a damages argument. *Lithium* stands for the proposition that false claims that deprive deserving business of such opportunities makes the entire value of the medical provider contracts the whole damages amount. *See id.* ("In a case such as this, where there is no tangible benefit to the government and the intangible benefit is impossible to calculate, it is appropriate to value damages in the amount the government actually paid to the Defendants.").

### D. Relator has pled that the pertinent Defendants knowingly caused the submission of claims that violated the Conflict-of-Interest provision

As the Amended Complaint describes and as Defendants' respective Motions corroborate, SWK built its multi-state empire *after* Dr. Garza reported the illegal kickback scheme to SWK leadership – including Defendant Diego Naranjo and Defendant Fanny Figueroa (SWK's former Director of Medical Services) – in September 2018.[12] *See* AC ¶ 53 (detailing the dates of SWK's cooperative agreements); N-MTD at 7; SWK-MTD at 11–12 (confirming Relator's reports).

[12] Defendant SWK claims that Relator's AKS fraud allegation relies on "collective knowledge" of the scheme. SWK is mistaken. Relator has not "collected" and compiled the knowledge of multiple individuals in order to support her allegations against SWK. Rather, she has imputed the knowledge of SWK leaders – such as Fanny Figueroa and Diego Naranjo – to the company, just as she is permitted. *See, e.g.*, *United States v. Marlin Med. Sols., LLC*, 2025 WL 2267997, at *1, *4 (W.D. Tex. Mar. 3, 2025) ("Because [the defendant] is a company entity, it 'cannot act or have a mental state by itself'; however, 'the acts and mental states of its agents and employees will be imputed to [it] . . . where such natural persons acted on behalf of [it].' *See United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 372 (5th Cir. 2017).").

In sum, Relator has alleged a long trail of knowledge by all the key SWK's company officers of their plan to award the most lucrative medical provider contracts to Naranjo and his companies. *See supra Consolidated Response* § II and III.A–III.C.

## IV. Relator Adequately Pled a Conspiracy Claim Under the FCA

The Fifth Circuit has held that to prove a False Claims Act conspiracy, a a relator must show "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009).

Relator's Amended Complaint details conspiracies to violate the False Claims Act, between and among the Defendants. As discussed above, the allegations also show numerous acts committed by the Defendants in furtherance of those conspiracies. *See supra Consolidated Response* § II and III.

## V. All claims satisfy the FCA's materiality requirements

Next, Defendants attempt to absolve themselves of FCA liability with a variety of arguments that ACF grant recipients' false statements and omissions concerning underlying AKS and conflicts of interest violations are not material to the Government – with each referencing the United States Supreme Court's opinion in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016). *See, e.g.*, SWK-MTD at 15–17; N-MTD at 15–18; H-MTD at 19, 23–24. Despite Defendants' desires, their arguments are woefully mistaken.

The FCA's materiality standard is generally an objective one, asking whether the fraud has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4); *see also United States ex rel. Aldridge v. Corporate Mgmt., Inc.*, 78 F.4th 727, 736 (5th Cir. 2023). Rather flippantly, and without any supporting authority whatsoever, Defendants contend that their false representations regarding AKS and

conflicts of interest violations would not matter to the Government payor – arguing that the Government was aware that the claims were false, and even suggesting that the violations were "minor." *See* SWK-MTD at 15; H-MTD at 23; N-MTD at 16, 18. But Defendants offer no substance to support these bald contentions – they certainly cite no cases holding that such provisions are immaterial. And perhaps most importantly, *Escobar* counsels otherwise and fully supports Relator's allegation that Defendants presented and caused to be presented false claims to the United States for SWK's lucrative ORR cooperative agreements, and caused SWK's corrupted providers to submit false claims as well. As the Supreme Court declared:

> [W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with a particular statutory, regulatory, or contractual requirement.

*Escobar*, 579 U.S. at 194. These factors – though not dispositive – weigh strongly in favor of materiality.

