IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* JANA GARZA | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:25-cv-00305-ADA-SH |
| | § | |
| SOUTHWEST KEY PROGRAMS, INC., *et. al.*, | § | |
| | § | |
| Defendants. | § | |

**RELATOR JANA GARZA'S RESPONSE IN OPPOSITION TO DEFENDANT SWK'S MOTION TO DISMISS**

# TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Colon. Oaks Assisted Living, L.L.C. v. Hannie Dev., Inc.*,
972 F.3d 684, 687 (5th Cir. 2020) ....11

*Emery v Am. Gen. Fin., Inc.*,
134 F.3d 1321 (7th Cir. 1998) ....11

*Freitas v. Wells Fargo Home Mortg., Inc.*,
703 F.3d 436 (8th Cir. 2013) ....11

*Guilfoile v. Shields*,
913 F.3d 178 (1st Cir. 2019)....7

*McElvy v. Southwestern Correctional, LLC*,
2021 WL 4476762 (N.D. Tex. Sep. 29, 2021)....12

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) ....19

*Miller v. Dept. of Justice*,
842 F.3d 1242 (Fed. Cir. 2016)....19

*Mira Safety LLC v. BTG Int'l, Inc.*,
2025 WL 1576829 (W.D. Tex. Mar. 14, 2025) ....11

*Pace v. Cirrus Design Corp.*,
93 F.4th 879 (5th Cir. 2024) ....11

*Peterson v. Weinberger*,
508 F.2d 45 (5th Cir. 1975) ....5

*Schouest v. Medtronic, Inc.*,
92 F. Supp.3d 606 (S.D. Tex. 2015) ....11

*United States v. Hoge*,
933 F.3d 468 (5th Cir. 2019) ....2

*United States ex rel. Aldridge v. Corporate Mgmt., Inc.*,
78 F.4th 727 (5th Cir. 2023) ....7, 17

*United States ex rel. Bias v. Tangipahoa Parish School Bd*,
816 F.3d 315 (5th Cir. 2016) ....19

*United States ex rel. Campbell v. KIC Dev., LLC*,
2019 WL (W.D. Tex. Dec. 10, 2019) ....................9

*United States ex rel. Grant v. United Airlines Inc.*,
912 F.3d 190 (4th Cir. 2018) ....................19

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) ....................10, 11, 12, 18

*United States ex rel. Hart v. McKesson Corp.*,
96 F.4th 145 (2d Cir. 2024) ....................4

*United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*,
664 F.Supp.3d 722 (W.D. Tex. 2023)....................5, 16

*United States ex rel. Lutz v. BlueWave Healthcare Consultants, Inc.*,
853 F.3d 131 (4th Cir. 2017) ....................8

*United States v. Marlin Med. Sols.*,
579 F. Supp.3d 876 (W.D. Tex. 2022)....................12

*United States v. Marlin Med. Sols., LLC*,
2025 WL 2267997 (W.D. Tex. Mar. 2, 2025) ....................8, 9–10

*United States ex rel. Miniex v. Houston Hous. Auth.*,
No. 21-20435, 2023 WL 6174416 (5th Cir. Sept. 22, 2023) ....................11

*United States ex rel. Morsell v. Symantec Corp.*,
471 F.Supp.3d 257, 296 (D.D.C. 2020) ....................14

*United States ex rel. Parikh v. Citizens Med. Ctr.*,
977 F. Supp.2d 654 (S.D. Tex. 2013) ....................12

*United States ex rel. Porter v. Magnolia Health Plan, Inc.*,
810 F. App'x 237, 240 (5th Cir. 2020) ....................11

*United States ex rel. Rigsby v. State Farm Fire & Cas. Co.*,
794 F.3d 457 (5th Cir. 2015) ....................11

*United States ex rel. Ruscher v. Omnicare, Inc.*,
2014 WL 2618158 (S.D. Tex. June 12, 2014) ....................3

*United States ex rel. Spicer v. Westbrook*,
751 F.3d 354 (5th Cir. 2014) ....................10

*United States ex rel. Taylor v. Healthcare Assocs. of Tex., LLC*,
2025 WL 1885642 (N.D. Tex. July 8, 2025) .......... 17

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*,
848 F.3d 366 (5th Cir. 2017) .......... 10

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
389 F.3d 1251 (D.C. Cir. 2004) .......... 19

*United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*,
2019 WL 571349 (W.D. Tex. Feb. 2, 2019) .......... 5

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) .......... 7, 9

**Statutes**

31 U.S.C. §3729(a)(1)(A) .......... 14

31 U.S.C. §3729(b)(1) .......... 10

31 U.S.C. §3729(b)(4) .......... 7

31 U.S.C. § 3730(h) .......... 19

42 U.S.C. § 1320a-7b(b) .......... 3

42 U.S.C. § 1320a–7b(g) .......... 5, 7

**Federal Regulations**

2 C.F.R. §200.112 .......... 18

# TABLE OF CONTENTS


I. Relator's Fraud Allegations State a Claim for Relief Under the False Claims Act............ 1

1. Relator's Anti-Kickback Statute Act Allegations State a Claim for Relief............ 2

A. Relator Has Pled Violations of the AKS.................................................... 2

i. SWK's Illegal Kickbacks Scheme.................................................. 2

ii. Eder Hernandez's Illegal Kickbacks Scheme................................ 4

B. Relator Has Alleged SWK's Corresponding Liability Under the FCA........................................................................................... 5

i. SWK's Claims were Materially False............................................ 7

