IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* JANA GARZA | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 1:25-cv-00305-ADA-SH |
| | § | |
| SOUTHWEST KEY PROGRAMS, INC., *et. al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

**RELATOR JANA GARZA'S RESPONSE IN OPPOSITION TO THE NARANJO DEFENDANTS' MOTION TO DISMISS**

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Caperton v. A.T. Massey Coal Co.*,
556 U.S. 868 (2009) .......... 7

*Casinger v. Advanced Pain Care, Inc.*,
No. 8:19-CV-1598-T-23TGW, 2021 WL 2786470 (M.D. Fla. Jan. 5, 2021) .......... 20

*Colon. Oaks Assisted Living, L.L.C. v. Hannie Dev., Inc.*,
972 F.3d 684, 687 (5th Cir. 2020) .......... 7

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) .......... 19

*Miller v. Dept. of Justice*,
842 F.3d 1242 (Fed. Cir. 2016) .......... 20

*Mira Safety LLC v. BTG Int'l, Inc.*,
2025 WL 1576829 (W.D. Tex. Mar. 14, 2025) .......... 7

*Mruz v. Caring, Inc.*,
991 F. Supp. 701 (D.N.J. 1998) .......... 20

*Pace v. Cirrus Design Corp.*,
93 F.4th 879 (5th Cir. 2024) .......... 7

*Peterson v. Weinberger*,
508 F.2d 45 (5th Cir. 1975) .......... 2

*Robertson v. Bell Helicopter Textron, Inc.*,
32 F.3d 948 (5th Cir. 1994) .......... 19

*United States v. DynCorp. Int'l, LLP*,
253 F.Supp.3d 89 (D.D.C. 2017) .......... 12

*United States v. Ruan*,
966 F.3d 1101 (11th Cir. 2020) .......... 3

*United States ex rel. Aldridge v. Corporate Mgmt., Inc.*,
78 F.4th 727 (5th Cir. 2023) .......... 11, 14

*United States ex rel. Bias v. Tangipahoa Parish School Bd*,
816 F.3d 315 (5th Cir. 2016) .......... 19

*United States ex rel. Campbell v. KIC Dev., LLC*,
2019 WL (W.D. Tex. Dec. 10, 2019) ....................13

*United States ex rel. Chorches for Bankruptcy Estate of Fabula v. American Medical Response, Inc.*,
865 F.3d 71 (2d Cir. 2017)....................19

*United States ex rel. Grant v. United Airlines Inc.*,
912 F.3d 190 (4th Cir. 2018) ....................19

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) ....................6, 9, 15

*United States ex rel. Hart v. McKesson Corp.*,
96 F.4th 145 (2d Cir. 2024) ....................5–6

*United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*,
664 F.Supp.3d 722 (W.D. Tex. 2023)....................2

*United States ex rel. Kelly v. Boeing Co.*,
9 F.3d 743, 749-59 (9th Cir. 1993) ....................17

*United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*,
985 F.2d 1148 (2d Cir. 1993)....................17

*United States ex rel. Lemon v. Nurses to Go, Inc.*,
924 F.3d 155 (5th Cir. 2019) ....................5, 6

*United States v. Marlin Med. Sols.*,
579 F. Supp.3d 876 (W.D. Tex. 2022)....................9

*United States ex rel. Miniex v. Houston Hous. Auth.*,
No. 21-20435, 2023 WL 6174416 (5th Cir. Sept. 22, 2023) ....................7

*United States ex rel. Montcrief v. Peripheral Vascular Assoc., P.A.*,
133 F.4th 395 (5th Cir. 2025) ....................17

*United States ex rel. Parikh v. Citizens Med. Ctr.*,
977 F. Supp.2d 654 (S.D. Tex. 2013) ....................9

*United States ex rel. Porter v. Magnolia Health Plan, Inc.*,
810 F. App'x 237, 240 (5th Cir. 2020) ....................7

*United States ex rel. Riley v. St. Luke's Hospital*,
252 F.3d 749 (5th Cir. 2001) ....................16–17

*United States ex rel. Stone v. Rockwell Int'l, Corp.*,
282 F.3d 787 (10th Cir. 2002) .....17

*United States ex rel. Sullivan v. Atrium Med. Corp*,
No. CV SA-13-CA-244-OLG, 2014 WL 12879671 (W.D. Tex. Dec. 31, 2014) .....6

*United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*,
41 F.3d 1032 (6th Cir. 1994) .....17

*United States ex rel. Taylor v. Healthcare Assocs. of Tex., LLC*,
2025 WL 1885642 (N.D. Tex. July 8, 2025) .....17

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
389 F.3d 1251 (D.C. Cir. 2004) .....19

*United States ex rel. Zafirov v. Florida Med. Assocs.*,
751 F. Supp. 3d 1293 (M.D. Fla. 2024) .....17–18

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) .....11, 12, 13

**United States Constitution**

U.S. Const. Art. II .....16

**Statutes**

31 U.S.C. §3729(a)(1)(A) .....11

31 U.S.C. §3729(b)(4) .....11

31 U.S.C. § 3730(h) .....18

42 U.S.C. § 1320a–7b(f) .....2

42 U.S.C. §1395mn .....12

42 U.S.C. § 14401 .....4

**Federal Regulations**

2 C.F.R. §200.112 .....14

42 C.F.R. §411.353 .....12

45 C.F.R. §410.1307 .....4

**Other Authorities**

Charles A. Wright, *et al*., 5A FED. PRAC. & PROC. CIV. § 1298 (4th ed., updated May 20, 2025) .....7

