IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* JANA GARZA | § | |
| Plaintiff, | § | |
| v. | § | Case No. 1:25-cv-00305-ADA-SH |
| SOUTHWEST KEY PROGRAMS, INC., *et. al.*, | § | |
| Defendants. | § | |

**RELATOR JANA GARZA'S RESPONSE IN OPPOSITION**
**<u>TO THE HERNANDEZ DEFENDANTS' MOTION TO DISMISS</u>**

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Casinger v. Advanced Pain Care, Inc.*,
No. 8:19-CV-1598-T-23TGW, 2021 WL 2786470 (M.D. Fla. Jan. 5, 2021) ....................18

*Health Choice Alliance, LLC, on behalf of United States v. Eli Lilly and Company, Inc.*,
2018 WL 4026986 (E.D. Tex. Jul. 25, 2018) ....................9–10

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) ....................17

*Mruz v. Caring, Inc.*,
991 F. Supp. 701 (D.N.J. 1998) ....................18

*Pace v. Cirrus Design Corp.*,
93 F.4th 879 (5th Cir. 2024) ....................6

*Peterson v. Weinberger*,
508 F.2d 45 (5th Cir. 1975) ....................4

*Robertson v. Bell Helicopter Textron, Inc.*,
32 F.3d 948 (5th Cir. 1994) ....................18

*Schouest v. Medtronic, Inc.*,
92 F. Supp.3d 606 (S.D. Tex. 2015) ....................5

*United States v. Davis*,
132 F.3d 1092 (5th Cir. 1998) ....................9

*United States of Am. & State of Texas v. Austin Radiological Ass'n*,
No. A-10-CV-914-LY, 2012 WL 12850250 (W.D. Tex. Aug. 29, 2012) ....................6

*United States ex rel. Aldridge v. Corporate Mgmt., Inc.*,
78 F.4th 727 (5th Cir. 2023) ....................15

*United States ex rel. Beauchamp v. Academi Training Center*,
816 F.3d 37 (4th Cir. 2016) ....................10, 12

*United States ex rel. Camburn v. Novartis Pharms. Corp.*,
124 F.4th 129 (2d Cir. 2024)) ....................9

*United States ex rel. Chorches for Bankruptcy Estate of Fabula v. American Medical Response, Inc.*,
865 F.3d 71 (2d Cir. 2017)....................17

*United States ex rel. Dekort v. Integrated Coast Guard Systems*,
705 F.Supp.2d 519 (N.D. Tex. 2010) ....................11

*United States ex rel. Grant v. United Airlines Inc.*,
912 F.3d 190 (4th Cir. 2018) ....................17

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) ....................15

*United States ex rel. Hart v. McKesson Corp.*,
96 F.4th 145 (2d Cir. 2024) ....................3

*United States ex rel. Holmes v. Consumer Ins. Grp.*,
318 F.3d 1199 (10th Cir.2003) ....................11–12

*United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*,
664 F.Supp.3d 722 (W.D. Tex. 2023)....................4, 6

*United States ex rel. Lemon v. Nurses to Go, Inc.*,
924 F.3d 155 (5th Cir. 2019) ....................7–8

*United States ex rel. Little v. Shell Exploration & Prod. Co.*,
690 F.3d 282 (5th Cir. 2013) ....................11

*United States v. Marlin Med. Sols.*,
579 F. Supp.3d 876 (W.D. Tex. 2022)....................8

*United States ex rel. Osheroff v. Humana, Inc.*,
776 F.3d 805 (11th Cir. 2015) ....................10

*United States ex rel. Parikh v. Citizens Med. Ctr.*,
977 F. Supp.2d 654 (S.D. Tex. 2013) ....................9

*United States ex rel. Payton v. Pediatric Servs. Of Am., Inc.*,
No. CV416-102, 2017 WL 3910434 (S.D. Ga. Sept. 6, 2017)....................9

*United States ex rel. Stone v. Rockwell Int'l, Corp.*,
282 F.3d 787 (10th Cir. 2002) ....................9–10

*United States ex rel. Taylor v. Healthcare Assocs. of Tex., LLC*,
2025 WL 1885642 (N.D. Tex. July 8, 2025)....................17

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
389 F.3d 1251 (D.C. Cir. 2004) ....................17

*United States ex rel. Williams v. NEC Corp.*,
931 F.2d 1493 (11th Cir. 1991) ....................11

*United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*,
2019 WL 571349 (W.D. Tex. Feb. 2, 2019) ....................4

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016) ....................14

**Statutes**

31 U.S.C. §3729(a)(1)(A) ....................4

31 U.S.C. § 3730(e)(4) ....................11

31 U.S.C. § 3730(e)(4) (2006) ....................10

31 U.S.C. § 3730(h) ....................17

42 U.S.C. § 1320a-7b(b) ....................3

42 U.S.C. § 1320a–7b(f) ....................6

42 U.S.C. § 1320a–7b(g) ....................4

42 U.S.C. §1395mn ....................14

**Federal Regulations**

42 C.F.R. §411.353 ....................14

45 C.F.R. §410.1307 ....................7

**Other Authorities**

Claire M. Sylvia, the False Claims Act: Fraud Against the Government §
5:6 (2020) ....................18