First, the materiality of false and misleading representations concerning AKS violations is now definitively settled. As noted above, Congress has explicitly made compliance with the AKS a condition of payment from the federal healthcare programs, going so far as to amend the statute in 2010 to clarify its intent and resolve a split among the courts. *See* 42 U.S.C. §1320a-7b(g). Federal courts have followed suit. *See, e.g.*, *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019); (the First Circuit "read[s] the AKS amendment as obviating the need for a plaintiff to plead materiality—that is, to plead that compliance with the AKS was <u>material</u> to the government's decision to pay any specific claim.) (emphasis in original); *United States ex rel. Lutz v. BlueWave Healthcare Consultants, Inc.*, 853 F.3d 131, 135 (4th Cir. 2017) ("An AKS violation that results in a federal health care payment is a per se false claim under the FCA.");

*United States v. Marlin Med. Sols., LLC*, 2025 WL 2267997, at *1, *7 (W.D. Tex. Mar. 2, 2025 ("The [materiality] analysis is simplified considerably when, as here, the falsity of the claims are based on underlying AKS violations, which are 'inherently material' under the FCA to the government's decision to pay claims presented."); *United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*, 664 F. Supp.3d 722, 740 (W.D. Tex. 2023) ("Even where there is no expressly certified compliance, an implied certification of compliance through the mere submission of a claim for payment can be sufficient for FCA liability, at least where falsity is premised on an AKS violation.").

Second, Defendants similarly cannot escape their obligations to comply with the cooperative agreements' conflict of interests provisions. Relator has not merely alleged minor noncompliance with one of thousands of insubstantial regulatory requirements, as Defendants suggest. Rather, she has alleged Defendants' noncompliance with a core provision of the cooperative agreements – a provision that the Government specifically incorporated into its contracts with SWK. *See, e.g.*, AC at ¶¶ 61, 194, 196. When SWK applied for HHS grant funds, while failing to disclose that a portion of those funds would be used to facilitate improper kickbacks and self-dealing arrangements, it knowingly violated a pre-condition of receiving those funds and fraudulently induced the Government to commit federal funds that would otherwise not have been paid to SWK. *See, e.g.*, 2 C.F.R. §200.112 ("Federal agencies must establish conflict of interest policies for Federal awards. A recipient or subrecipient must disclose in writing any potential conflict of interest to the Federal agency or pass-through entity in accordance with the established Federal agency policies.").

Furthermore, consistent with *Escobar*, Relator can also establish materiality by showing the Government's consistent refusal to pay claims tainted by noncompliance with AKS and self-

dealing violations. Without question, Relator can show that the Government takes compliance with these requirements very seriously. As previously noted, claims tainted by AKS violations are the products of criminal activity and are *per se* false under the FCA; thus, those claims do not qualify for reimbursement. The federal Stark Law, 42 U.S.C. §1395mn; 42 C.F.R. §411.353, similarly prohibits providers from submitting healthcare claims that reflect improper self-dealing. It is clear that the Government refuses to pay these claims when it uncovers fraud. Additionally, Relator can demonstrate that the Government often uses the FCA to recover funds that were already paid out as a result of fraudulent misrepresentations.[13] Materiality is clear.

Defendants counter that Relator cannot establish materiality because the Government has **not** discontinued SWK's cooperative agreements and corresponding payments, despite Relator's *qui tam* allegations. *See* SWK-MTD at 16; N-MTD at 17 But *Escobar* does not discuss the Government's knowledge of *allegations*; instead, the focus is on the Government's actual