ii. SWK's Claims Were Knowingly False ......................................... 9

iii. The Allegation Satisfies Rule 9(b)'s Pleading Standard............... 10

2. Relator's Conflicts of Interest Allegations State a Claim for Relief .................... 13

II. Relator Adequately Pled a Conspiracy Claim Under the FCA........................................ 18

III. The Amended Complaint Sufficiently Pleads a Retaliation Claim ................................. 19

IV. Conclusion ..................................................................................................... 20

Relator, Jana Garza, respectfully submits this **Response** in opposition to Defendant, Southwest Key Programs, Inc.'s (**SWK**), motion to dismiss (**MTD**) Relator's First Amended Complaint (**AC**). *See* ECF 89. Contrary to Defendant's assertion, the AC properly states claims for relief under the FCA, and pleads the circumstances of SWK's fraud schemes with the requisite particularity. Consequently, the MTD should be denied.

## I. Relator's Fraud Allegations State a Claim for Relief Under the False Claims Act

SWK contends that the AC "fails to provide any connection between any request for payment to the government – the "*sine qua non*" of an FCA claim – and any materially false statement or fraudulent conduct by SWK." MTD at 1; 10. SWK reaches this baseless conclusion because it misapprehends Relator's multiple fraud claims.

First, Relator has alleged that SWK perpetrated an illegal kickbacks scheme involving the medical providers selected to operate its shelters, in violation of the AKS; the company is also liable under the FCA for subsequently causing those providers to submit false claims tainted by those AKS violations. Relatedly, Relator alleged that SWK violated the FCA by submitting requests for ORR grant funds that knowingly omitted material information that those funds were subject to being used to pay illegal kickbacks to one of its employees – Eder Hernandez – whom SWK had charged with recruiting medical providers on its behalf.

Second, Relator has alleged that SWK violated the FCA by submitting requests for ORR grants funds that knowingly omitted material information regarding its violations of the conflicts of interest policy incorporated into its cooperative agreements with the United States. Similarly, she alleged that when SWK improperly awarded shelter contracts to the Naranjo Defendants in violation of the conflicts policy, SWK caused those Defendants to submit false reimbursement claims for their services. In all of these instances, Relator has alleged the four elements of an

FCA fraud claim, namely, the presentment of a claim that was knowingly and materially false. *See generally*, 31 U.S.C. § 3729; *United States v. Hoge*, 933 F.3d 468, 473 (5th Cir. 2019) ("In determining whether liability attaches under the FCA, this court asks '(1) whether there was a false statement or fraudulent course of conduct; (2) made ... with ... scienter; (3) that was material; and (4) that caused the government to pay out money.'").

Third, Relator has alleged that SWK violated the FCA by conspiring with several others – including the Naranjo Defendants – to defraud the United States by directing and participating in the conflicts of interest scheme. Relator has sufficiently described, with particularity, the circumstances of the conspiratorial agreements between and among those Defendants, as well as numerous acts SWK, through its leaders, took in furtherance of the conspiracy.

In addition, Relator has alleged that SWK unlawfully retaliated against her in response to her efforts to prevent the frauds described above.

**1. Relator's Anti-Kickback Statute Act Allegations State a Claim for Relief**

**A. Relator Has Pled Violations of the AKS**

**i. SWK's Illegal Kickbacks Scheme**

SWK argues that "Relator fails to meet any of the AKS elements regarding SWK, particularly that SWK sought or received any remuneration from any individual; nor has Relator identified any payment requests to the government that resulted from SWK violating the AKS. Rather, Relator's AKS allegations focus on an alleged solicitation by an individual defendant, not SWK." MTD at 11. But, as noted above, Relator *has* in fact alleged that SWK directly participated in an illegal kickback scheme. She pled particularized facts about the company's attempt – in 2014 or 2015 – to engage Dr. B, a dentist in San Benito, Texas, in a kickback scheme involving contracts for services to unaccompanied minors at SWK's Casa Rio Grande

and Casa Antigua shelters.[1] *See* AC at ¶¶98–101. Without question, SWK's misconduct violated the Anti-Kickback Statute's prohibitions, which apply to:

> (1) Whoever knowingly and willfully **solicits** or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> > (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b) (emphasis added).

SWK offers that "[a] relator must sufficiently plead that a defendant: (1) knowingly and willfully (2) solicited or received, or offered or paid remuneration (3) in return for or to induce referrals or program-related business." MTD at 8. Here, Relator has very clearly alleged that SWK knowingly solicited remuneration from Dr. B in return for program-related business. Next, SWK argues that an AKS-based fraud claim under the FCA must "sufficiently allege[s] that the defendant *received* kickbacks made 'with the intent of inducing referrals, and they plead 'particular details of a scheme . . . paired with reliable indicia that lead to a strong inference that claims were actually submitted.''" MTD at 8-9 (emphasis added). However, as noted above, the AKS not only reaches successful kickbacks schemes, but it also criminalizes *attempts* at illegal kickbacks, *i.e.* "solicitations." In addition, SWK's argument for a heightened scienter standard –