Claire M. Sylvia, the False Claims Act: Fraud Against the Government § 5:6 (2020) .....20

James Wm. Moore *et al*., MOORE'S FEDERAL PRACTICE § 9.03 [1] [a], at 9–16 to 9–18 (3d ed. 2005) .....7

# TABLE OF CONTENTS


I. The Amended Complaint Alleges Violations of the Anti-Kickback Statute, as well as Corresponding Violations of the False Claims Act ........ 1

1. Relator Has Not Alleged that the Naranjo Defendants Directly Participated in an Illegal Kickbacks Scheme; Diego Naranjo is Liable Under the FCA for Causing SWK to Submit False Claims ........ 1

2. The Tainted Claims at Issue Were Submitted to a Federal Health Program .......... 2

3. Relator Has Satisfied the AKS's "Knowingly and Willfully" Requirement .......... 5

4. The AKS-Based Fraud Claims Were Pled with the Requisite Particularity........... 6

II. The Amended Complaint Pleads Defendants' FCA Liability for Underlying Violations of SWK's Conflicts of Interest Requirements........ 9

III. Relator Adequately Pled a Conspiracy Claim Under the FCA........ 14

IV. The Amended Complaint is Not Subject to Dismissal on Constitutional Grounds.......... 16

V. The Amended Complaint Sufficiently Pleads a Retaliation Claim ........ 18

VI. Conclusion ........ 20

Relator Jana Garza, by her undersigned attorneys respectfully submits this **Response** in opposition to the Motion to Dismiss (**MTD**) Relator's First Amended Complaint (cited to herein as **AC**) filed by Defendants, Diego Naranjo (**Diego**), and his companies, Divine Family Care, PLLC; Trinity Health Services, PLLC; and Diego Naranjo d/b/a UC Health Consultants (collectively **the Naranjo Defendants**). *See* ECF 90.

The Naranjo Defendants' arguments that the AC's fraud and retaliation claims are deficient are wholly without merit and the MTD should be denied.

## I. The Amended Complaint Alleges Violations of the Anti-Kickback Statute, as well as Corresponding Violations of the False Claims Act

The Naranjo Defendants argue that the AC "fails to allege the key elements of an AKS violation. *First*, Relator fails to allege that any Naranjo Defendant offered, paid, solicited, or received remuneration – or agreed with anyone to do so – in exchange for a referral. *Second*, Relator fails to allege that any claim was submitted to 'a federal health care program.' And *third*, Relator fails to allege that any Naranjo Defendant acted knowingly and willfully." MTD at 6 (emphasis in original). Each of these arguments will be addressed in turn.

### 1. Relator Has Not Alleged that the Naranjo Defendants Directly Participated in an Illegal Kickbacks Scheme; Diego Naranjo is Liable Under the FCA for Causing SWK to Submit False Claims

The Naranjo Defendants are correct that Relator has not alleged that they solicited or paid illegal kickbacks from anyone. But the inquiry does not end there. While Relator has alleged that another SWK employee, Defendant Eder Hernandez, perpetrated an illegal kickbacks scheme involving SWK medical providers, *see* AC ¶¶ 110–124, she also alleged that Defendant Diego Naranjo (**Diego**) was aware of Eder's scheme—indeed, she informed Diego herself, *see id.* at ¶¶ 117–119—despite the Naranjo Defendants' contrary assertion, *see* MTD at 7. As Diego was SWK's Assistant Director of Medical Services at the time, and charged with assigning SWK's

shelter contracts to medical providers, *see, e.g.*, AC ¶¶ 129–192 (describing Diego's control over the distribution of SWK shelter contracts); MTD at 7 (acknowledging Relator's allegation that it was Diego who informed Relator that she would receive additional contracts from SWK). Moreover, Relator alleged that Diego Naranjo aided SWK in submitting materially false claims for ORR cooperative agreements – claims that misled the Government by intentionally concealing Diego's knowledge of Eder's kickback scheme involving federal grant funds. Consequently, Relator has alleged that Diego caused SWK to submit false claims to the Government. *See, e.g.*, *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975) (FCA can "reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud."); *United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*, 664 F.Supp.3d 722, 739 (W.D. Tex. 2023) ("That [the defendant] did not itself submit claims to [the government] is irrelevant because 'the FCA reaches anyone who 'causes' the submission of a false claim . . .").

**2. The Tainted Claims at Issue Were Submitted to a Federal Health Program**

The Naranjo Defendants challenge Relator's AKS-based fraud allegations, arguing that the AKS was not implicated because the false claims at issue were submitted to ORR – which they assert is not a "Federal health care program." *See* MTD at 8–10. While Defendants concede that ORR provides medical services to unaccompanied minors, they argue that ORR medical services do not qualify as "health benefits," *see* MTD at 9–10, despite 42 U.S.C. § 1320a-7b(f), which provides:

> ORR, a component of the Department of Health and Human Services (HHS), primarily administers programs for the resettlement of refugees and care of unaccompanied minors. **These services include** housing, education, and some limited **medical screening and urgent care**, but ORR does not provide health insurance, ongoing medical care, or reimbursement for health services in a manner akin to Medicare or Medicaid.

(emphasis added).

The Amended Complaint plainly alleges that the ORR program for medical services constitutes a “Federal health care program”:

> 200. “Federal health care program” is defined in subsection (f) of the statute as “any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government….”
>
> 201. The program covering UCs in ORR custody constitutes a “Federal health care program” because it is a plan or program that provides health benefits to the UCs and is funded directly by the federal government through HHS and its ORR component.

AC ¶¶ 200–201.