## TABLE OF CONTENTS

I. The Amended Complaint Properly Alleges the Hernandez Defendants' Violations of the Anti-Kickback Statute and Resulting Liability Under the False Claims Act ........... 1

1. The ORR Qualifies as a Federal Healthcare Program, for AKS Purposes ............. 6

2. A *Quid Pro Quo* Arrangement is Not Required ..................................................... 8

3. The FCA's Original Source Provision Was Not Triggered .................................... 9

II. The Amended Complaint Properly Alleges FCA Liability Based on Violations of SWK's Conflicts of Interest Requirements.......................................................................... 12

III. Relator Adequately Pled a Conspiracy Claim Under the FCA........................................ 15

IV. The Amended Complaint Sufficiently Pleads a Retaliation Claim .................................. 16

V. Conclusion ........................................................................................................................ 19

Relator Jana Garza, by her undersigned attorneys respectfully submits this **Response** in opposition to the Motion to Dismiss (**MTD**) Relator's First Amended Complaint (**AC**), filed by Defendants, Eder Francisco Hernandez, Alyssa Hernandez, Migdal Eder, LLC, and Valley Med Urgent Care, PLLC, (collectively, **the Hernandez Defendants**). *See* ECF 91.

Contrary to the Hernandez Defendants' assertions, the AC properly states claims for relief under the False Claims Act's anti-fraud and anti-retaliation provisions, and pleads the circumstances of Defendants' fraud scheme with the requisite particularity. Consequently, the Hernandez Defendants' MTD should be denied.

## I. The Amended Complaint Properly Alleges the Hernandez Defendants' Violations of the Anti-Kickback Statute and Resulting Liability Under the False Claims Act

As an initial matter, the Hernandez Defendants' MTD fundamentally misunderstands Relator's fraud allegations, and immediately misstates her claim, saying that "Garza seeks to recover FCA damages based on claims that *she herself submitted*, for services *she herself rendered*, pursuant to contracts *she herself was awarded*, despite having rejected any illegal inducement and continuing under the terms independent of any alleged kickback scheme." MTD at 5 (emphasis in original). None of this is true. Relator's fraud allegations are **not** based on her own claims for reimbursement for the healthcare services she provided.

To be sure, as described in the Amended Complaint, Relator's fraud allegation against the Hernandez Defendants is that SWK's medical provider recruiter, Defendant Eder Hernandez ("Eder"), engaged in a scheme in which he steered lucrative Office of Refugee Resettlement ("ORR")-financed shelter contracts to providers who were willing to pay financial kickbacks and submit to SWK's control. Relator alleged that Eder personally told her that he helped Dr. Diaz obtain the Casa Padre contract and admitted that Dr. Diaz was paying him a kickback for each

child he saw there.[1] AC ¶ 93. As Relator alleged, Eder Hernandez's illicit dealings with Dr. Diaz, and with Defendant Naranjo and his company, Trinity Health Services, PLLC, resulted in a $30,000 kickback payment from Dr. Diaz to Eder, before Dr. Diaz's shelter was taken away and awarded to Trinity.

Relator further alleged that in July 2018 Eder recruited her to become a shelter medical provider for a new SWK shelter that was slated to open. AC ¶ 85. Eder knew the name of the shelter—Casa Sunzal—and the opening date before that information became publicly available, showing that he had inside information from SWK leadership. AC ¶ 91. Eder explicitly told Relator he would schedule a meeting with Defendants Diego Naranjo and Fanny Figueroa. AC ¶ 92. In August 2018, Eder sent Relator an email which showed that Eder knew exactly what Casa Sunzal and Casa Quetzal needed to be operational. AC ¶ 108. Eder further knew that the opening on Casa Sunzal would be delayed – which only insiders knew. AC ¶ 108.

Furthermore, Relator detailed Eder's attempts to coerce her to pay him kickbacks, which would be funneled through his sister, Defendant Alyssa Hernandez, and his company, Migdal Eder LLC. She described how Eder solicited an illegal kickback from her, in the form of an Administrative Services Agreement, wherein Relator's company would pay Migdal Eder LLC a 45% kickback. AC ¶ 113. She pled that Eder knew it was a kickback because the administrative costs were not in line with actual billing costs. *Id*. She further alleged how the scheme would involve Eder's sister, Alyssa, whom Eder told Relator would be in charge of billing. AC ¶ 110. Alyssa had been in the email communications from the start of preparations for the opening of the Casa Sunzal shelter where Relator was slated to become the medical provider. AC ¶¶ 106–109. Relator also alleged that Alyssa was well aware of the illegal kickbacks scheme and

---

[1] The Amended Complaint attempted to anonymize him as Dr. A but in a later paragraph disclosed his name as Dr. Diaz. His name was also fully disclosed in Relator's Original Complaint.

complained in a WhatsApp group chat that Relator did not want to participate in the scheme, but instead wanted to keep all the patients and profits for herself. AC ¶ 124. After Relator confronted Naranjo about Eder's solicitation of kickbacks, Naranjo admitted to her that Eder had provided her name as a potential medical provider. AC ¶ 119.