[13] *See, e.g.*, AC ¶ 217, n. 21 (referencing a 2020 GAO report discussing actions taken against non-compliant shelter providers, including one provider who was required to return more than $5 million to ORR the prior year because of financial conflicts of interest issues); Press Release, U.S. Department of Justice, "U.S. Attorney Announced $202 Million Settlement With Gilead Sciences For Using Speaker Programs To Pay Kickbacks To Doctors To Induce Them To Prescribe Gilead's Drugs" (Apr. 29. 2025) (available at: https://www.justice.gov/usao-sdny/pr/us-attorney-announces-202-million-settlement-gilead-sciences-using-speaker-programs); Press Release, U.S. Department of Justice, "Teva Pharmaceuticals Agrees To Pay $425 Million To Resolve Kickback Allegations" (Oct. 10, 2024) (available at: https://www.justice.gov/usao-ma/pr/teva-pharmaceuticals-agrees-pay-425-million-resolve-kickback-allegations); Press Release, U.S. Department of Justice, "Laboratory To Pay $26.67 Million To Settle False Claims Act Allegations Of Illegal Inducements To Referring Physicians" (Nov. 26, 2019) (available at: https://www.justice.gov/archives/opa/pr/laboratory-pay-2667-million-settle-false-claims-act-allegations-illegal-inducements-referring); Press Release, U.S. Department of Justice, "Trident USA Health Services LLC to Pay $8.5 Million To Resolve False Claims Act Liability For Alleged Kickback Scheme) (Sept. 25, 2019) (available at: https://www.justice.gov/usao-edpa/pr/trident-usa-health-services-llc-pay-85-million-resolve-false-claims-act-liability); Press Release, U.S. Department of Justice, "Medical Equipment Company Will Pay $646 Million For Making Illegal Payments To Doctors And Hospitals In United States And Latin America" (Mar. 1, 2016) (available at: https://www.justice.gov/archives/opa/pr/medical-equipment-company-will-pay-646-million-making-illegal-payments-doctors-and-hospitals).

knowledge that claims it has been asked to pay are false. *See Escobar,* 576 U.S. at 195 ("[I]f the Government pays a particular claim in full despite its **actual knowledge** that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.") (emphasis added); *United States ex rel. Campbell v. KIC Dev., LLC,* 2019 WL, at *1, *11, 12 (W.D. Tex. Dec. 10, 2019) ("[T]he Government's actual knowledge that it has been defrauded is not necessarily imputed from its awareness that allegations of fraud have been brought by a relator . . . . The Government's continued payment after the filing of Relator's Complaint may not be relevant to materiality because the Government may not yet have known with certainty that it had been defrauded by Defendants when it made the payments."). Defendant SWK contends that the Government had an independent basis of knowledge about the fraud schemes Relator alleged – referencing a 2020 GAO report cited in the Amended Complaint in which the Government made clear that "[a]s part of any enforcement actions and under HHS grants policy, ORR may recover any funds it determines were misspent or spent for purposes that are not allowed," and which described an unnamed grantee who was required to return $5 million to ORR in July "because of issues including financial conflicts of interest by executives at the organization." *See* SWK-MTD at 16. This report did not give the Government actual knowledge that any of *SWK's* cooperative agreements – most of which became effective after the events described in the report – were also tainted by conflicts of interest violations. Instead, the GAO report put **the Defendants** on notice that their actions were illegal and material, and could result in a substantial financial penalty. *See, e.g.*, *Hueseman*, 664 F. Supp.3d at 749 ("Ironically, [the defendant] argues that [the

Government's] guidance undermines the Government's position on materiality. Just the opposite is true. The Government accurately observes that the 2003 OIG Guidance 'put [the defendant] on notice that its actions were illegal. It did not put the government on notice of [the defendant's] illegal actions, which occurred [years later].")). Thus, in accordance with *Escobar*, the 2020 GAO report serves as "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with a particular statutory, regulatory, or contractual requirement."

Moreover, even if the Government did have actual knowledge of Defendants' false claims, yet continued making payments to SWK and its medical providers, that would not be dispositive. The Government has repeatedly explained that it often has important reasons for continuing to make payments, despite its knowledge of a recipient's fraud and its efforts to combat it. Traditionally, the Government employs a "pay and chase" approach, whereby claims are promptly paid in the first instance, and the Government subsequently investigates and pursues fraud claims where appropriate. As the Fifth Circuit recently observed in upholding a jury's finding of materiality despite the Government's continued payments, "the Government contends that various circuits have recognized valid reasons why an agency may continue to pay claims despite allegations of fraud without defeating materiality – for example, public health and safety. . . . Stopping reimbursements upon the first allegations of fraud would thus have undermined CMS's goal of sustaining healthcare access for underserved rural patients." *Aldridge*, 78 F.4th at 737–738. The same is true here, where abruptly stopping payments to SWK and its medical providers would have immediately ceased services for a highly vulnerable, underserved population of unaccompanied immigrant minors. The Government's continued payments are of no consequence here.