[1] SWK also argues that Relator's AKS-based claims fail because she has not alleged "how it was that [d]efendant provided remuneration to its clients, the form of that remuneration, how and why [d]efendant believed that remuneration would induce new business; and how [d]efendant benefitted from the remuneration," citing *United States ex. rel. Ruscher v. Omnicare, Inc.* SWK-MTD at 11, 12.But Relator has not alleged that SWK *paid* illegal kickbacks. Thus, *Ruscher* is inapplicable. Moreover, SWK's quote from *Ruscher* is glaringly incomplete. The court actually "conclude[d] that 'to allege the particulars of a scheme to **offer** kickbacks, Relator must sketch how it was that Defendant provided remuneration to its clients . . .'" *Ruscher*, 2014 WL 2618158, at *1, *10 (S.D. Tex. June 12, 2014) (emphasis added). Relator has not alleged a scheme to offer kickbacks; rather, SWK **solicited** kickbacks from its medical providers.

it must have known that it was violating the AKS in order to be liable – has been soundly rejected. As the Second Circuit explained:

> The retention of the willfulness requirement in that context suggests that Congress still intended the term to protect against criminal liability for unwitting defendants by requiring that a defendant act with knowledge that her conduct is somehow unlawful, even though it eschewed any requirement that a defendant know about the **AKS** specifically.

*United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 156 (2d Cir. 2024) (emphasis added). Relator has properly pled the elements of SWK's AKS violation.

### ii. Eder Hernandez's Illegal Kickbacks Scheme

Separately, Relator has alleged that one of SWK's employees – Defendant, Eder Hernandez ("Eder"), who was used to recruit providers to operate SWK's shelter – perpetrated an independent illegal kickback scheme in order to enrich himself, his family, and his own interests. As Relator alleges, Eder steered lucrative ORR-financed shelter contracts to providers who were willing to pay financial kickbacks and submit to SWK's control. She notes that he not only carried out this illegal kickback scheme to benefit himself and his interests, but he did so on behalf of the other Defendants as well – including Diego Naranjo (SWK's Assistant Director of Medical Services); Fanny Figueroa (SWK's Director of Medical Services), Valley Med Urgent Care, LLC ("Valley Med Urgent Care"); Alyssa Hernandez ("Alyssa"); and Migdal Eder, LLC ("Migal Eder"). SWK is vicariously liable, as the Naranjo and Figueroa were corporate managers authorized to award medical provider contract for SWK. *See generally* AC ¶¶ 93–131.

Relator alleged particularized facts regarding Eder's solicitation of illegal kickbacks from Dr. A (also identified as Dr. Diaz), as well as the details of Eder's unsuccessful solicitation of kickbacks from her – a scheme that also involved Eder's sister, Defendant, Alyssa Hernandez and his company, Defendant, Migdal Eder, as instrumentalities of the scheme. *See id.* Without

question, the AC alleges that Eder solicited remuneration from SWK providers in exchange for SWK's program-related business – which violates the AKS. Relator also alleged that SWK was aware of Eder's scheme – Relator told SWK leadership herself – which SWK has seemingly corroborated. *See id.;* MTD at 11–12.

### B. Relator Has Alleged SWK's Corresponding Liability Under the FCA

Relator has also pled SWK's FCA liability regarding the AKS violations described above. She pleads that since illegally soliciting Dr. B, the company has sought and received at least a dozen new cooperative agreements with ORR – for billions of taxpayer dollars, *see id.* at ¶53 – without divulging any underlying its material AKS violations to the Government. As Relator has not only alleged that SWK violated the AKS, but that those violations also tainted SWK's subsequent claims for federal funds, she has alleged a claim for relief under the False Claims Act. *See* AC ¶¶ 193–203; *see also*¸42 U.S.C. § 1320a–7b(g) ("[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim.").

But SWK does not only bear FCA liability for its own fraudulent submissions to ORR. SWK is also liable under the statute for *causing* each of its providers who participated in SWK's scheme to subsequently submit their own false reimbursement claims to ORR, in violation of the "causes to be presented" provision of section 3729(a)(1)(A). *See, e.g.*, *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975) (FCA can "reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud."); *United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*, 664 F.Supp.3d 722, 739 (W.D. Tex. 2023) ("That [the defendant] did not itself submit claims to [the government] is irrelevant because 'the FCA reaches anyone who 'causes' the submission of a false claim . . ."); *United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*, 2019 WL 571349, at *1, *5 (W.D. Tex. Feb. 2, 2019)

("The FCA allows claims to proceed against parties who can fairly be said to have caused a claims to be presented to the government. '[I]f the government proves that a kickback arrangement existed and that the kickback arrangement was as substantial factor in bringing about [a party's] submissions to Medicare and that the submissions were a normal consequence of the situation created by the kickback arrangement, the defendant may be found to have 'caused' the submissions.") (internal citation omitted). Notably, Relator's allegation that SWK caused providers to submit false claims does not rest on any false statements made by SWK; . Indeed, Relator can plead "the circumstances" of this fraud scheme, *see* FED. R. CIV. P. 9(b), without alleging any specific false statement by SWK. Similarly, although Relator *has* alleged that SWK directly solicited kickbacks on its own, she can maintain her "cause to be presented" allegation without alleging that SWK paid, solicited or otherwise benefitted from a kickback.[2]

Relator has also alleged SWK's liability under the False Claims Act, with respect to Eder's illegal kickbacks scheme. The AC alleges that, even after learning about Eder's scheme in 2018, SWK sought and received multiple cooperative agreements from ORR, totaling hundreds of millions of dollars, *see* AC at ¶53 – without telling the Government that it had reason to believe that a portion of those grant funds would be misappropriated and used to pay illegal kickbacks to one of its employees. Indeed, SWK built its multi-state empire *after* Dr. Garza reported the illegal kickback scheme to SWK leadership – including Defendant Diego Naranjo and Defendant Fanny Figueroa (SWK's former Director of Medical Services). Again, Relator has alleged that all reimbursement claims to the federal government that were tainted by Eder's AKS

---

[2] Thus, SWK's repeated references to its "zero-dollar" contracts are inconsequential. *See* MTD at 10.

violations – including those submitted by SWK[3] – are false under the FCA. *See* AC ¶¶ 193–203; *see* also 42 U.S.C. § 1320a–7b(g). SWK cannot escape this result, despite its varied arguments.