The statutory definition of “federal health care program” is a broad, functional one: it asks whether a “plan or program” provides “health benefits,” and whether those health benefits are funded “by the United States Government.” Nowhere does it require, nor is it determinative, that those health services be provided “through insurance,” as signified by the word “otherwise.” The definition also does not require, nor is not determinative, that the health services be provided as ongoing medical care or through reimbursement “akin to Medicare or Medicaid,” so long as the plan or program at issue provides Government-funded *health benefits*.

Defendants have set forth an unfounded new test that has no statutory or legal basis. Defendants rely mainly on one criminal case for their extreme narrow reading of what qualifies as a Federal health care program: *United States v. Ruan*. *See, e.g.*, MTD at 10. In that case, an appeals court was tasked with determining whether the kickback *prescription* claims at issue were paid using federal funds. *See United States v. Ruan*, 966 F.3d 1101, 1145–46 (11th Cir. 2020). The circuit court held that the Government failed to establish beyond a reasonable doubt that the prescription claims were federally funded because the Government only produced

evidence at trial that federal funds were used to pay "for physician services, not prescriptions." *Id.* at 1145. In *dicta*, the court noted that FARA, the federal longshoreman insurance program which provided the federal funds, was "not named in 42 U.S.C. § 14402(d), the statute listing Federal health care funding programs, like Medicare and Medicaid." *Id.* at 1146. But that was not the determinative reason for its holding. Furthermore, the Court's *dicta* should be ignored in light that the statutory provision it is referencing falls under Chapter 138 of Title 42, which deals with the very limited topic of funding restrictions for assisted suicide. *See* 42 U.S.C § 14401 ("It is the principal purpose of this chapter to continue current Federal policy by providing explicitly that Federal funds may not be used to pay for items and services . . . to cause (or assist in causing) the suicide, euthanasia, or mercy killing of any individual.").

The Naranjo Defendants attempt to rely on an October 2023 letter from then HHS Secretary Sebelius for their sweeping view that ORR does not qualify as a federal health care program. *See* MTD at 11. But that letter discusses privately-paid insurance plans. Nothing in the letter "strongly" counsels that ORR is not a federal health care program, because it contains no legal analysis and because the private plans referenced bear no resemblance to ORR medical services. The Naranjo Defendants further misconstrue the statutory text by arguing that ORR claims need to be paid from a federal health care program. *See id.* at 9. But the statute clearly provides that a plan or program can be funded "directly, in whole or in part, by the United States Government" – meaning it can come from any federal source of funds. Defendants also ignore the obvious regulatory text: the medical services that ORR provides through third parties to unaccompanied children is through a program known as "standard programs." *See* 45 C.F.R. § 410.1307.

In any case, at the pleading stage, this Court is required to take Plaintiff's allegations as true. *See, e.g.*, *United States ex rel. Lemon v. Nurses to Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019) ("We accept as true all well-pleaded allegations of fact in the complaint and construe them in the light most favorable to Plaintiffs.").

Finally, the United States has weighed in on this question before the Court, with a Statement of Interest brief that responds directly to the Naranjo Defendants' "unconvincing arguments," and declares that Defendants' "narrow view of the phrase 'Federal health care Program' cannot be squared with the statutory language, which broadly prohibits most kickbacks for items or services that might ultimately be paid for by American taxpayers. . . . Under the plain language of the AKS, health care benefits are provided to [unaccompanied minors] by ORR under a Federal health care Program." ECF 93, United States Department of Justice, United States Statement of Interest at 1–4. Relator adopts the United States' arguments.

**3. Relator Has Satisfied the AKS's "Knowingly and Willfully" Requirement**

The Naranjo Defendants assert that "[t]he AKS requires that a defendant act both 'knowingly' and 'willfully.'" Relator agrees. But she also reiterates that she has not alleged that the Naranjo Defendants participated in Eder Hernandez's illegal kickbacks scheme. Thus, Defendants' discussion of supposed "conclusory allegations" regarding Diego Naranjo and his scienter is of no value.

Furthermore, the AKS's scienter standard was clarified in 2010, when Congress announced amendments to the FCA. As the Second Circuit explained:

> The retention of the willfulness requirement in that context suggests that Congress still intended the term to protect against criminal liability for unwitting defendants by requiring that a defendant act with knowledge that her conduct is *somehow* unlawful, even though it eschewed any requirement that a defendant know about the **AKS** specifically.

*United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 156 (2d Cir. 2024) (emphasis added). Relator has satisfied the AKS pleading standard; her allegations against the Hernandez Defendants plead knowing and willful misconduct. Notably, Relator has alleged that Eder personally told her that he helped Dr. Diaz obtain the Casa Padre contract.[1] *See* AC ¶ 93. Further, Eder admitted to Relator that Dr. Diaz was paying him a kickback for each child he saw at Casa Padre. *Id.* Although Dr. Diaz was not honoring the terms of his kickback arrangement with Eder, Eder did not pursue legal remedies because he knew that the arrangement was illegal. AC ¶¶ 94–96. These allegations suffice to meet the AKS' "knowing" and willful" pleading requirement.