Although the Hernandez Defendants' efforts to include Relator in the kickbacks scheme was unsuccessful, they still violated the AKS's prohibition against soliciting bribes – and similarly resulted in Relator being punished for refusing to pay kickbacks, and having several of her shelters taken away and given to Defendant Naranjo's company, Trinity.

Without question, Eder's kickbacks scheme violated the Anti-Kickback Statute's prohibitions, which apply to:

> (1) Whoever knowingly and willfully[2] **solicits** or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
> > (A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b) (emphasis added).

---

[2] Congress clarified the AKS's "knowing and willful" language in 2010, when amending the FCA, and as the Second Circuit observed "[t]he retention of the willfulness requirement in that context suggests that Congress still intended the term to protect against criminal liability for unwitting defendants by requiring that a defendant act with knowledge that her conduct is *somehow* unlawful, even though it eschewed any requirement that a defendant know about the **AKS** specifically." *United States ex rel. Hart v. McKesson Corp.*, 96 F.4th 145, 156 (2d Cir. 2024) (emphasis added).

Relator has satisfied this standard. Notably, the Amended Complaint alleged that Defendant Eder Hernandez knew that his payment arrangement with Dr. Diaz was wrong. Relator alleged that Eder told her "that he had a contract with Dr. [Diaz], but complained that Dr. [Diaz] was not honoring his end of the deal because he was only paying Eder $90 for each child he saw at Casa Padre. Garza asked Eder why he did not sue Dr. [Diaz] to enforce the contract. . . In truth, had Eder or his co-conspirators pursued civil enforcement of their 'arrangement' with Dr. [Diaz], they risked exposing the entire illicit scheme to collect kickbacks and submit false claims to the federal government." AC ¶¶ 93, 97.

And since the Hernandez Defendants' kickbacks scheme resulted in violations of the Anti-Kickback Statute, *by statute*, any resulting claims for reimbursement from ORR were automatically rendered "false," for FCA purposes. *See* 42 U.S.C. § 1320a–7b(g) ("[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim."). Thus, by engaging in the kickback scheme, the Hernandez Defendants ultimately **caused** SWK and each of SWK's providers who paid illegal kickbacks to submit subsequent false claims to ORR, in violation of the FCA; SWK submitted materially false claims for ORR grant funds after learning about the kickbacks scheme from Relator, while the providers who participated in the scheme submitted false claims to ORR seeking payment for their services. *See* AC ¶¶ 193–203 (Relator alleging that all reimbursement claims to the federal government that were tainted by Defendants' AKS violations are false under the FCA); *see also* 31 U.S.C. § 3729(a)(1)(A); *Peterson v. Weinberger*, 508 F.2d 45, 52 (5th Cir. 1975) (FCA can "reach any person who knowingly assisted in causing the government to pay claims which were grounded in fraud."); *United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*, 664 F.Supp.3d 722, 739 (W.D. Tex. 2023) ("That [the defendant] did not itself submit claims to [the government] is irrelevant because 'the FCA reaches anyone who 'causes' the submission of a false claim . . .").

Relator can maintain a "cause to be presented" theory of FCA liability without alleging "that any of the Hernandez Defendants drafted, submitted reviewed, influenced, or even knew about the claims ultimately presented to the government." MTD at 18. *See, e.g.*, *United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*, 2019 WL 571349, at *1, *5 (W.D. Tex. Feb. 2, 2019) ("The FCA allows claims to proceed against parties who can fairly be said to have caused a claims to be presented to the government. '[I]f the government proves that a kickback

arrangement existed and that the kickback arrangement was as substantial factor in bringing about [a party's] submissions to Medicare and that the submissions were a normal consequence of the situation created by the kickback arrangement, the defendant may be found to have 'caused' the submissions.") (internal citation omitted).

The Hernandez Defendants, pre-occupied with Relator's own reimbursement claims, attempt to distance themselves from FCA liability by insisting that "Relator herself – not the Hernandez Defendants – submitted the claims she now seemingly labels as false." MTD at 18. However, as discussed above, Relator's fraud claim is <u>not</u> based on her own reimbursement claims to the Government – claims that were <u>not</u> tainted by AKS violations because she did <u>not</u> participate in the illegal kickback scheme. Rather, Relator has identified the cooperative agreements SWK submitted since becoming aware of the Hernandez Defendants' kickbacks scheme, *see* AC ¶53, notwithstanding the Hernandez Defendants' claim that she "does not identify a single claim for payment to ORR (or any federal program) that was connected to Dr. Diaz's contract or influenced by an alleged kickback to the Hernandez Defendants," MTD at 19. Moreover, the essential details of the Hernandez Defendants' kickbacks arrangement with SWK providers are within those Defendants' possession, and therefore, it is not surprising that the AC offers "no dates, claim numbers, amounts or patients," when discussing other providers' false reimbursement claims. Relator is not required to identify those claims. *See, e.g.*, *Schouest v. Medtronic, Inc.* 92 F. Supp.3d 606, 610 n2 (S.D. Tex. 2015) ("[A] number of courts have recognized that the heightened pleading standards of Rule 9(b) should be relaxed 'upon a showing by the plaintiff that he or she is unable, without pretrial discovery, 'to obtain essential information' peculiarly in the possession of the defendant.'") (internal citation omitted).