## VI. The Amended Complaint is Not Subject to Dismissal on Public Disclosure / Original Source Grounds Because Defendants Have Not Alleged that Dr. Garza's Allegations and Transactions Had Been Publicly Disclosed Previously.

As the court explained in *Health Choice Alliance, LLC, on behalf of United States v. Eli Lilly and Company, Inc.*:

> The law governing whether a relator may bring claims that have been publicly disclosed underwent some changes pursuant to the Patient Protection and Affordable Care Act ("PPACA")[ 124 Stat. 119-1025].[14] *United States ex rel. Payton v. Pediatric Servs. Of Am., Inc.,* No. CV416-102, 2017 WL 3910434, at *4 (S.D. Ga. Sept. 6, 2017). Prior to the passage of that law in 2010, challenges based on the FCA's public disclosure bar were considered jurisdictional and were brought pursuant to Fed. R. Civ. P. 12(b)(1).[15] *See, e.g., Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467 (2007) (holding § 3730(e)(4) is jurisdictional). After the passage of the PPACA, the public disclosure rule is no longer considered a jurisdictional bar, and the Court applies a Rule 12(b)(6) standard, rather than a Rule 12(b)(1) standard. *Payton*, 2017 WL 3910434, at *5 (citing *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015).

2018 WL 4026986 at *4 (E.D. Tex. Jul. 25, 2018).

---

[14] For this reason, the Supreme Court's *Rockwell* analysis, and most of the case law decisions cited by Hernandez Defendants at H-MTD at 21 are inapposite.

[15] The prior, now irrelevant, version of the public disclosure bar and original source-requirement provided that:

> (4) (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of information.
>
> (B) For purposes of this paragraph, 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A)–(B) (2006), *amended by* 31 U.S.C. § 3730(e)(4)(A)–(B) (Supp. 2011) (emphasis added).

Therefore, instead of depriving a court of jurisdiction, the public disclosure bar is treated in effect as an affirmative defense. *See, e.g.*, *United States ex rel. Beauchamp v. Academi Training Center,* 816 F.3d 37, 40 (4th Cir. 2016). Hence, the applicability of Rule 12(b)(6).

The False Claims Act section applicable in this case now provides in pertinent part:

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has [3] knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4). It is clear from the plain meaning of this amended statutory language that, a relator must qualify as an "original source" in accordance with subsection (B) of this provision **if, but only if**, there was prior to the filing of the complaint a disclosure of the complaint allegations in one of the sources identified in subsection (A), *i.e.*, in a Federal hearing of the kinds mentioned, in a Federal report, audit or investigation, or in the news media. *See, e.g.*, *United States ex rel. Little v. Shell Exploration & Prod. Co*., 690 F.3d 282, 294 (5th Cir. 2013) ("[O]nly if a public disclosure has occurred in this case will it become relevant whether the relator was an original source of the information.").

No Defendant alleges that Dr. Garza's allegations were previously publicly disclosed per the statute's definition. Accordingly, the Hernandez Defendants' 3-page discussion of original source is wholly irrelevant as a matter of law, *see* H-MTD at 20–22, and the Court need not, and should not, reach the question of whether Dr. Garza qualifies as an original source. *See, e.g., United States ex rel. Dekort v. Integrated Coast Guard Systems*, 705 F.Supp.2d 519, (N.D. Tex. 2010) (on motion to dismiss converted to motion for summary judgment, where relator sufficiently raised a genuine issue of material fact that the "allegations or transactions" upon which Relator's FCA causes of action were based, were not publicly disclosed, the court need not consider whether Relator qualified as an "original source."); *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1500 (11th Cir. 1991) ( The "original source" inquiry only becomes necessary once a court makes a factual determination that the particular qui tam suit before it was based upon information that was publicly disclosed.); *United States ex rel. Holmes v. Consumer Ins. Grp.*, 318 F.3d 1199, 1208 (10th Cir. 2003) (*en banc*) ("[W]here, as here, there was no public disclosure, the ... inquiry under § 3730(e)(4) ceases, regardless of whether the relator qualifies as an original source."); *United States ex rel. Beauchamp v. Academi Training Center,* 816 F.3d 37, 47 (4th Cir. 2016) (same).