**i. SWK's Claims were Materially False**

SWK argues that the falsity Relator alleged – SWK's failure to tell the Government about the AKS violations that tainted its cooperative agreements – was not material to the United States and suggested the violations "minor or insubstantial." MTD at 15. However, the materiality of AKS violations for purposes of FCA liability is well-settled.

The FCA's materiality standard is generally an objective one, asking whether the fraud has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4); *see also United States ex rel. Aldridge v. Corporate Mgmt., Inc.*, 78 F.4th 727, 736 (5th Cir. 2023). The Supreme Court has also declared:

> [W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with a particular statutory, regulatory, or contractual requirement.

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). These factors – though not dispositive – weigh strongly in favor of materiality here.

First, Congress explicitly made compliance with the AKS a condition of payment from the federal healthcare programs with a 2010 amendment to the statute that clarified its intent and resolved a circuit split. *See* 42 U.S.C. §1320a-7b(g). The courts followed suit. *See, e.g.*, *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019); (the First Circuit "read[s] the AKS amendment as

[3] SWK claims that "Relator cannot identify any request for payment that SWK made or caused to be made and through which SWK received any federal government compensation that relates to *any* of Relator's allegations regarding AKS…" MTD at 18. This is simply not true, as Relator has identified several tainted cooperative agreements, worth hundreds of millions of dollars. *See* AC at ¶53.

obviating the need for a plaintiff to plead materiality—that is, to plead that compliance with the AKS was material to the government's decision to pay any specific claim.) (emphasis in original); *United States ex rel. Lutz v. BlueWave Healthcare Consultants, Inc.*, 853 F.3d 131, 135 (4th Cir. 2017) ("An AKS violation that results in a federal health care payment is a per se false claim under the FCA."); *United States v. Marlin Med. Sols., LLC*, 2025 WL 2267997, at *1, *7 (W.D. Tex. Mar. 2, 2025 ("The [materiality] analysis is simplified considerably when, as here, the falsity of the claims are based on underlying AKS violations, which are 'inherently material' under the FCA to the government's decision to pay claims presented.").

Furthermore, consistent with *Escobar*, Relator can also establish materiality by showing the Government's consistent refusal to pay claims tainted by noncompliance with AKS and self-dealing violations. Without question, Relator can show that the Government takes compliance with the AKS very seriously. As previously noted, claims tainted by AKS violations are the products of criminal activity and are *per se* false under the FCA; thus, those claims do not qualify for reimbursement. It is also clear that the Government refuses to pay these claims when it uncovers fraud. In fact, Relator can demonstrate that the Government often uses the FCA to recover funds that were already paid out as a result of fraud.[4] Materiality is clear.

---

[4] *See, e.g.*, Press Release, U.S. Department of Justice, "U.S. Attorney Announced $202 Million Settlement With Gilead Sciences For Using Speaker Programs To Pay Kickbacks To Doctors To Induce Them To Prescribe Gilead's Drugs" (Apr. 29. 2025) (available at: https://www.justice.gov/usao-sdny/pr/us-attorney-announces-202-million-settlement-gilead-sciences-using-speaker-programs); Press Release, U.S. Department of Justice, "Teva Pharmaceuticals Agrees To Pay $425 Million To Resolve Kickback Allegations" (Oct. 10, 2024) (available at: https://www.justice.gov/usao-ma/pr/teva-pharmaceuticals-agrees-pay-425-million-resolve-kickback-allegations); Press Release, U.S. Department of Justice, "Laboratory To Pay $26.67 Million To Settle False Claims Act Allegations Of Illegal Inducements To Referring Physicians" (Nov. 26, 2019) (available at: https://www.justice.gov/archives/opa/pr/laboratory-pay-2667-million-settle-false-claims-act-allegations-illegal-inducements-referring); Press Release, U.S. Department of Justice, "Trident USA Health Services LLC to Pay $8.5 Million To Resolve False Claims Act Liability For Alleged Kickback Scheme) (Sept. 25, 2019) (available at: https://www.justice.gov/usao-edpa/pr/trident-usa-health-services-llc-pay-85-million-resolve-false-claims-act-liability); Press Release, U.S. Department of Justice, "Medical Equipment Company Will Pay $646 Million For Making Illegal Payments To Doctors And Hospitals In

SWK counters that Relator cannot establish materiality because the Government did not discontinue SWK's cooperative agreements and corresponding payments, despite Relator's fraud allegations. *See* SWK-MTD at 16. But *Escobar* does not discuss the Government's knowledge of *allegations*; instead, the focus is on the Government's actual knowledge that claims it has been asked to pay are false. *See Escobar,* 576 U.S. at 195 ("[I]f the Government pays a particular claim in full despite its **actual knowledge** that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.") (emphasis added); *United States ex rel. Campbell v. KIC Dev., LLC,* 2019 WL, at *1, *11, 12 (W.D. Tex. Dec. 10, 2019) ("[T]he Government's actual knowledge that it has been defrauded is not necessarily imputed from its awareness that allegations of fraud have been brought by a relator . . . . The Government's continued payment after the filing of Relator's Complaint may not be relevant to materiality because the Government may not yet have known with certainty that it had been defrauded by Defendants when it made the payments.").