**4. The AKS-Based Fraud Claims Were Pled with the Requisite Particularity**

As the Naranjo Defendants observe, Relator's fraud claims are subject to Rule 9(b)'s heightened pleading requirements, and to the extent that those claims are based on AKS violations, then the kickbacks scheme must also be pled with particularity. MTD at 4. The AC meets this standard. Although Defendants make the touchstone of their attack on the particularity of Dr. Garza's Amended Complaint the "who, what, when, where, and how" test, *see* MTD at 4-5, 11, in *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009)—which is the Rule 9(b) case cited most often in this Circuit—the Fifth Circuit rejected a rigid Rule 9(b) test and held that "the 'time, place, contents, and identity' standard is not a straitjacket for Rule 9(b)." *Grubbs,* 565 F.3d at 190.[2] Thus, a relator's complaint need not particularize each allegation, or Rule 9(b) factor, as "[n]o one factor is dispositive, and our inquiry is holistic." *Lemon*, 924 F.3d at 161 (5th Cir. 2019). Numerous other cases have followed the same

[1] The Amended Complaint attempted to anonymize him as Dr. A but in a later paragraph disclosed his name as Dr. Diaz. His name was also fully disclosed in Relator's Original Complaint.

[2] *See United States. ex rel. Sullivan v. Atrium Med. Corp.*, No. CV SA-13-CA-244-OLG, 2014 WL 12879671, at *21 (W.D. Tex. Dec. 31, 2014), rept. & rec. adopted, No. SA-5:13-CV-244-OLG, 2015 WL 13799755 (W.D. Tex. Mar. 18, 2015).

approach.[3] This Court recently did the same, in *Mira Safety LLC v. BTG Int'l, Inc.*, 2025 WL 1576829, at *1, *2 (W.D. Tex. Mar. 14, 2025) ("Rule 9(b) that applies in all contexts. . . . [A] plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' **without including all the details** . . .—it depends on the elements of the claim at hand"),[4] and should do so again here. The leading treatises also agree.[5]

As the Amended Complaint describes, SWK's medical provider recruiter, Defendant Eder Hernandez (**Eder**), engaged in a scheme in which he steered lucrative Office of Refugee Resettlement (**ORR**)-financed shelter contracts to providers who were willing to pay financial kickbacks and submit to SWK's control. Relator pled particularized facts regarding Eder's illegal scheme, alleging that he personally told her that he helped Dr. Diaz obtain the Casa Padre contract and admitted that Dr. Diaz was paying him a kickback for each child he saw there. AC ¶ 93. As Relator further alleged, Eder Hernandez's illicit dealings with Dr. Diaz, and with Defendant Naranjo and his company, Trinity Health Services, PLLC, resulted in a $30,000 kickback payment from Dr. Diaz to Eder, before Dr. Diaz's shelter was taken away and awarded to Trinity.

---

[3] *See, e.g.*, *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 891 (5th Cir. 2024); *United States ex rel. Miniex v. Houston Hous. Auth.*, No. 21-20435, 2023 WL 6174416, at *6 (5th Cir. Sept. 22, 2023); *United States ex rel. Porter v. Magnolia Health Plan, Inc.*, 810 F. App'x 237, 240 (5th Cir. 2020); *Colon. Oaks Assisted Living, L.L.C. v. Hannie Dev., Inc.*, 972 F.3d 684, 687 n.4 (5th Cir. 2020).

[4] Defendants have not distinguished or even mentioned *Mira*, as if they are "whistling past the graveyard." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 899 (2009) (Roberts, C.J., and Scalia, Thomas, & Alito, JJ., dissenting).

[5] As Wright and Miller summarize, under the "holistic" test the Supreme Court articulated in *Tellabs*, "the degree of detail required ... often turns on the substantive context in which the fraud is alleged to have occurred," paying attention to "the complexity of the transaction in question," "[t]he relationship of the parties," whether a case turns on "omissions rather than affirmative misrepresentations," and other relevant factors. The most important "consideration … as to the sufficiency of a pleading for purposes of [Rule 9(b)] is the determination of how much detail is necessary to give adequate notice to an adverse party and to enable that party to prepare a responsive pleading." Charles A. Wright, *et al.*, 5A FED. PRAC. & PROC. CIV. § 1298 (4th ed., updated May 20, 2025). *See* James Wm. Moore *et al.*, MOORE'S FEDERAL PRACTICE § 9.03 [1] [a], at 9–16 to 9–18 (3d ed. 2005).

Additionally, Relator alleged that in July 2018 Eder recruited her to become a shelter medical provider for a new SWK shelter that was slated to open. AC ¶ 85. Eder knew the name of the shelter – Casa Sunzal – and the opening date before that information became publicly available, showing that he had inside information from SWK leadership. AC ¶ 91. Eder explicitly told Relator he would schedule a meeting with Defendants Diego Naranjo and Fanny Figueroa. AC ¶ 92. In August 2018, Eder sent Relator an email which showed that Eder knew exactly what Casa Sunzal and Casa Quetzal needed to be operational. AC ¶ 108. Eder further knew that the opening on Casa Sunzal would be delayed – which only insiders knew. AC ¶ 108.

Furthermore, Relator detailed Eder's attempts to coerce her to pay him kickbacks, which would be funneled through his sister, Defendant Alyssa Hernandez, and his company, Migdal Eder LLC. She described how Eder solicited an illegal kickback from her, in the form of an Administrative Services Agreement, wherein Relator's company would pay Migdal Eder LLC a 45% kickback. AC ¶ 113. She pled that Eder knew it was a kickback because the administrative costs were not in line with actual billing costs. *Id*. She further alleged how the scheme would involve Eder's sister, Alyssa, whom Eder told Relator would be in charge of billing. AC ¶ 110. Alyssa had been in the email communications from the start of preparations for the opening of the Casa Sunzal shelter where Relator was slated to become the medical provider. AC ¶¶ 106–109. Relator also alleged that Alyssa was well aware of the illegal kickbacks scheme and complained in a WhatsApp group chat that Relator did not want to participate in the scheme, but instead wanted to keep all the patients and profits for herself. AC ¶ 124. After Relator confronted Naranjo about Eder's solicitation of kickbacks, Naranjo admitted to her that Eder had provided her name as a potential medical provider. AC ¶ 119.