As a sister district court recently observed:

> [A] complaint satisfies the particularity requirements of Rule 9(b) by alleging 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.' *See United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009); ECF No. 66-22. As the Fifth Circuit has explained, 'a plaintiff does not necessarily need the exact dollars amounts, billing numbers, or dates to prove to a preponderance that fraudulent bills were actually submitted.' *Grubbs*, 565 F.3d at 190. 'To require these details at pleading is one small step shy of requiring production of actual documentation with the complaint, a level of proof not demanded to win at trial and significantly more than any federal pleading rule contemplates.'

*United States ex rel. Hueseman v. Professional Compounding Ctrs. Of Am., Inc.*, 664 F.Supp.3d 722, 739–740 (W.D. Tex. 2023); *see also*, *Pace v. Cirrus Design Corp.*, 93 F.4th 879, 892 (5th Cir. 2024) (citing *Grubbs*); *United States of Am. & State of Texas v. Austin Radiological Ass'n*, No. A-10-CV-914-LY, 2012 WL 12850250, at *3 (W.D. Tex. Aug. 29, 2012) (same).

Each of the Hernandez Defendants' other arguments challenging Relator's fraud allegations is equally meritless and must be rejected.

**1. The ORR Qualifies as a Federal Healthcare Program, for AKS Purposes**

First, the Hernandez Defendants argue that Relator's AKS-based fraud allegations should be dismissed because they do not involve claims submitted to a "Federal health care program." *See* MTD at 15–16. While the Hernandez Defendants concede that ORR provides medical services to unaccompanied minors, they argue that ORR medical services do not qualify as "health benefits," *see id.*, despite 42 U.S.C. § 1320a-7b(f), which provides:

> ORR, a component of the Department of Health and Human Services (HHS), primarily administers programs for the resettlement of refugees and care of unaccompanied minors. **These services include** housing, education, and some limited **medical screening and urgent care**, but ORR does not provide health insurance, ongoing medical care, or reimbursement for health services in a manner akin to Medicare or Medicaid.

(emphasis added).

The Amended Complaint plainly alleges that the ORR program for medical services constitutes a "Federal health care program":

> 200. "Federal health care program" is defined in subsection (f) of the statute as "any plan or program that provides health benefits, whether directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the United States Government…."
>
> 201. The program covering UCs in ORR custody constitutes a "Federal health care program" because it is a plan or program that provides health benefits to the UCs and is funded directly by the federal government through HHS and its ORR component.

AC ¶¶ 200–201.

The statutory definition of "federal health care program" is a broad, functional one: it asks whether a "plan or program" provides "health benefits," and whether those health benefits are funded "by the United States Government." Nowhere does it require, nor is it determinative, that those health services be provided "through insurance," as signified by the word "otherwise." The definition also does not require, nor is not determinative, that the health services be provided as ongoing medical care or through reimbursement "akin to Medicare or Medicaid," so long as the plan or program at issue provides Government-funded *health benefits*.

In addition, the Hernandez Defendants ignore the obvious regulatory text: the medical services that ORR provides through third parties to unaccompanied children is through a program known as "standard programs." *See* 45 C.F.R. § 410.1307. It is undeniable that the providers' false claims at issue – which the Hernandez Defendants caused to be submitted – were to provide reimbursements for medical services under an ORR program, and that the federal government was the source of the funds used to pay those false claims. In any case, at the pleading stage, this Court is required to take Plaintiff's allegations as true. *See, e.g.*, *United States ex rel. Lemon v. Nurses to Go, Inc.*, 924 F.3d 155, 159 (5th Cir. 2019) ("We accept as true

all well-pleaded allegations of fact in the complaint and construe them in the light most favorable to Plaintiffs.").

Finally, the United States has weighed in on this question before the Court, with a Statement of Interest brief that responds directly to the Hernandez Defendants' "unconvincing arguments," and declares that Defendants' "narrow view of the phrase 'Federal health care Program' cannot be squared with the statutory language, which broadly prohibits most kickbacks for items or services that might ultimately be paid for by American taxpayers. . . . Under the plain language of the AKS, health care benefits are provided to [unaccompanied minors] by ORR under a Federal health care Program." ECF 93, United States Department of Justice, United States Statement of Interest at 1–4. Relator adopts the United States' arguments.