Moreover, the Amended Complaint asserts **the absence of any of the statutory bars to suit**, **including section 3730(e)(4)**, and that, alternatively **Dr. Garza is an original source**. AC ¶ 4. Defendants say nothing in their motions to cast doubt on this allegation by Dr. Garza and, therefore, it must be accepted as true for purposes of Defendants' Rule 12(b)(6) motions to dismiss.

## VII. The Amended Complaint is Not Subject to Dismissal on Constitutional Grounds.

The Naranjo Defendants argue that the Amended Complaint must be dismissed because the enactment by Congress of the *qui tam* right of action for private persons violates two provisions of the U.S. Constitution, *i.e.*, the Appointments Clause and the Take Care Clause. *See* U.S. Const. Art. II; N-MTD at 18–20. The other Defendants do not join in this argument, presumably because they recognize that the argument is precluded in the Fifth Circuit by controlling precedent.

In *United States ex rel. Riley v. St. Luke's Hospital*, the Fifth Circuit Court of Appeals ruled *en banc* that:

> we hold that the qui tam provisions of the False Claims Act do not violate the principle of separation of powers by impermissibly infringing upon the constitutional duty of the Executive to take care that the laws are faithfully executed under the Take Care Clause of Article II. We similarly hold that the FCA's qui tam provisions do not violate the Appointments Clause.

252 F.3d 749, 758 (5th Cir. 2001) (*en banc*).

Notably, **every other circuit court that has considered the issue agrees.** *See United States ex rel. Stone v. Rockwell Int'l, Corp.*, 282 F.3d 787, 804–807 (10th Cir. 2002); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749–59 (9th Cir. 1993); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993). The Naranjo Defendants do not even acknowledge *Riley*, which is directly on point, and they fail to raise any new arguments not addressed and rejected in *Riley* and the other decisions just cited. Instead, they resort to a few decisions that either are inapposite or anomalous to the issues they raise. But *Riley* is still binding precedent. *See United States ex rel. Montcrief v. Peripheral Vascular Assoc., P.A.*, 133 F.4th 395, 410–412 (5th Cir. 2025) (circuit court concluding that Fifth

Circuit precedent "prevents us from addressing" Article II challenges to the FCA's *qui tam* provision); *Healthcare Assocs. Of Tex., LLC*, 2025 WL 1885642, at *1, *6 (N.D. Tex. July 8, 2025) (recognizing that Defendants' Article II challenges to the FCA's *qui tam* provision are "foreclosed by binding Fifth Circuit precedent").

Moreover, the U.S. Department of Justice – speaking on behalf of the federal Executive Branch whose constitutional powers are supposedly being infringed upon – has consistently maintained that the FCA's *qui tam* provision is constitutional, and has done so across multiple DOJ administrations. The Eleventh Circuit is the latest appellate court to examine the constitutionality issue, in the pending case, *United States ex rel. Zafirov v. Florida Med. Assocs.* (Cause Nos. 24-13581, 24-13583). Of course, that case involves a non-intervened *qui tam* suit being prosecuted by the relator, but the United States requested and received leave to intervene in the appeal in order to share its views on constitutionality with the circuit court. And in its briefing – which began under President Biden's administration and continued under the current administration – DOJ's position has remained unchanged: "[a]s private litigants pursuing private interests, relators are not enforcing federal law in a manner inconsistent with the Vesting and Take Care Clauses and need not be appointed in the manner required by the Appointments Clause." United States Department of Justice, Appellant's Opening Brief in *United States ex rel. Zafirov v. Florida Med. Assocs.*, Nos. 24-13581, -13583 (11th Cir. Jan. 6, 2025) (submitted under President Biden's administration); United States Department of Justice, Appellant's Reply Brief in *United States ex rel. Zafirov v. Florida Med. Assocs.*, Nos. 24-13581, -13583 (11th Cir. Apr. 30, 2025 (same) (filed under President Trump's administration). DOJ filed a similar Statement of Interest in this proceeding, making the same points. *See* Dkt. #93, United States Department of Justice, United States Statement of Interest at 5–6.