**ii. SWK's Claims Were Knowingly False**

SWK contends that Relator's AKS fraud allegation relies on "collective knowledge" of the scheme. SWK is mistaken. Relator has not "collected" and compiled the knowledge of multiple individuals in order to support her allegations against SWK. Rather, she has imputed the knowledge of SWK leaders – such as Defendants, Fanny Figueroa and Diego Naranjo – to the company, just as she is permitted. *See, e.g.*, *Marlin Med. Sols.*, 2025 WL 2267997, at *1, *4

---

United States And Latin America" (Mar. 1, 2016) (available at: https://www.justice.gov/archives/opa/pr/medical-equipment-company-will-pay-646-million-making-illegal-payments-doctors-and-hospitals).

("Because [the defendant] is a company entity, it 'cannot act or have a mental state by itself'; however, 'the acts and mental states of its agents and employees will be imputed to [it] . . . where such natural persons acted on behalf of [it].' *See United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 372 (5th Cir. 2017).").

Significantly, Relator is not required to plead SWK's knowledge of FCA violations with particularity. *See* FED. R. CIV. P. 9(b) ("knowledge, and other conditions of a person's mind may be alleged generally"). Moreover, the FCA's scienter standard is very lenient, as it not only includes actual knowledge, but also deliberate indifference and reckless disregard for the truth. *See* 31 U.S.C. § 3729(b)(1). Relator's AKS-based fraud allegations certainly satisfy this standard; she has alleged that SWK either/both submitted materially false claims for cooperative agreements with actual knowledge that they were concealing their own illegal kickbacks scheme from the Government and/or SWK learned about Eder's illegal kickbacks scheme and subsequently submitted materially false claims for cooperative agreements with at least deliberate indifference and reckless disregard for whether or not those claims omitted additional AKS violations and the corresponding misuse of the ORR grant funds SWK was to receive.

**iii. The Allegation Satisfies Rule 9(b)'s Pleading Standard**

SWK argues that Relator must allege the "who, what, when, where, and how" of their alleged fraud. *See* MTD at 6–7, citing *United States ex rel. Spicer v. Westbrook*, 751 F.3d 354 (5th Cir. 2014). But the Fifth Circuit does not require Relator to particularize each one of the five "who, what, when, where, and how" factors with exacting specificity for each alleged false claim and/or false statement. In fact, the Fifth Circuit rejected similar arguments in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009)—which is the Rule 9(b) case cited

most often in this Circuit—and that principle has been reinforced in numerous cases since.[5] This Court reached the same conclusion in *Mira Safety LLC v. BTG Int'l, Inc*., 2025 WL 1576829, at *1, *2 (W.D. Tex. Mar. 14, 2025), and should do the same here.

The *Grubbs* court stressed that Rule 9(b) is not only "context specific [and] flexible and [but] must remain so to achieve the remedial purpose of the False Claim Act" and to "effectuate[] Rule 9(b) without stymieing legitimate efforts to expose fraud." *Grubbs*, 565 F.3d at 190; *see also*, *United States ex rel. Rigsby v. State Farm Fire & Cas. Co*, 794 F.3d 457, 466 n.5 (5th Cir. 2015). Thus, the context/holistic formulation advances the public interest by "protect[Ing] the [T]reasury," and "ensur[es] the complaint 'provides defendants with fair notice of the plaintiffs' claims, protects defendants from harm to their reputation and goodwill, reduces the number of strike suits, and prevents plaintiffs from filing baseless claims then attempting to discover unknown wrongs.'" *Grubbs,* 565 F.3d at 184 (citation omitted).

Importantly, Rule 9(b)'s pleading standard has long been relaxed when an FCA plaintiff has difficulty alleging particularized details regarding the fraud scheme that are "peculiarly within the possession of the defendant." *Freitas v. Wells Fargo Home Mortg., Inc*., 703 F.3d 436, 440 (8th Cir. 2013); *Emery v Am. Gen. Fin., Inc*., 134 F.3d 1321, 1323 (7th Cir. 1998) (collecting cases and declaring: "We don't want to create a Catch-22 situation in which a complaint is dismissed because of the plaintiff's inability to obtain essential information without pretrial discovery (normally of the defendant, because the essential information is in his possession and he will not reveal it voluntarily) that she could not conduct before filing the complaint."); *Schouest v. Medtronic, Inc.* 92 F. Supp.3d 606, 610 n.2 (S.D. Tex. 2015) (citing

[5] *See*, *e.g., Pace v. Cirrus Design Corp*., 93 F.4th 879, 891 (5th Cir. 2024); *United States ex rel. Miniex v. Houston Hous. Auth*., No. 21-20435, 2023 WL 6174416, at *6 (5th Cir. Sept. 22, 2023); *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020); *Colon. Oaks Assisted Living, L.L.C. v. Hannie Dev., Inc*., 972 F.3d 684, 687 n.4 (5th Cir. 2020).