Relator has pled the circumstances of Eder's AKS violations with particularity, as Rule 9(b) requires. It is well settled in this Circuit that "[i]f the [plaintiff] plausibly alleges that a defendant received kickbacks made 'with the intent of inducing referrals, and they plead 'particular details of a scheme paired with reliable indicia that lead to a strong inference that claims were actually submitted,' the separate elements of the AKS and FCA are satisfied." *United States v. Marlin Med. Sols.*, 579 F. Supp.3d 876, 884–885 (W.D. Tex. 2022) (*quoting United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp.2d 654, 665 (S.D. Tex. 2013)) and (*citing Grubbs*, 565 F.3d at 190). Relator has done just that.

## II. The Amended Complaint Pleads Defendants' FCA Liability for Underlying Violations of SWK's Conflicts of Interest Requirements

Count 2 of the Amended Complaint alleges a claim based on the presentment of false claims stemming from the Naranjo Defendants' violation of the Conflict-of-Interest Prohibitions of the Government's cooperative agreements with SWK. Relator alleges that the Naranjo Defendants violated Section D (Code of Conduct and Conflict of Interest Requirements Conflict of Interest Provision) of SWK's cooperative agreement with ORR, which requires:

> C. Care Provider staff are prohibited from taking unfair advantage of any professional or personal relationship or from exploiting their position to further their personal, religious, political, financial, or business interests.
>
> D. Care Provider must establish and maintain a written Conflict of Interest policy applicable to all staff, board members, contractors, sub-contractors, subgrantees, volunteers, and other internal stakeholders. The policy must:
>
> - Identify and define conduct that creates a conflict of interest or a potential conflict of interest;
> - Prohibit employees from having any direct or indirect financial interests in the transactions of services of the program;
> - Require staff to recuse themselves from the decision-making process if there is a conflict of interest or a potential conflict of interest;

- Require staff to disclose any conflicts of interest prior to their involvement in a decision related to or affected by the conflict; and,
- State that failure to disclose conflicts of interest or potential conflicts of interest may result in discipline or termination of employment.

AC ¶ 61.

Relator alleged that she first learned about the conflicts of interest scheme directly from Eder, who told her that he was part of a "master plan" to take over the SWK shelters at Houston, Phoenix, and Brownsville. *See* AC ¶¶ 94–95. The events that unfolded demonstrated that Diego was also a key player in this multi-year master plan, as SWK improperly awarded various shelters to several of his companies, including Trinity Health Services, Divine Family Care and UC Health Consultants. *See id.* at ¶¶ 145–194. As the AC describes, the conflicts of interest scheme began in earnest in 2019, when SWK, through Figeroa, awarded Trinity Health Services the Casa Padre medical provider contract and later the Arizona shelters to Divine Family Care, just as Diego Naranjo had planned for nearly a year.[6] *See id.* ¶¶ 94, 130–150.

In 2021, SWK enacted a sham "bidding" process to take several of the most lucrative Houston shelters away from Relator and award them to Trinity, in a flagrant example of improper self-dealing by Diego Naranjo and his cronies at SWK. *See id.* at ¶¶ 178–189. Relator has alleged that, by perpetrating these conflicts of interest violations—particularly given Diego's leadership positions within SWK; Trinity Health Services PLLC; Divine Family Care, PLLC.; and UC Health Consultants—the Naranjo Defendants not only caused SWK's false claims to be presented, in violation of the FCA. *See* 31 U.S.C. §3729(a)(1)(A), but they also subsequently

[6] Therefore, while he was still employed at SWK, Naranjo violated the SWK's Conflict of Interests provision by taking "unfair advantage of [his] professional or personal relationship" and by "exploiting [his] position to further [his] personal, … financial, or business interests by attempting to award Casa Sunzal to Dr. Rauf and Valley Med Urgent Care, with whom he had a relationship through Eder, whom he used to recruit medical providers. The scheme continued after Diego Naranjo purportedly "left" SWK; Relator alleged that, for years, Diego and his companies maintained a close relationship with SWK—including an SWK email address—as well as undue influence over SWK policies. *See* AC at ¶¶ 164–174

submitted tainted, false claims seeking reimbursements for their own services. *See Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 187 (2016) (stating that when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided.").

Furthermore, notwithstanding the Naranjo Defendants' arguments, *see* MTD at 15–18, *Escobar* clarifies why Defendants' noncompliance with prohibitions against self-dealing **is** material to the Government. The FCA's materiality standard is generally an objective one, asking whether the fraud has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. §3729(b)(4); *see also United States ex rel. Aldridge v. Corporate Mgmt., Inc.*, 78 F.4th 727, 736 (5th Cir. 2023); *Escobar*, 159 U.S. at 182.

First, Defendants claim that "*Escobar* only recognizes the implied certification theory as a basis for liability where *at least* 'two conditions are satisfied: first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." MTD at 16 (emphasis added). But this is NOT what *Escobar* says. Significantly, Defendants misplace where the term "at least" appears – which changes the meaning of the Court's statement dramatically. The Court actually said, "[w]e hold that the implied certification theory can be a basis for liability, *at least* where two conditions are satisfied: first, the claim does not merely request payment, . . ." To be sure, the Supreme Court did NOT hold that at least two requirements must be met before an implied certification of compliance can be actionable under the FCA; rather, the

Court held that there can be an implied false certification *at least* where those two conditions are present. As the District of Columbia District Court observed:

> Because the Supreme Court in *Escobar* held that the implied certification theory was satisfied 'at least' under the conditions it described and did 'not resolve whether all claims for payment implicitly represent that the billing party is legally entitled to payment, the D.C. Circuit's broader statement of the implied certification theory remains good law after *Escobar*. Thus, the government can show falsity by demonstrating that (1) a contractor withheld information about its noncompliance with contractual or regulatory requirements; and (2) those contractual or regulatory requirements were material.") (internal citation omitted).