**2. A *Quid Pro Quo* Arrangement is Not Required**

Contrary to the Hernandez Defendants' claim, *see* MTD at 6, 16 ("Without the exchange of remuneration, there can be no AKS violation as a matter of law"), the AKS not only reaches successful kickbacks, but attempted kickbacks (*ie* "solicitations") as well. Thus, the Hernandez Defendants' argument that an unpaid kickback does not violate the FCA has no merit. Similarly, the AKS does not require a *qui pro quo* arrangement, despite the Hernandez Defendants' contention that "[t]he AKS requires a quid quo pro arrangement, where remuneration is provided in exchange for referrals of federally reimbursable services. The Complaint does not provide evidence of an agreement to exchange payment for such referrals." MTD at 17, 13. But Relator is not required to allege the specifics of a *quid pro quo* arrangement in order the plead an FCA claim based on AKS violations. In fact, Rule 9(b) does not even require Relators to plead with that level of specificity. *See, e.g.*, *United States v. Marlin Med. Sols.*, 579 F. Supp.3d 876, 887 (W.D. Tex. 2022) (*quoting United States ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp.2d

654, 665 (S.D. Tex. 2013), and saying "[a]ll that Rule 9(b) requires are allegations that kickbacks were made with the intent of inducing referrals, coupled with 'the particular details of a scheme'; actual inducement is not required.").

In addition, the Fifth Circuit adopted the "one purpose rule" long ago. *United States v. Davis*, 132 F.3d 1092 (5th Cir. 1998) (announcing the "one purpose rule" in the Fifth Circuit). The Second Circuit recently became the eighth circuit to adopt the rule, and explained that "in relator-initiated actions, a defendant violates the AKS when at least one (rather than the primary or sole) purpose of the remuneration she provides is to induce purchase of a federally reimbursable healthcare product. . . And as a corollary, a plaintiff pleading an AKS violation as a predicate to an FCA claim need not state a quid pro quo exchange." *United States ex rel. Camburn v. Novartis Pharms. Corp.*, 124 F.4th 129, 136–137 (2d Cir. 2024).

**3. The FCA's Original Source Provision Was Not Triggered**

As the court explained in *Health Choice Alliance, LLC, on behalf of United States v. Eli Lilly and Company, Inc.*:

> The law governing whether a relator may bring claims that have been publicly disclosed underwent some changes pursuant to the Patient Protection and Affordable Care Act ("PPACA")[ 124 Stat. 119-1025].[3] *United States ex rel. Payton v. Pediatric Servs. Of Am., Inc.*, No. CV416-102, 2017 WL 3910434, at *4 (S.D. Ga. Sept. 6, 2017). Prior to the passage of that law in 2010, challenges based on the FCA's public disclosure bar were considered jurisdictional and were brought pursuant to FED. R. CIV. P. 12(b)(1).[4] *See, e.g., Rockwell Int'l Corp. v.*

---

[3] For this reason, the Supreme Court's *Rockwell* analysis, and most of the case law decisions cited by Hernandez Defendants, *see* MTD at 21, are inapposite.

[4] The prior, now irrelevant, version of the public disclosure bar and original source-requirement provided that:

> (4) (A) No court shall have jurisdiction over an action under this section based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media,

> *United States*, 549 U.S. 457, 467 (2007) (holding § 3730(e)(4) is jurisdictional). After the passage of the PPACA, the public disclosure rule is no longer considered a jurisdictional bar, and the Court applies a Rule 12(b)(6) standard, rather than a Rule 12(b)(1) standard. *Payton*, 2017 WL 3910434, at *5 (citing *United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 810 (11th Cir. 2015).

2018 WL 4026986 at *4 (E.D. Tex. Jul. 25, 2018). Therefore, instead of depriving a court of jurisdiction, the public disclosure bar is treated, in effect, as an affirmative defense. *See, e.g.*, *United States ex rel. Beauchamp v. Academi Training Center,* 816 F.3d 37, 40 (4th Cir. 2016). Hence, the applicability of Rule 12(b)(6).

The False Claims Act section applicable in this case now provides in pertinent part:

> (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
>
> (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
>
> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
>
> (B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has [3] knowledge that is independent of and materially adds to the publicly

---

unless the action is brought by the Attorney General or the person bringing the action is an original source of information.

(B) For purposes of this paragraph, 'original source' means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(A)–(B) (2006), *amended by* 31 U.S.C. § 3730(e)(4)(A)–(B) (Supp. 2011) (emphasis added).

> disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4). It is clear from the plain meaning of this amended statutory language that, a relator must qualify as an "original source" in accordance with subsection (B) of this provision **if, but only if**, there was prior to the filing of the complaint a disclosure of the complaint allegations in one of the sources identified in subsection (A), *i.e.*, in a Federal hearing of the kinds mentioned, in a Federal report, audit or investigation, or in the news media. *See, e.g.*, *United States ex rel. Little v. Shell Exploration & Prod. Co*., 690 F.3d 282, 294 (5th Cir. 2013) ("[O]nly if a public disclosure has occurred in this case will it become relevant whether the relator was an original source of the information.").