In summary, this lawsuit does not offend the Constitution, and is not subject to dismissal on that ground.

## VIII. The Amended Complaint Sufficiently Pleads that the pertinent Defendants Retaliated Against Relator in Response to Her Protected Activity of Attempting to Stop Defendants' Violations of the FCA

Count 4 of the Amended Complaint is a claim by Dr. Garza under 31 U.S.C. § 3730(h), which provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

As the Fifth Circuit ruled in *United States ex rel. Bias v. Tangipahoa Parish School Bd.*, 816 F.3d 315, 323 (5th Cir. 2016) "To survive a motion to dismiss, a plaintiff alleging injury under Section 3730(h)(1) must show (1) he engaged in protected activity, (2) his employer, or the entity with which he has contracted or serves as an agent, knew about the protected activity, and (3) he was retaliated against because of his protected activity." (citing *Robertson v. Bell Helicopter Textron*, Inc., 32 F.3d 948, 951 (5th Cir. 1994)). Protected activity includes, in the words of § 3730(h)(1), "efforts to stop 1 or more violations of" the FCA.

It cannot reasonably be doubted that Dr. Garza sufficiently alleged in the AC that she tried to stop what she reasonably believed to be an illegal kickback arrangement that Eder and Alyssa Hernadez were attempting to pressure her into joining. Dr. Garza informed Naranjo and Figueroa of the Hernandez family's demands for kickbacks in an effort to avoid participation in the illegality. AC ¶¶ 20, 104–107, 110–115, and 117–124. For example, Eder Hernandez and other members of the Hernandez family operated as though they controlled and were empowered

to select the medical providers needed at SWK facilities. Eder's mostly successful efforts to obtain kickbacks from other providers and his pressuring communications seeking a kickback from Dr. Garza reveal as much. AC ¶¶ 110–115. In this way, Eder acted as though he was the *de facto* employer and that medical providers needed to reach an agreement with him to secure a contract at a SWK facility. *Casinger v. Advanced Pain Care, Inc.*, No. 8:19-CV-1598-T-23TGW, 2021 WL 2786470, at *1 (M.D. Fla. Jan. 5, 2021) (exercising control over healthcare providers qualifies the defendant as a de facto employer), citing, "*Lampenfeld v. Pyramid Healthcare*, Inc., 2015 WL 926154, at *4 (M.D. Pa. 2015) (describing a circuit split), a natural person who 'dominates' and 'dictates" a corporate defendant's actions can qualify as a 'de facto employer' under Section 3730(h). *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1062 (6th Cir. 2014) (construing Section 3730 (h) as applying to 'employment-like relationships'); *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 710 (D.N.J. 1998); Claire M. Sylvia, the False Claims Act: Fraud Against the Government § 5:6 (2020) (explaining the 'de facto employer' exception)."

Relator engaged in protected activity directly with Eder by challenging and then refusing his demands for a kickback. AC ¶ 110. In doing so, Relator alerted Eder and others in the Hernandez family that she was aware their kickback scheme and intended to stop it. 31 U.S.C. § 3730(h)(1) (protected activity includes "efforts to stop 1 or more violations of this subchapter"). Relator then disclosed the kickback scheme to SWK mangers Naranjo and Figeroa. AC ¶¶ 117–118. It is unlikely that Naranjo, Figeroa, or other SWK officials were unaware of the Hernandez family's kickback operations. SWK relied on Eder to secure medical providers for its facilities. [AC ¶ 93] "Pay to play" was part of SWK's business model.