*Freitas* and observing that "a number of courts have recognized that the heightened pleading standards of Rule 9(b) should be relaxed 'upon a showing by the plaintiff that he or she is unable, without pretrial discovery, 'to obtain essential information' peculiarly in the possession of the defendant.'"); *McElvy v. Southwestern Correctional, LLC*, 2021 WL 4476762, at *1, *3 (N.D. Tex. Sep. 29, 2021) ("the Rule 9(b) pleading requirements may be relaxed where information is peculiarly in the possession of the defendant. . . . This exception is not a 'license to base claims of fraud on speculation and conclusory allegations.' . . . Plaintiff's allegations here do not implicate these concerns because they are based on personal experience, are not speculative or conclusory, and put [the defendant] on sufficient notice as to the circumstances of the alleged fraud."). Certainly, Relator does not have complete information regarding the scope of SWK's and Eder's illegal kickbacks schemes; much of that information is in those Defendants' possession. However, Relator's claims are also based on her personal experience, which warrants a more relaxed pleading standard here.

Similarly, although Relator does not have access to SWK's and its providers' reimbursement claims data, the AC satisfies Rule 9(b). As *Grubbs* counsels, "[i]f the [plaintiff] plausibly alleges that a defendant received kickbacks made 'with the intent of inducing referrals, and they plead 'particular details of a scheme paired with reliable indicia that lead to a strong inference that claims were actually submitted,' the separate elements of the AKS and FCA are satisfied." *United States v. Marlin Med. Sols.*, 579 F. Supp.3d 876, 884–885 (W.D. Tex. 2022) (*quoting United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp.2d 654, 665 (S.D. Tex. 2013) and *citing Grubbs*, 565 F.3d at 190). Relator has met this burden by offering sufficient details of the fraud scheme, coupled with indicia of reliability that SWK and its medical providers actually submitted claims to ORR. Here, the kickback scheme involves SWK's grant

funds, *see* AC ¶ 27 – a percentage of which providers illegally "kicked back" to SWK, Eder Hernandez and others. Logically, the scheme simply could not survive if SWK did not submit claims for cooperative agreements, and if SWK's medical providers did not subsequently submit reimbursement claims for their services to unaccompanied minors. SWK has offered no reason to believe that it and/or its medical providers failed to submit claims to the United States for cooperative agreement funds and/or for reimbursement for medical services. Indeed, SWK's shelters remained operational for years and years, while the company and its providers received documented billions in Government funds. Relator has therefore provided the necessary "reliable indicia that lead to a strong inference that claims were actually submitted."

**2. Relator's Conflicts of Interest Allegations State a Claim for Relief**

The AC alleges that SWK violated Sections C and D of its cooperative agreements with ORR, which include the following requirements:

> C. Care Provider staff are prohibited from taking unfair advantage of any professional or personal relationship or from exploiting their position to further their personal, religious, political, financial, or business interests.
>
> D. Care Provider must establish and maintain a written Conflict of Interest policy applicable to all staff, board members, contractors, sub-contractors, subgrantees, volunteers, and other internal stakeholders. The policy must:
>
> - Identify and define conduct that creates a conflict of interest or a potential conflict of interest;
> - Prohibit employees from having any direct or indirect financial interests in the transactions of services of the program;
> - Require staff to recuse themselves from the decision-making process if there is a conflict of interest or a potential conflict of interest;
> - Require staff to disclose any conflicts of interest prior to their involvement in a decision related to or affected by the conflict; and,
> - State that failure to disclose conflicts of interest or potential conflicts of interest may result in discipline or termination of employment.

AC ¶ 61. Relator has alleged that SWK knowingly received numerous cooperative agreements involving ORR contracts for shelters that were improperly steered to Defendant Diego Naranjo and several of his companies – Defendants, Trinity Health Services PLLC, Divine Family Care, PLLC, and UC Health Consultants (collectively, "the Naranjo Defendants") – in violation of the conflicts of interest provision incorporated into those agreements, that required SWK to take certain steps to prevent and report any self-dealing involving its employees.

As the AC pleads, SWK was part of a "master plan" to divert its largest and most lucrative shelter contracts to the Naranjo Defendants, *see* AC ¶¶ 94–95, despite their limited experience providing direct services to patients, and the conflicts created due to Diego Naranjo's history as a high-ranking SWK official. Consequently, SWK's promises to ORR that it would abide by the conflicts of interest policy were false and illusory at the time those promises were made. Thus, SWK is liable under the FCA for presenting false claims that fraudulently induced the United States to award cooperative agreements for shelters that SWK knew would go to the Naranjo Defendants. *See* 31 U.S.C. §3729(a)(1)(A); *see also, e.g.*, *United States ex rel. Morsell v. Symantec Corp.*, 471 F.Supp.3d 257, 296 (D.D.C. 2020) ("There are, in turn, 'two major variations of the fraudulent inducement theory.' One of these 'requires that a party make[ ] promises at the time of contracting that it intends to break' while the other 'requires that false statements induced the government to make the initial contract or caused it to agree on particular contract terms or modifications.'") (internal citations omitted).

In addition, by perpetrating the conflicts scheme and improperly awarding shelter contracts to the Naranjo Defendants, SWK caused Diego Naranjo and his companies to submit corresponding false claims to the Government to be reimbursed for their healthcare services. Relator alleged that in 2019, SWK, through Figeroa, awarded Trinity Health Services the Casa

Padre medical provider contract and later the Arizona shelters to Divine Family Care. AC ¶ 130. In 2021, SWK enacted a sham "bidding" process to award Trinity Health Services the most lucrative Houston shelters. *Id.* at ¶¶ 178–189. As early as July 2018, Eder, Naranjo, and Figueroa had knowledge of this plan. *Id.* at ¶ 94. Therefore, while he was still employed at SWK, Naranjo violated the SWK's Conflict of Interests provision by taking "unfair advantage of [his] professional or personal relationship" and by "exploiting [his] position to further [his] personal, … financial, or business interests" by attempting to award Casa Sunzal to Dr. Rauf and Valley Med, with whom he had a relationship through Eder, whom he used to recruit medical providers.