*United States v. DynCorp. Int'l, LLP*, 253 F.Supp.3d 89, 100 (D.D.C. 2017).

Next, Defendants claim that Relator has failed to allege that "conflict-of-interest compliance is a condition of payment from ORR. But as the AC notes, the conflicts of interest provision incorporated into SWK's cooperative agreements mimics the federal Stark Law, 42 U.S.C. §1395mn; 42 C.F.R §411.353, which similarly prohibits providers from submitting healthcare claims that reflect improper self-dealing. Simply stated, the Government refuses to pay claims tainted by conflict of interest violations. And when the Government uncovers fraudulent self-dealing, it often uses the FCA to claw back and recover funds that were already paid out.[7] Each of these facts strongly weighs in favor of materiality, consistent with *Escobar's* guidance:

> [W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with a particular statutory, regulatory, or contractual requirement.

*Escobar*, 579 U.S. at 194.

---

[7] *See, e.g.*, AC ¶ 217, n.21 (referencing a 2020 GAO report discussing actions taken against non-compliant shelter providers, including one provider who was required to return more than $5 million to ORR the prior year because of financial conflicts of interest issues).

Defendants next argue that since the Government continued making payments to SWK and the Naranjo Defendants, despite their conflict of interest violations, the Defendants' noncompliance must not have been material. But *Escobar* counsels that the Government's continued payment is only a factor when the Government has **actual knowledge** that claims it has been asked to pay are false. *See Escobar,* 576 U.S. at 195 ("[I]f the Government pays a particular claim in full despite its **actual knowledge** that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.") (emphasis added); *United States ex rel. Campbell v. KIC Dev., LLC,* 2019 WL, at *1, *11, 12 (W.D. Tex. Dec. 10, 2019) ("[T]he Government's actual knowledge that it has been defrauded is not necessarily imputed from its awareness that allegations of fraud have been brought by a relator . . . . The Government's continued payment after the filing of Relator's Complaint may not be relevant to materiality because the Government may not yet have known with certainty that it had been defrauded by Defendants when it made the payments."). Defendants have not asserted that the Government had actual knowledge of their noncompliance with the conflict of interest prior to funding SWK's false cooperative agreement claims or paying Diego and his companies' false reimbursement claims for medical services tainted by those conflicts.

Furthermore, the Government's continued payments to SWK and to the Naranjo Defendants is not dispositive of the materiality issue. The Government often has important reasons for continuing to make payments, despite its knowledge of a recipient's fraud and its efforts to combat it. Traditionally, the Government employs a "pay and chase" approach,

whereby claims are promptly paid in the first instance, and the Government subsequently investigates and pursues fraud claims where appropriate. As the Fifth Circuit recently observed in upholding a jury's finding of materiality despite the Government's continued payments, "the Government contends that various circuits have recognized valid reasons why an agency may continue to pay claims despite allegations of fraud without defeating materiality – for example, public health and safety. . . . Stopping reimbursements upon the first allegations of fraud would thus have undermined CMS's goal of sustaining healthcare access for underserved rural patients." *Aldridge*, 78 F.4th at 737–738. The same is true here, where abruptly stopping payments to SWK and its medical providers would have immediately ceased services for a highly vulnerable, underserved population of unaccompanied immigrant minors. The Government's continued payments are of no consequence here.

Finally, the Naranjo Defendants—without any support—suggest that noncompliance with their conflict of interest obligations was only a minor violation. However, Relator has not merely alleged minor noncompliance with one of thousands of insubstantial regulatory requirements, as Defendants suggest. Rather, she has alleged Defendants' noncompliance with a core provision of the cooperative agreements – a regulatory requirement that the Government specifically incorporated into its contracts with SWK. *See, e.g.*, AC ¶¶ 61, 194, 196; *see also* 2 C.F.R §200.112 ("Federal agencies must establish conflict of interest policies for Federal awards. A recipient or subrecipient must disclose in writing any potential conflict of interest to the Federal agency or pass-through entity in accordance with the established Federal agency policies.").

## III. Relator Adequately Pled a Conspiracy Claim Under the FCA

The Naranjo Defendants argue that Count 3 of the AC – which alleges violations of the FCA's conspiracy provision, *see* AC ¶¶ 221–223 – "should be dismissed because Relator fails to allege a violation of the AKS or that a false claim was submitted as a result of an AKS violation." MTD at 5. Of course, as discussed above, Relator has indeed alleged AKS violations – just not against the Naranjo Defendants. Instead, as Count 3 states, several Defendants— including the Naranjo Defendants— "also conspired to and did engage in conflicts of interest in the award of medical provider contracts." Relator has adequately pled *this* conspiracy claim against the Naranjo Defendants.

The Fifth Circuit has held that to prove a False Claims Act conspiracy, a relator must show "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement." *Grubbs*, 565 F.3d at 193.