The Hernandez Defendants have not alleged that Dr. Garza's allegations were previously publicly disclosed per the statute's definition. Accordingly, the Hernandez Defendants' 3-page discussion of original source is wholly irrelevant as a matter of law, *see* MTD at 20–22, and the Court need not, and should not, reach the question of whether Dr. Garza qualifies as an original source. *See, e.g., United States ex rel. Dekort v. Integrated Coast Guard Systems*, 705 F.Supp.2d 519, (N.D. Tex. 2010) (on motion to dismiss converted to motion for summary judgment, where relator sufficiently raised a genuine issue of material fact that the "allegations or transactions" upon which Relator's FCA causes of action were based, were not publicly disclosed, the court need not consider whether Relator qualified as an "original source."); *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1500 (11th Cir. 1991) ( The "original source" inquiry only becomes necessary once a court makes a factual determination that the particular qui tam suit before it was based upon information that was publicly disclosed.); *United States ex rel. Holmes v. Consumer Ins. Grp.*, 318 F.3d 1199, 1208 (10th Cir. 2003) (*en banc*) ("[W]here, as here, there was no public disclosure, the ... inquiry under § 3730(e)(4) ceases, regardless of

whether the relator qualifies as an original source."); *United States ex rel. Beauchamp v. Academi Training Center*, 816 F.3d 37, 47 (4th Cir. 2016) (same).

Moreover, the Amended Complaint asserts the absence of any of the statutory bars to suit, including section 3730(e)(4), and that, alternatively Dr. Garza qualifies as an original source. AC ¶ 4. The Hernandez Defendants say nothing in their MTD to cast doubt on this allegation by Dr. Garza and, therefore, it must be accepted as true for purposes of Defendants' Rule 12(b)(6) motion to dismiss.

## II. The Amended Complaint Properly Alleges FCA Liability Based on Violations of SWK's Conflicts of Interest Requirements

As the Amended Complaint makes clear, Count 2 alleges a claim against only two of the Hernandez Defendants – Eder Hernandez and Valley Med Urgent Care PLLC. *See* AC ¶¶ 209-220; MTD at 22. As Relator alleges, Eder Hernandez participated in a "master plan" to award SWK's largest and most profitable business opportunities to Diego Naranjo and his companies – which also benefitted Eder, who shared the Valley Med Urgent Care office with Diego as a hub for their operation. *See* AC ¶¶ 23, 151, 157.

Relator has further alleged fact connecting Eder, Naranjo, and Figueroa with Valley Med Urgent Care, Dr. Rauf, and Dr. Juan Garcia. She has also alleged that she spoke with employees who confirmed these connections, such as Daniel De La Cruz and Lozano.

In 2017, while Eder was working with Dr. Rauf at Valley Med Urgent Care, Eder offered Relator a job at their Houston office. AC ¶ 80. At the time, Dr. Rauf was the owner of Valley Med. *Id*. In early 2019, Naranjo tried to replace Relator with Dr. Rauf (i.e. Valley Med) at the Casa Sunzal shelter.[5] AC ¶ 129. When that did not work out, Figueroa tried to bring in Dr. Juan

[5] Although not part of the First Amended Complaint, in the Original Complaint the Relator alleges that she felt this was retaliation for not agreeing to Eder's kickback agreement.

Garcia. AC ¶ 137. While both of those plain failed due to the incompetence of those other doctors besides Relator (AC ¶ 129–140), they gave Relator an insight behind the curtain and showed that these Defendants had preexisting relationships. After all, Naranjo and Figueroa did not pick Dr. Rauf and Dr. Garcia out of thin air, they had the "insider" track. AC ¶ 131.

After Naranjo left SWK, he joined forces with Eder at Valley Med Urgent Care (Complaint at 157), which at the time was still owned by Dr. Rauf. AC ¶ 80. Naranjo and Eder both on the same date (3/25/2019) retained Dr. Garcia, as their supervising physician. AC ¶¶ 150, 151. Their delegation address was the same one belonging to Valley Med Urgent Care. *Id.* During this exact time period, Figuera tried to bring Dr. Garcia as the medical provider for Casa Sunzal. AC ¶ 137. Dr. Garcia was Eder's former employer. *Id.*

In November 2019, Eder obtained a physician license in Arizona through Naranjo's other company, Divine Family Care. AC ¶ 158. Lozano also informed Relator that Figuero had given the Arizona shelter contracts to Naranjo and Eder—showing that Eder was not some outsider. AC ¶ 160. Dr. Rauf's and Eder's actions and knowledge can be imputed to Valley Med Urgent Care.

The Hernandez Defendants contend that, with respect to the alleged conflicts of interest violations, "the [Amended] Complaint fails to show that any violation was material to any claim paid by the government," and that "[t]here are no allegations that the government actually did stop or claw back payments upon learning of these issues." MTD at 23, 24. But as the Supreme Court declared:

> [W]hen evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with a particular statutory, regulatory, or contractual requirement.

*Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016). These factors—though not dispositive—weigh strongly in favor of materiality.

Here, Relator can establish materiality by showing the Government's consistent refusal to pay claims tainted by noncompliance with self-dealing violations. Without question, Relator can show that the Government takes compliance with these requirements very seriously. As the AC notes, just like the conflicts of interest provision incorporated into SWK's cooperative agreements, the federal Stark Law, 42 U.S.C. §1395mn; 42 C.F.R §411.353, also prohibits providers from submitting healthcare claims that reflect improper self-dealing. It is clear that the Government refuses to pay these claims when it uncovers fraud. Additionally, Relator can demonstrate that the Government often uses the FCA to recover funds that were already paid out as a result of fraudulent misrepresentations.[6] Materiality is clear.