Having sufficiently alleged protected activity and knowledge of both the Hernandez family and SWK of her protected activity, Relator must plead sufficient facts to indicate that the

retaliation she experienced was, at least in part, due to her protected activity. 31 U.S.C. § 3730(h)(1) ("employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent"). "The showing necessary to demonstrate the causal-link part of the *prima facie* case is not onerous," and [Relator] "merely has to prove that the protected activity and the negative employment action are not completely unrelated." *United States ex rel. George v. Bos. Sci. Corp.*, 864 F.Supp.2d 597, 609 (S.D. Tex. 2012) (Rosenthal, J.) (quoting *United States ex rel. Dyson v. Amerigroup Tex., Inc.*, 2005 WL 2467689, at *3 (S.D. Tex. Oct. 6, 2005)); *United States ex rel. Johnson v. Raytheon Co.*, 563 F. Supp. 3d 599, 610 (N.D. Tex. 2021), aff'd sub nom. *United States ex rel Johnson v. Raytheon Co.*, 93 F.4th 776 (5th Cir. 2024).

Following Dr. Garza's refusal to pay kickbacks, Naranjo began taking certain of the Casas from her and her company, Nutrix, and awarding them to other cronies of his. AC, ¶¶ 129. Dr. Garza directly inferred the causal connection between Dr. A's severing of his kickback-paying relationship with the Hernandez defendants and Dr. A's loss of his plum medical provider contract with SWK's flagship shelter, Casa Padre. As alleged in the AC, Dr. A paid Eder a payment of $30,000 as a result of his wife's complaints about paying Eder when Eder was not performing the services at Casa Padre (AC, ¶ 97). Following that, SWK replaced Dr. A with Trinity Health Services, one of Naranjo's companies. (*Id.)*

Thus, the AC plausibly alleges the elements of the claims for FCA whistleblower retaliation at this, the pleading stage. This is especially the case since retaliation claims under the FCA are not subject to the heightened particularity requirement of Rule 9(b), but a plaintiff need only satisfy the notice-pleading standard of Rule 8(a). *United States ex rel. Grant v. United*

*Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018); *United States ex rel. Chorches for Bankruptcy Estate of Fabula v. American Medical Response, Inc.*, 865 F.3d 71, 95 (2d Cir. 2017); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008); *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004).

## IX. CONCLUSION

For the following reasons, Relator prays that this Court deny the three group of Defendants' motion to dismiss (ECF. 89, ECF. 90, and ECF. 91) and for all relief she is entitled to under the law.

Dated: August 20, 2025

Respectfully submitted,

/s/ Jack Kolar
John A. (Jack) Kolar
D.C. Bar No. 292953
*Appearing pro hac vice (Lead Counsel)*
**Government Accountability Project**
1612 K Street NW, Suite 1100
Washington, DC 20006
(p) 202-926-3311
(e) JackK@whistleblower.org

Richard Condit
D.C. Bar No. 417786
Cleveland Lawrence III
D.C. Bar No. 480462
*Appearing pro hac vice*
**Mehri & Skalet, PLLC**
2000 K Street NW, Suite 325
Washington, DC 20006
(p) 202-822-5100
(e) rcondit@findjustice.com
(e) clawrence@findjustice.com

Carlos Doroteo
TX Bar No. 24097616
*Appearing pro hac vice*
**Milpa Law PLLC**
1300 W 18th Street # 7263
Houston, TX 77008
(p) 866-666-4572
(e) Carlos@MilpaLaw.com

**COUNSEL FOR PLAINTIFF-RELATOR JANA GARZA**

# CERTIFICATE OF SERVICE

I certify that on August 21, 2025, I caused a true and correct copy of this document to be served via ECF on all counsel of record.

/s/Carlos Doroteo
Carlos Doroteo

**COUNSEL FOR PLAINTIFF-RELATOR JANA GARZA**