Figeroa also had knowledge of this plan. *Id.* at ¶ 160. Figeroa awarded the contract to Trinity Health Services even though the company had only been in existence for two months. *Id/* at ¶ 150. Relator also knew that Naranjo had tried to install Dr. Rauf as the medical provider for Casa Sunzal right before he left, as Figeroa shared with Relator the issues she was having with Dr. Rauf. *Id.* at ¶ 131. When Relator tried to recommend a replacement, she responded by saying "No, that's now how it works", which showed that such contracts were not up for public grabs but cherry picked by her and Naranjo. *Id*. Figeroa further attempted to hide that she was married to Geraldo Rivera, a vice president at SWK who oversaw all its shelter and medical provider contracts. *Id.* at ¶¶ 147, 150. When Relator asked, Figeroa denied they were married. *Id.*.

Since its inception SWK – through Figeroa, Naranjo, and Rivera – had knowledge that the company was awarding contacts to Naranjo's companies in violation of the Conflict of Interest policy. Furthermore, SWK awarded the most lucrative Houston medical provider contracts to Trinity in a sham "bidding" process. As Relator alleges, SWK set for a request for production with unrealistic and unattainable timeframes for any outsider medical provider to achieve, meaning it was done with a predetermined outcome in mind. AC ¶ 189. Wilder, the

procurement specialist for SWK who oversaw the process, informed Relator that the decision had been made by SWK's CEO, Anselmo Villareal. AC ¶ 188. SWK's CEO personally picked Naranjo's companies, establishing SWK's knowledge that it was violating this provision.

Additionally, SWK raised a different materiality argument concerning Relator's conflicts of interest allegation. But compliance with the conflicts of interest policy was undoubtedly material to the Government. According to SWK, materiality is negated because ORR already knew about the company's conflicts of interest violations – referencing a 2020 GAO report cited in the AC in which the Government made clear that "[a]s part of any enforcement actions and under HHS grants policy, ORR may recover any funds it determines were misspent or spent for purposes that are not allowed," and which described an unnamed grantee who was required to return $5 million to ORR in July "because of issues including financial conflicts of interest by executives at the organization." MTD at 16. But this report did not give the Government actual knowledge that any of *SWK's* cooperative agreements – most of which became effective after the events described in the report occurred – were also tainted by conflicts of interest violations. Instead, the GAO report put **SWK** on notice that its actions were illegal and material, and could result in a substantial financial penalty. *See, e.g.*, *Hueseman*, 664 F. Supp.3d at 749 ("Ironically, [the defendant] argues that [the Government's] guidance undermines the Government's position on materiality. Just the opposite is true. The Government accurately observes that the 2003 OIG Guidance 'put [the defendant] on notice that its actions were illegal. It did not put the government on notice of [the defendant's] illegal actions, which occurred [years later]."). Thus, in accordance with *Escobar*, the 2020 GAO report serves as "evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with a particular statutory, regulatory, or contractual requirement."

Moreover, even if the Government *did* have actual knowledge of false claims, yet continued making payments to SWK and its medical providers, that would not be dispositive on materiality. The Government often has important reasons for continuing to make payments, despite knowledge of a recipient's fraud. Traditionally, the Government employs a "pay and chase" approach, whereby claims are promptly paid in the first instance, and the Government subsequently investigates and pursues fraud claims where appropriate. As the Fifth Circuit recently observed in upholding a jury's finding of materiality despite the Government's continued payments, "the Government contends that various circuits have recognized valid reasons why an agency may continue to pay claims despite allegations of fraud without defeating materiality – for example, public health and safety. . . . Stopping reimbursements upon the first allegations of fraud would thus have undermined CMS's goal of sustaining healthcare access for underserved rural patients." *Aldridge*, 78 F.4th at 737–738. The same is true here, where abruptly stopping payments to SWK and its medical providers would have immediately ceased services for a highly vulnerable, underserved population of unaccompanied immigrant minors. The Government's continued payments are of no consequence here – even if the Government was aware that SWK's cooperative agreements were false (which has not been established).

Additionally, despite SWK's suggestion that non-compliance with the conflicts-of-interest provision is "minor or insubstantial," MTD at 15–16, Relator has not merely alleged minor noncompliance with one of thousands of insubstantial regulatory requirements. Rather, she has alleged SWK's noncompliance with a core provision of the cooperative agreements – a provision that the Government specifically incorporated into its contracts with SWK. *See, e.g.*, AC at ¶¶ 61, 194, 196. When SWK applied for HHS grant funds, while failing to disclose that a portion of those funds would be used to facilitate improper kickbacks and self-dealing

arrangements, it knowingly violated a pre-condition of receiving those funds and fraudulently induced the Government to commit federal funds that would otherwise not have been paid to SWK. *See, e.g.*, 2 CFR §200.112 ("Federal agencies must establish conflict of interest policies for Federal awards. A recipient or subrecipient must disclose in writing any potential conflict of interest to the Federal agency or pass-through entity in accordance with the established Federal agency policies."). Relator has, therefore, stated a claim for relief under the FCA.