Relator's Amended Complaint details conspiracies to violate the False Claims Act, between and among the Defendants. As discussed above, the allegations also show numerous acts committed by the Defendants in furtherance of those conspiracies. First, the AC alleges that multiple Defendants – including each of the Naranjo Defendants – conspired with SWK, Eder, and others to "take over Houston, Phoenix, and Brownsville" and that they "intended to manipulate their federal contracts in such a way that they could maximize their personal financial gain," and "violate[] the prohibitions against conflicts of interest in SWK's Cooperative Agreement with ORR." AC ¶¶ 94–95. Relator saw firsthand the power Diego Naranjo wielded, and recognized his ability to make the master plan a reality; she alleged that

> [i]n early 2019, Naranjo called Garza to tell her that he was going to 'divide the Houston region.' Naranjo told Garza she would be keeping Casa Quetzal, and he would also give her the Casa Mesa and Casa Reliant shelters. Naranjo said that to be fair, he was taking Casa Sunzal from her and giving it to Dr. Rauf. Naranjo

> further told Garza that he was also giving Casa Montezuma and Casa Conroe to Dr. Rauf.

*Id.* ¶129. Then, as soon as Diego became licensed as a nurse practitioner, he and his cronies at SWK diverted several shelters – including the nation's largest shelter, Casa Padre, to the other Naranjo Defendants: Trinity Health Services; Divine Family Care, PLLC; and UC Health Consultants. *See id.* ¶¶ 145–192. Thus, Relator alleged that the Naranjo Defendants engaged in an unlawful agreement with SWK, Eder, and others to defraud the Government by submitting materially false claims to ORR for grants and reimbursements.

Relator also detailed how Diego Naranjo, with assistance from other SWK officials, maintained his influence and control at SWK—which he used improperly to steer SWK business opportunities to his own companies—in clear violation of SWK's conflict of interest obligations. AC ¶¶ 145–192. The AC describes how this misconduct was repeated again and again, until Diego operated many of SWK's most lucrative shelters – in a matter of about two years. *See id.* And the AC alleges that the subsequent claims SWK and the Naranjo Defendants submitted for reimbursement were materially false. Relator has, therefore, alleged numerous acts by the Naranjo Defendants in furtherance of the Defendants' illicit master plan. Relator has properly pled the Naranjo Defendants' FCA liability due to the conflicts of interest conspiracy.

## IV. The Amended Complaint is Not Subject to Dismissal on Constitutional Grounds

The Naranjo Defendants argue that the Amended Complaint must be dismissed because the enactment by Congress of the *qui tam* right of action for private persons violates two provisions of the U.S. Constitution, *i.e.*, the Appointments Clause and the Take Care Clause. *See* U.S. Const. Art. II; MTD at 18–20.

In *United States ex rel. Riley v. St. Luke's Hospital*, the Fifth Circuit Court of Appeals ruled *en banc*:

> we hold that the qui tam provisions of the False Claims Act do not violate the principle of separation of powers by impermissibly infringing upon the constitutional duty of the Executive to take care that the laws are faithfully executed under the Take Care Clause of Article II. We similarly hold that the FCA's qui tam provisions do not violate the Appointments Clause.

252 F.3d 749, 758 (5th Cir. 2001) (*en banc*).

Notably, **every other circuit court that has considered the issue agrees.** *See United States ex rel. Stone v. Rockwell Int'l, Corp.*, 282 F.3d 787, 804–807 (10th Cir. 2002); *United States ex rel. Taxpayers Against Fraud v. Gen. Elec. Co.*, 41 F.3d 1032, 1040–42 (6th Cir. 1994); *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 749–59 (9th Cir. 1993); *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1155 (2d Cir. 1993). The Naranjo Defendants do not even acknowledge *Riley*, which is directly on point, and they fail to raise any new arguments not addressed and rejected in *Riley* and the other decisions just cited. Instead, they resort to a few decisions that either are inapposite or anomalous to the issues they raise. But *Riley* is still binding precedent. *See United States ex rel. Montcrief v. Peripheral Vascular Assoc., P.A.*, 133 F.4th 395, 410–412 (5th Cir. 2025) (circuit court concluding that Fifth Circuit precedent "prevents us from addressing" Article II challenges to the FCA's *qui tam* provision); *United States ex rel. Taylor v. Healthcare Assocs. of Tex., LLC*, 2025 WL 1885642, at *1, *6 (N.D. Tex. July 8, 2025) (recognizing that Defendants' Article II challenges to the FCA's *qui tam* provision are "foreclosed by binding Fifth Circuit precedent").

Moreover, the U.S. Department of Justice—speaking on behalf of the federal Executive Branch whose constitutional powers are supposedly being infringed upon—has consistently maintained that the FCA's *qui tam* provision is constitutional, and has done so across multiple DOJ administrations. The Eleventh Circuit is the latest appellate court to examine the constitutionality issue, in the pending case, *United States ex rel. Zafirov v. Florida Med. Assocs.*

(Cause Nos. 24-13581, 24-13583). Of course, that case involves a non-intervened *qui tam* suit being prosecuted by the relator, but the United States requested and received leave to intervene in the appeal in order to share its views on constitutionality with the circuit court. And in its briefing—which began under President Biden's administration and continued under the current administration—DOJ's position has remained unchanged: "[a]s private litigants pursuing private interests, relators are not enforcing federal law in a manner inconsistent with the Vesting and Take Care Clauses and need not be appointed in the manner required by the Appointments Clause." United States Department of Justice, Appellant's Opening Brief in *United States ex rel. Zafirov v. Florida Med. Assocs.*, Nos. 24-13581, -13583 (11th Cir. Jan. 6, 2025) (submitted under President Biden's administration); United States Department of Justice, Appellant's Reply Brief in *United States ex rel. Zafirov v. Florida Med. Assocs.*, Nos. 24-13581, -13583 (11th Cir. Apr. 30, 2025 (same) (filed under President Trump's administration). DOJ filed a similar Statement of Interest in this proceeding, making the same points before this Court. *See* ECF 93, United States Department of Justice, United States Statement of Interest at 5–6.[8]

In summary, this lawsuit does not offend the Constitution, and is not subject to dismissal on that ground.