Further, the Government's continued payments to SWK and its medical providers is not dispositive of the materiality issue. The Government often has important reasons for continuing to make payments, despite its knowledge of a recipient's fraud and its efforts to combat it. Traditionally, the Government employs a "pay and chase" approach, whereby claims are promptly paid in the first instance, and the Government subsequently investigates and pursues fraud claims where appropriate. As the Fifth Circuit recently observed in upholding a jury's finding of materiality despite the Government's continued payments, "the Government contends that various circuits have recognized valid reasons why an agency may continue to pay claims despite allegations of fraud without defeating materiality – for example, public health and safety.

---

[6] *See, e.g.*, AC ¶ 217, n.21 (referencing a 2020 GAO report discussing actions taken against non-compliant shelter providers, including one provider who was required to return more than $5 million to ORR the prior year because of financial conflicts of interest issues).

. . . Stopping reimbursements upon the first allegations of fraud would thus have undermined CMS's goal of sustaining healthcare access for underserved rural patients." *United States ex rel. Aldridge v. Corporate Mgmt., Inc.*, 78 F.4th 727, 737–738 (5th Cir. 2023). The same is true here, where abruptly stopping payments to SWK and its medical providers would have immediately ceased services for a highly vulnerable, underserved population of unaccompanied immigrant minors. The Government's continued payments are of no consequence here.

Further, Defendants' FCA liability is not limited to the false claims they caused SWK's medical providers to submit. Several Defendants are also subject to liability for SWK's years of false applications for new and continuing cooperative agreements with ORR, despite their knowledge of the illegal kickback schemes perpetrated by SWK and the Hernandez Defendants, and the misappropriation of HHS grant funds that were being funneled to Eder and Alyssa, both SWK employees.

## III. Relator Adequately Pled a Conspiracy Claim Under the FCA

The Fifth Circuit has held that to prove a False Claims Act conspiracy, a a relator must show "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by [the Government] and (2) at least one act performed in furtherance of that agreement." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 193 (5th Cir. 2009).

Relator's Amended Complaint details several of the Hernandez Defendants' involvement in conspiracies to violate the False Claims Act – by concealing from the Government material underlying violations of the AKS and the conflict of interest requirement incorporated into SWK's cooperative agreements. As discussed above, the allegations also show numerous acts these Hernandez Defendants committed in furtherance of those conspiracies.

The AC alleges that Eder and Alyssa Hernandez were part of Defendants' "master plan" to "take over Houston, Phoenix, and Brownsville" and that they "intended to manipulate their federal contracts in such a way that they could maximize their personal financial gain." AC ¶ 94. For his part, Eder concocted an illegal kickbacks scheme in which he coerced SWK medical providers to funnel money back to him, through his sister, Alyssa, and his company, Migdal Eder. *See id.* ¶¶ 110–116. That arrangement between Hernandez Defendants and medical providers they corrupted, like Dr. Diaz, reflected a conspiracy to defraud the United States, in violation of the FCA. Relator also alleged several acts Defendants took in furtherance of that conspiracy, including providing details about the multiple agreements Eder prepared and sent to her in an effort to effectuate the scheme; and Alyssa's involvement, including correspondence she sent in an attempt to convince Relator to participate in the scheme. *See id.* As a result, Relator has pled the elements of a conspiracy claim under the FCA.

Relator separately pleads a conspiracy claim against Hernandez Defendants Eder and Valley Med Urgent Care, PLLC, in connection with SWK and Diego Naranjo's violations of the conflicts of interest obligations baked into ORR's cooperative agreements with SWK. Relator alleges that as soon as Diego left SWK's employ, he joined forces with Eder, through Valley Med, and continued to effectuate the master plan by taking over a plethora of shelters, *see id.* at ¶¶ 144–192[7] – resulting in additional FCA liability.

## IV. The Amended Complaint Sufficiently Pleads a Retaliation Claim

[7] "In addition to the shelters in Brownsville (Casa Padre), Phoenix (Casa Fortaleza and Lighthouse), Houston (Casa Sunzal, Quetzal, and Montezuma), and the El Paso region (Casa Trail House, Franklin, and Casita del Valle), SWK has awarded Naranjo the medical provider contracts for shelters in McAllen (Casa Oasis), Weslaco (Casa Sueno) and Youngtown, Arizona (Casa Amanecer). SWK also awarded Naranjo the medical provider contract for its Midland influx shelter. It is also Garza's understanding that Naranjo has been awarded the medical provider contracts for shelters in California."

Count 4 of the Amended Complaint is a claim by Dr. Garza under 31 U.S.C. § 3730(h), which provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

The Defendants under this count are SWK, the Hernandez Defendants, and Diego Naranjo.

At the outset, it is important to distinguish the pleading requirements applicable to this count from those applicable to the FCA violation counts. Retaliation claims under 3730(h) are not subject to the heightened particularity requirement of Rule 9(b), but a plaintiff need only satisfy the notice-pleading standard of Rule 8(a). *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 200 (4th Cir. 2018); *United States ex rel. Chorches for Bankruptcy Estate of Fabula v. American Medical Response, Inc.*, 865 F.3d 71, 95 (2nd Cir. 2017); *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008); *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1259 (D.C. Cir. 2004).