## II. Relator Adequately Pled a Conspiracy Claim Under the FCA

The Fifth Circuit has held that to prove a False Claims Act conspiracy, a a relator must show "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement." *Grubbs*, 565 F.3d at 193. Contrary to SWK's argument, *see* MTD at 12–13, Relator alleges conspiracies to violate the False Claims Act, between and among the Defendants. As discussed above, the allegations also show numerous acts committed by the Defendants in furtherance of those conspiracies. Relator alleges that SWK and several of its employees conspired with the Naranjo Defendants to defraud the United States by implementing their "master plan" to "take over Houston, Phoenix, and Brownsville," and "intend[ing] to manipulate their federal contracts in such a way that they could maximize their personal financial gain," and "violate[] the prohibitions against conflicts of interest in SWK's Cooperative Agreement with ORR." AC ¶¶ 94–95. She further alleged that Diego Naranjo—once a powerful SWK official who wielded incredible power to decide which medical providers would receive SWK shelter contracts, *see id.* at ¶ 129—eventually left SWK, and immediately used his influence to steer SWK's most lucrative shelter contracts to his own companies, in clear violation of SWK's conflict of interest obligations. *See id.* at ¶¶ 145–192.

Further, Relator describes how SWK's misconduct was repeated again and again, until the Diego Naranjo and his companies actually took over, as he predicted – a process that only took about two years. *See id.* And Relator alleges that the subsequent claims SWK and the Naranjo Defendants submitted for reimbursement were materially false. Therefore, Relator has alleged numerous acts by SWK in furtherance of the Defendants' illicit master plan.

Relator has properly pled the Naranjo Defendants' FCA liability due for the conflicts of interest conspiracy ad SWK's motion to dismiss that claim should be denied.

## III. The Amended Complaint Sufficiently Pleads a Retaliation Claim

Count 4 of the AC is a claim by Dr. Garza under 31 U.S.C. § 3730(h), which provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

*Unlike fraud* claims, FCA retaliation claims are not subject to Rule 9(b); a plaintiff need only satisfy the notice-pleading standard of Rule 8(a). See *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008); *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004).

As the Fifth Circuit ruled in *United States ex rel. Bias v. Tangipahoa Parish School Bd.*, 816 F.3d 315, 323 (5th Cir. 2016) "To survive a motion to dismiss, a plaintiff alleging injury under Section 3730(h)(1) must show (1) he engaged in protected activity, (2) his employer, or the entity with which he has contracted or serves as an agent, knew

about the protected activity, and (3) he was retaliated against because of his protected activity." (internal citation omitted).

Dr. Garza sufficiently alleged that she tried to stop what she reasonably believed to be an illegal kickback arrangement that Eder Hernandez and his affiliates were pressuring her to join. In September 2018, Relator (1) refused to pay Eder the kickbacks; and (2) reported the Hernandez's family illicit demands Diego Naranjo, whom she reasonably believed had authority over Eder and could demand that Eder stop his illegal activity. AC ¶¶ 20, 104–107, 110–115, and 117–124. Once Dr. Garza she reported this effort to stop an FCA violation, she was viewed as not being a "team player." Naranjo retaliated against Garza by taking away Casa Sunzal away from her and awarding it to Dr. Rauf. AC ¶ 129. That constituted an act of discrimination close in time to her protected activity supporting an inference that it was retaliatory to her whistleblowing under a common test for causation in the context of whistleblowing, the knowledge-timing test. *See, e.g.*, *Miller v. Dept. of Justice*, 842 F.3d 1242, 1256 (Fed. Cir. 2016).

Later, SWK began to systematically award to the Naranjo defendants medical provider contracts all over the US. AC ¶ 159. Around October 2021, SWK created sham bidding process for the shelters and awarded Naranjo the three largest Houston shelters. AC ¶¶ 178–189. This sham process showed SWK's continued discrimination against Dr. Garza in retaliation for her whistleblowing. In summary, Relator Garza's allegations of retaliation by SWK satisfies the three elements for 3730(h) liability described above, and therefore states a claim for relief.

## IV. Conclusion

For the following reasons, Relator prays that this Court deny SWK's Motion to Dismiss (ECF. 89) and for all relief she is entitled to under the law.

Dated: September 17, 2025

Respectfully submitted,

/s/ Jack Kolar
John A. (Jack) Kolar
D.C. Bar No. 292953
*Appearing pro hac vice (Lead Counsel)*
**Government Accountability Project**
1612 K Street NW, Suite 1100
Washington, DC 20006
(p) 202-926-3311
(e) JackK@whistleblower.org

Richard Condit
D.C. Bar No. 417786
Cleveland Lawrence III
D.C. Bar No. 480462
*Appearing pro hac vice*
**Mehri & Skalet, PLLC**
2000 K Street NW, Suite 325
Washington, DC 20006
(p) 202-822-5100
(e) rcondit@findjustice.com
(e) clawrence@findjustice.com

Carlos Doroteo
TX Bar No. 24097616
*Appearing pro hac vice*
**Milpa Law PLLC**
1300 W 18th Street # 7263
Houston, TX 77008
(p) 866-666-4572
(e) Carlos@MilpaLaw.com

**COUNSEL FOR PLAINTIFF-RELATOR JANA GARZA**

## CERTIFICATE OF SERVICE

I certify that on September 17, 2025, I caused a true and correct copy of this document to be served via ECF on all counsel of record.

/s/Carlos Doroteo
Carlos Doroteo

**COUNSEL FOR PLAINTIFF-RELATOR JANA GARZA**