## V. The Amended Complaint Sufficiently Pleads a Retaliation Claim

Count 4 of the Amended Complaint is a claim by Dr. Garza under 31 U.S.C. § 3730(h), which provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

[8] Relator adopts the United States' arguments.

The Defendants under this count are SWK, the Hernandez Defendants, and Diego Naranjo.

At the outset, it is important to distinguish the pleading requirements applicable to this count from those applicable to the FCA violation counts. Retaliation claims under 3730(h) are not subject to the heightened particularity requirement of Rule 9(b), but a plaintiff need only satisfy the notice-pleading standard of Rule 8(a). *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018); *United States ex rel. Chorches for Bankruptcy Estate of Fabula v. American Medical Response, Inc.*, 865 F.3d 71, 95 (2nd Cir. 2017); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008); *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004).

As the Fifth Circuit ruled in *United States ex rel. Bias v. Tangipahoa Parish School Bd.*, 816 F.3d 315, 323 (5th Cir. 2016) "To survive a motion to dismiss, a plaintiff alleging injury under Section 3730(h)(1) must show (1) he engaged in protected activity, (2) his employer, or the entity with which he has contracted or serves as an agent, knew about the protected activity, and (3) he was retaliated against because of his protected activity." (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)). Protected activity includes, in the words of § 3730(h)(1), "efforts to stop 1 or more violations of" the FCA.

In this case, Eder Hernandez and other members of the Hernandez family operated as though they controlled and were empowered to select the medical providers needed at SWK facilities. Eder's mostly successful efforts to obtain kickbacks from other providers (e.g., Dr. Diaz) and his pressuring communications seeking a kickback from Dr. Garza reveal as much. AC ¶¶ 110–115. In this way, Eder acted as though he was the de facto employer and that medical providers needed to reach an agreement with him to secure a

contract at a SWK facility. *See Casinger v. Advanced Pain Care, Inc.,* No. 8:19-CV-1598-T-23TGW, 2021 WL 2786470, at *1 (M.D. Fla. Jan. 5, 2021) (explaining the 'de facto employer" exception. [A] natural person who 'dominates' and 'dictates" a corporate defendant's actions can qualify as a 'de facto employer' under Section 3730(h). *Id.* (*citing Mruz v. Caring, Inc.*, 991 F. Supp. 701, 710 (D.N.J. 1998); Claire M. Sylvia, the False Claims Act: Fraud Against the Government § 5:6 (2020).

Dr. Garza sufficiently alleged that she tried to stop what she reasonably believed to be an illegal kickback arrangement that Eder Hernandez and his affiliates were pressuring her to join. In September 2018, Relator (1) refused to pay Eder the kickbacks; and (2) reported the Hernandez's family illicit demands Diego Naranjo, whom she reasonably believed had authority over Eder and could demand that Eder stop his illegal activity. AC ¶¶ 20, 104–107, 110–115, and 117–124. Once Dr. Garza she reported this effort to stop an FCA violation, she was viewed as not being a "team player." Naranjo retaliated against Garza by taking away Casa Sunzal away from her and awarding it to Dr. Rauf. AC ¶ 129. She was not immediately dropped in favor of Dr. Rauf because SWK needed her due to Rauf's incompetence. AC ¶¶ 131-132. Naranjo thanked Garza for helping to see children from Casa Sunzal at Casa Quetzal "in the interim basis". AC ¶ 134. That constituted an act of discrimination close in time to her protected activity supporting an inference that it was retaliatory to her whistleblowing under a common test for causation in the context of whistleblowing, the knowledge-timing test. *See, e.g.*, *Miller v. Dept. of Justice*, 842 F.3d 1242, 1256 (Fed. Cir. 2016).

## VI. Conclusion

For the following reasons, Relator prays that this Court deny SWK's Motion to Dismiss (ECF. 89) and for all relief she is entitled to under the law.

Dated: September 17, 2025

Respectfully submitted,

/s/ Jack Kolar
John A. (Jack) Kolar
D.C. Bar No. 292953
*Appearing pro hac vice (Lead Counsel)*
**Government Accountability Project**
1612 K Street NW, Suite 1100
Washington, DC 20006
(p) 202-926-3311
(e) JackK@whistleblower.org

Richard Condit
D.C. Bar No. 417786
Cleveland Lawrence III
D.C. Bar No. 480462
*Appearing pro hac vice*
**Mehri & Skalet, PLLC**
2000 K Street NW, Suite 325
Washington, DC 20006
(p) 202-822-5100
(e) rcondit@findjustice.com
(e) clawrence@findjustice.com

Carlos Doroteo
TX Bar No. 24097616
*Appearing pro hac vice*
**Milpa Law PLLC**
1300 W 18th Street # 7263
Houston, TX 77008
(p) 866-666-4572
(e) Carlos@MilpaLaw.com

**COUNSEL FOR PLAINTIFF-RELATOR JANA GARZA**

## CERTIFICATE OF SERVICE

I certify that on September 17, 2025, I caused a true and correct copy of this document to be served via ECF on all counsel of record.

/s/Carlos Doroteo
Carlos Doroteo

**COUNSEL FOR PLAINTIFF-RELATOR JANA GARZA**