As the Fifth Circuit ruled in *United States ex rel. Bias v. Tangipahoa Parish School Bd.*, 816 F.3d 315, 323 (5th Cir. 2016) "To survive a motion to dismiss, a plaintiff alleging injury under Section 3730(h)(1) must show (1) he engaged in protected activity, (2) his employer, or the entity with which he has contracted or serves as an agent, knew about the protected activity, and (3) he was retaliated against because of his protected activity." (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 951 (5th Cir. 1994)).

Protected activity includes, in the words of § 3730(h)(1), "efforts to stop 1 or more violations of" the FCA.

In this case, Eder Hernandez and other members of the Hernandez family operated as though they controlled and were empowered to select the medical providers needed at SWK facilities. Eder's mostly successful efforts to obtain kickbacks from other providers (e.g., Dr. Diaz) and his pressuring communications seeking a kickback from Dr. Garza reveal as much. AC ¶¶ 110–115. In this way, Eder acted as though he was the de facto employer and that medical providers needed to reach an agreement with him to secure a contract at a SWK facility. *See Casinger v. Advanced Pain Care, Inc.,* No. 8:19-CV-1598-T-23TGW, 2021 WL 2786470, at *1 (M.D. Fla. Jan. 5, 2021) (explaining the 'de facto employer" exception. [A] natural person who 'dominates' and 'dictates" a corporate defendant's actions can qualify as a 'de facto employer' under Section 3730(h). *Id.* (*citing Mruz v. Caring, Inc.*, 991 F. Supp. 701, 710 (D.N.J. 1998); Claire M. Sylvia, the False Claims Act: Fraud Against the Government § 5:6 (2020).

It cannot reasonably be doubted that Dr. Garza sufficiently alleged in the Amended Complaint that she tried to stop what she reasonably believed to be an illegal kickback arrangement that the Hernandez Defendants were pressuring her into joining. Here, Relator Garza's "efforts to stop 1 or more violations of" the FCA consisted of her two-fold action of (1) refusing to succumb to the Hernandez' demands that she pay them kickbacks which came from ORR health care funds; and (2) then reporting that to Naranjo, whom she reasonably believed had authority over Eder, and could demand that Eder halt engaging in the kickback activity.

In September 2018, Dr. Garza informed Naranjo of the Hernandez family's demands for kickbacks in an effort to avoid participation in the illegality. AC ¶¶ 20, 104–107, 110–115, and 117–124. In early 2019, her complaint to Naranjo about Eder was followed in short order by Naranjo telling Garza that he had decided to take Casa Sunzal away from her and award it to Dr. Rauf, *i.e.*, to Valley Med. See AC ¶ 129. She was not immediately dropped in favor of Dr. Rauf because SWK needed her due to Rauf's incompetence. AC ¶¶ 131–132.

That constituted an act of discrimination close in time to her protected activity supporting an inference that it was retaliatory to her whistleblowing under a common test for causation in the context of whistleblowing, the knowledge-timing test. *See, e.g., Miller v. Dept. of Justice*, 842 F.3d 1242, 1256 (Fed. Cir. 2016).

In summary, Relator Garza's allegations of retaliation by Defendants SWK, the Hernandez', and Naranjo satisfy the three elements for 3730(h) liability described above, and therefore satisfy the notice pleading standard of FED. R. CIV. P. 8(a).

## V. Conclusion

For the following reasons, Relator prays that this Court deny the Hernandez Defendants' Motion to Dismiss (ECF 91) and for all relief she is entitled to under the law.

Dated: September 17, 2025

Respectfully submitted,

/s/ Jack Kolar

John A. (Jack) Kolar
D.C. Bar No. 292953
*Appearing pro hac vice (Lead Counsel)*
**Government Accountability Project**
1612 K Street NW, Suite 1100
Washington, DC 20006
(p) 202-926-3311
(e) JackK@whistleblower.org

Richard Condit
D.C. Bar No. 417786
Cleveland Lawrence III
D.C. Bar No. 480462
*Appearing pro hac vice*
**Mehri & Skalet, PLLC**
2000 K Street NW, Suite 325
Washington, DC 20006
(p) 202-822-5100
(e) rcondit@findjustice.com
(e) clawrence@findjustice.com

Carlos Doroteo
TX Bar No. 24097616
*Appearing pro hac vice*
**Milpa Law PLLC**
1300 W 18th Street # 7263
Houston, TX 77008
(p) 866-666-4572
(e) Carlos@MilpaLaw.com

**COUNSEL FOR PLAINTIFF-RELATOR JANA GARZA**

## CERTIFICATE OF SERVICE

I certify that on September 17, 2025, I caused a true and correct copy of this document to be served via ECF on all counsel of record.

/s/Carlos Doroteo
Carlos Doroteo

**COUNSEL FOR PLAINTIFF-RELATOR JANA GARZA**