**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* JANA GARZA<br>*Plaintiff,*<br><br>v.<br><br>SOUTHWEST KEY PROGRAMS, INC.,<br>*et. al.,*<br>*Defendants.* | ) | Case No. 1:25-cv-00305-ADA-SH |

**DEFENDANT SOUTHWEST KEY PROGRAMS, INC.'S**
**<u>REPLY IN SUPPORT OF MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

I. Relator Fails to Allege an AKS FCA Violation by SWK. 1

II. Relator Fails to Allege a Conflict of Interest FCA Violation by SWK. 5

III. Relator Fails to Allege FCA Conspiracy by SWK. 8

IV. Relator Fails to Allege FCA Retaliation by SWK. 8

V. Relator's Conclusory Allegations Cannot Survive Any Iteration of Rule 9(b) And Fail to Allege Any Knowledge Attributable to SWK 9

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................1

*United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*,
816 F.3d 315 (5th Cir. 2016) ....................8

*United States ex rel. Grubbs v. Kanneganti*,
565 F.3d 180 (5th Cir. 2009) ....................1, 9, 10

*United States ex rel. Hueseman v. Prof'l Compounding Ctrs. Of Am.*,
, 664 F. Supp.3d 722 (W.D. Tex. 2023)....................10

*Mira Safety LLC v. BTG Int'l, Inc.*,
No. 1:24-cv-01363, 2025 WL 1576829 (W.D. Tex. Mar. 14, 2025)....................9

*Nichols v. Baylor Research Inst.*,
418 F. Supp. 3d 143 (N.D. Tex. 2019) ....................9

*Settoon Towing, L.L.C. v. Shelley*,
2024 U.S. App. LEXIS 18254 (5th Cir. Jul. 24, 2024)....................1

*United States v. Hangar One, Inc.*
563 F.2d 1155 (5th Cir. 1977) ....................3

*United States v. Ridglea State Bank*,
357 F.2d 495 (5th Cir. 1966) ....................3

*Universal Health Servs., Inc. v. United States ex rel. Escobar*,
579 U.S. 176 (2016)....................7

*United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*,
2019 U.S. Dist. LEXIS 178030 (W.D. Tex. Jul. 1, 2019) ....................3

*United States ex rel. Wismer v. Branch Banking & Trust Co.*,
2014 U.S. Dist. LEXIS 50217 (N.D. Tex. Apr. 11, 2014)....................3, 4

**Statutes**

42 U.S.C. § 1320a-7b(g) ....................4

False Claims Act ("FCA")....................1, 3, 4, 5, 6, 7, 8, 9

**Court Rules**

Fed. Rule Civ. P. 8 ....................................................................................................1

Fed. Rule Civ. P. 9(b) ....................................................................................1, 2, 9, 10

Fed. Rule Civ. P. 12(b)(6)..........................................................................................1, 2

**Other Authorities**

42 C.F.R. § 1001.952(d) ..............................................................................................2

U.S. Department of Health and Human Services "Tracking Accountability in Government Grants System" (TAGGS) entry for Southwest Key Programs, available at https://taggs.hhs.gov/ .......................................................................................7

Despite three years elapsing since Relator filed this matter under seal alleging a "master plan" among a dozen defendants to systematically defraud the United States government, *see, e.g.*, Am. Compl. ¶ 94 (Dkt. No. 24) ("Compl."); Relator's Opp'n Br. (Dkt. No. 102) at 14, 18, 19, it took an Order of this Court (Dkt. No. 101) for Relator to finally identify her allegations specifically as to SWK. When Relator did so, it became obvious that her theories fail to meet pertinent legal standards and her complaint contains fatal gaps.[1]

Most notably, throughout her Opposition Brief, Relator calls upon this Court to infer the opposite of what the well-pled factual allegations in Relator's Complaint most naturally suggest—which wholly contradicts Fed. Rule Civ. P. 9(b). Courts in the Fifth Circuit are to apply Rule 9(b) and Fed. Rule Civ. P. 12(b)(6) "with bite and without apology" precisely to "weed out meritless fraud claims sooner than later and to stand "as a gatekeeper to discovery." *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (cleaned up).

This Court should dismiss Relator's claims against SWK under Rules 12(b)(6) and 9(b) because, after demanding pleading with particularity and taking all *reasonable* inferences in Relator's favor, Relator has failed to state a viable fraud claim against SWK.

## I. Relator Fails to Allege an AKS FCA Violation by SWK.

Relator's clarified arguments in her Opposition Brief expose the extent to which her Anti-Kickback Statute (AKS)-based False Claims Act ("FCA") allegations rely upon sparse, contradictory factual allegations and incomplete legal theories.

---

[1] Such inferences are contrary to Fed. Rule Civ. P. 8, which requires that "plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *see also Settoon Towing, L.L.C. v. Shelley*, 2024 U.S. App. LEXIS 18254 (5th Cir. Jul. 24, 2024) (dismissing a complaint in which the plaintiff alleged tortious conduct collectively against eighteen defendants enabling the court to "infer only a 'mere possibility of misconduct' by each Defendant.").

First, Relator asserts, based on a second-hand account, that at some point about ten years ago, in "2014 or 2015," two unidentified individuals purportedly identified themselves as representatives of SWK to an unidentified dentist referred to as "Dr. B," and purportedly used unspecific language to unsuccessfully solicit a kickback from Dr. B. *See* Compl. ¶¶ 98-101. This allegation fails to meet the specificity requirements of Rule 9(b) or the minimum requirements of Rule 12(b)(6).

Second, Relator asserts Eder Hernandez ("Hernandez") both solicited a kickback from her (Compl. ¶ 110-117) and previously solicited a kickback from a "Dr. A." Compl. ¶ 93; Opp'n Br. at 4. Whatever Relator alleges Hernandez may have done or said,[2] Relator pleads no facts to reasonably infer that Hernandez represented SWK as an employee. In fact, her Complaint asserts the opposite, that (i) SWK employees Naranjo and Figueroa told her they were unaware of any expectation by Hernandez to receive any compensation from her and that she did not need to contract with Hernandez to proceed with her SWK contract (Compl. ¶ 119); (ii) her agreement to contract with SWK was reached in a phone call on August 13, 2018, in which numerous SWK staff participated and Hernandez did not (*Id.* ¶ 104); and (iii) several days after the phone call with SWK staff, she texted Hernandez to convey the news of her being engaged by SWK (*Id.* ¶ 105). In sum, the facts asserted by Relator, and any reasonable inference drawn from these facts, confirm that Hernandez was <u>not</u> acting on SWK's behalf in any purported kickback scheme.

Third, Relator seems to suggest that, despite her pleading that Naranjo and Figueroa specifically rejected the purported Hernandez kickback solicitation on her provider contract, they

[2] Relator assumes, without elaboration or support, that a personal or management services contract along the lines allegedly proposed by Hernandez would violate the AKS. *But see* 42 C.F.R. § 1001.952(d) (establishing a safe harbor from AKS liability for personal and management services contracts).

had a degree of involvement in some broader scheme that, in turn, makes SWK vicariously liable for any AKS-tainted claims providers may have later submitted to Point Comfort Underwriters (PCU). Opp'n Br. at 6-7. However, in the Fifth Circuit, under *United States v. Ridglea State Bank*, 357 F.2d 495 (5th Cir. 1966), acts of employees are attributable to their employer for FCA liability *only when* the employee is "acting within the scope of their authority *and* for the purpose of benefitting the corporation." *United States v. Hangar One, Inc.* 563 F.2d 1155, 1158 (5th Cir. 1977) (citing *Ridglea*)(emphasis added). In *Ridglea*, FCA liability was asserted against a bank on the basis of false loan insurance applications submitted by the executive vice president (EVP) of the bank to the Federal Housing Authority (FHA). *Ridgelea.* at 496. As explained by the Court:

> "Hubbard's [the EVP's] purpose was most certainly not to benefit his employer banks. He must have known that the loans he approved would be defaulted, so that the banks would not make any money on interest on the loans. And, as the trial court found, Hubbard's approval of fraudulent applications for FHA-insured loans endangered the bank's ability to continue to handle FHA business and jeopardized the reputation of the banks and their financial integrity. Hubbard's purpose, in fact, was to line his own pockets and those of his accomplices with the proceeds of the loans and to get money to make payments on loans previously approved by him on the basis of fraudulent applications, so that these earlier wrongdoings would remain concealed."

*Ridglea*, 357 F.2d at 498.

At least two Federal District Courts in Texas have recently applied the *Ridglea* standard in considering motions to dismiss FCA actions. In *United States ex rel. Wheeler v. Union Treatment Ctrs., LLC*, 2019 U.S. Dist. LEXIS 178030 (W.D. Tex. Jul. 1, 2019), the Western District of Texas reconfirmed the *Ridglea* standard is binding in the Fifth Circuit and rejected an allegation of vicarious FCA liability where the government did not argue the employee's acts were intended to benefit the corporate defendant. *Id.* at *4-7. In *United States ex rel. Wismer v. Branch Banking & Trust Co.*, 2014 U.S. Dist. LEXIS 50217 (N.D. Tex. Apr. 11, 2014), the Federal District Court for the Northern District of Texas similarly rejected a vicarious liability

claim where the relator "never claimed that [the alleged bad actor] …was acting for the benefit for BB&T." *Id.* at *8, fn. 10.

Relator's AKS theory against SWK is premised on vicarious liability for the acts of Naranjo and Figueroa. Yet, nowhere in her complaint does Relator offer any factual allegation that suggests Naranjo or Figueroa were acting "for the benefit of SWK" when supposedly participating in some "master plan" to steer or acquire medical provider contracts, nor can any such inference reasonably be drawn. Most notably, Relator confirms that SWK has no role in the medical claim submission process and receives no payment for the medical services which providers such as Relator furnish, explaining: "[a] medical provider submits [its] claim to Point Comfort Underwriters (PCU), a third party that the federal government utilizes to process claims. PCU then pays out these claims to medical providers using Federal health care dollars." Compl. ¶ 69.

Rather, Realtor's allegations all state or suggest that Naranjo and Figueora were engaged in a fraudulent scheme *for their own benefit*. Said another way, if Relator's allegations are true and reasonable inferences are drawn, SWK is a victim of the fraudulent scheme in much the same way as the government, yet Relator claims SWK is a perpetrator. In this respect, Relator ignores a Fifth Circuit legal standard at the heart of her attempt to attach liability to the corporate entity of SWK.[3]

[3] Moreover, Relator fails to plead the necessary causal connection with respect to SWK. The Anti-Kickback Statute provides that "a claim that includes items or services *resulting from* a violation of" the Statute is "a false or fraudulent claim" under the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g) (emphasis added). None of the alleged kickbacks that Relator pleads involve a successful kickback or any claim "resulting" therefrom. This is especially the case relating to SWK, where Relator fails to plead any causal nexus, relying instead on unsupported allegations of vicarious liability

## II. Relator Fails to Allege a Conflict of Interest FCA Violation by SWK.

Relator's Opposition Brief similarly reveals that her conflict of interest (COI) allegations regarding SWK do not hold up to scrutiny for four primary reasons: (i) Relator ignores the express requirements for shelter providers within ORR cooperative agreements; (ii) Relator again fails to allege facts that suggest SWK, as a corporation, should be liable under the FCA for any purported bad acts of its employees; (iii) Relator fails to allege facts suggesting that the violation of a cooperative agreement COI provision would lead to the withholding of any funds under the cooperative agreement, especially since all payments to medical providers flow directly from PCU and not through the cooperative agreements; and (iv) Relator wrongly presumes that there is some obligation in PCU payment terms that medical provider contracts be awarded by ORR Shelter Providers such as SWK in a manner consistent with cooperative agreement COI obligations. Each deficiency is addressed in turn.

First, Relator's Complaint states that ORR cooperative agreements require Shelter Providers like SWK to establish and maintain written COI policies that: (i) identify and define COIs; (ii) prohibit employees from having financial interests in the transactions of services of the program; (iii) requires staff to recuse themselves from the decision-making process if there is a COI; (iv) requires staff to disclose any COI before making a decision related to the conflict; and (v) states that failure to disclose COIs may result in discipline or termination of employment. Compl. ¶ 61.b. Accordingly, the cooperative agreement obligation is for SWK to have and follow a COI policy with the features identified above. Nowhere does Relator allege that SWK failed to have or enforce such a policy, and nowhere does she assert how, or who within, SWK reviews or negotiates cooperative agreement provisions from a compliance perspective when entering into such agreements.

Take, for example, Relator's claims that SWK violated the COI terms by steering medical shelter contracts to Naranjo. None of her assertions, *see* Opp'n. Br. at 14, establish that SWK violated any of the provisions (i) through (v) listed in paragraph 61.b. Relator alleges that SWK created a new "sham" bidding process for 2022 medical provider contracts that was, in her opinion, "odd" because the process set out "unrealistic and unattainable timeframes." Compl. ¶ 178-189. Relator does not allege that a SWK decision maker with a COI failed to disclose such a conflict or recuse himself from decision making; nor does she allege that SWK failed to enforce its COI policy when presented with evidence of violation. To the contrary, Relator's allegations regarding the internal SWK decision making process indicate that individuals with potential conflicts were *not* included in decisions. *See, e.g.*, Compl. ¶ 188 (stating "that the decision on what providers would receive [outside medical provider zero-dollar contract] awards was made by Anselmo Villarreal, who was the CEO of SWK" and not Naranjo or Figueroa); *see also* Compl. ¶ 182 (stating that SWK VP Rivera "told Garza that he had nothing to do with the bidding process and that the Director of Procurement was on his back"). Once more, Relator demands that this Court disregard factual allegations she has pled and *infer their opposite*.

Second, for the reasons described above as to Fifth Circuit precedent on corporate FCA liability for acts of employees, no purported violation of any COI obligation is alleged to have been for the benefit of SWK. To the contrary, Relator's theory is based on the presumption and reasonable inference that Naranjo and Figueroa would have been acting in violation of SWK's COI policy if they had engaged in the self-serving conduct Relator asserts.

Third, even if Relator had actually alleged any conduct attributable SWK that violated the COI terms of its cooperative agreements, she has failed to allege facts suggesting that any funds under SWK's cooperative agreements would have been withheld, *i.e.* that such obligations or

violation thereof are material to payment of funds under the cooperative agreement. In her Opposition Brief, Relator seems to assert that cooperative agreement funds were used to pay medical providers (Opp'n Br. at 1), but Relator's Complaint alleges that medical providers were paid directly by PCU rather than with cooperative agreement funds. Compl. ¶¶ 63-69.

Further, Relator filed her original FCA complaint on October 26, 2022 (Dkt. No. 2) and the Government, per Relator's allegations, thereafter continued to pay SWK substantial sums under cooperative agreements in the routine course of operating numerous shelters across multiple states. Compl. ¶¶ 47-54.[4] Relator alleges no action by the U.S. Department of Health and Human Services with respect to SWK's cooperative agreements despite her October 2022 allegations. This reflects a lack of materiality. "[I]f the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 195 (2016). By invoking SWK's cooperative agreement terms to claim corporate liability for strained COI violations by employees, even though the medical provider contracts at issue are not even paid for via those agreements, Relator improperly attempts to wield the FCA as "an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.* at 194.

Fourth and finally, to the extent Relator asserts FCA liability on the basis of providers submitting medical claims to PCU (Opp'n Br. at 14), Relator asserts no conditions of payment under the PCU provider agreements that would render such a payment request false simply

[4] *See also* U.S. Department of Health and Human Services "Tracking Accountability in Government Grants System" (TAGGS) entry for Southwest Key Programs, available at https://taggs.hhs.gov/ (reflecting awards made after the date of the Complaint through 2025).

because there was a COI on the part of any SWK staff member involved in selecting the medical provider in the first place.[5] As explained in SWK's motion to dismiss, PCU's public website encourages Shelter Providers to identify medical providers through "[r]ecommendations/referral from providers already working with [the Shelter Provider]." SWK Motion (Dkt. No. 89-1) at 4.

## III. Relator Fails to Allege FCA Conspiracy by SWK.

Since Relator devotes just two paragraphs to Relator's FCA conspiracy count and identifies no facts to support a claim that SWK as a corporate entity agreed to participate in an FCA violation, SWK refers the Court to its Motion to Dismiss. To the extent that Relator asserts that SWK employees Naranjo and Figueroa were involved in a conspiracy with Hernandez to steer medical provider contracts to certain entities, Relator has failed to (i) connect Hernandez's role in the purported scheme to SWK; and (ii) to tie any actions by Naranjo and Figueroa to the purpose of "benefitting the corporation" as required under Fifth Circuit precedent.

## IV. Relator Fails to Allege FCA Retaliation by SWK.

Relator's Opposition Brief reveals that she fails to plead FCA retaliation by SWK, including that: (1) the employee "engaged in protected activity," (2) the "employer, or the entity with which he has contracted or serves as an agent, knew about the protected activity," and (3) "retaliat[ion] . . . because of his protected activity." *United States ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 323 (5th Cir. 2016). Three years after filing the case, Relator's response tries to shift the alleged retaliation theory: it is not that Relator failed to win three of five competitive bids for zero-dollar contracts for outside medical provider services four years after

[5] The fact that Relator was a provider who had an agreement with PCU suggests that were there any such obligation in the PCU payment terms, it would have been easy for her to plead.

the principal events on which she bases claims, but rather—now—that the basis is that Naranjo, while still employed at SWK, reallocated medical provider contracts in early 2019. Opp'n Br. at 20. Relator still does not allege that Relator "used the terms 'illegal,' 'unlawful,' or 'qui tam action' in characterizing [Relator's] concerns" when raising those concerns with SWK, *see* SWK Mot. at 19 (citing cases); nor does she allege that she informed SWK that her motivation for reporting Hernandez's soliciting a contract from her was a concern about defrauding the government. *See Nichols v. Baylor Research Inst.*, 418 F. Supp. 3d 143, 148-51 (N.D. Tex. 2019) (dismissing retaliation claim where relator failed to allege that noncompliance was reported because it constituted fraud against the federal government).

Finally, Relator received numerous medical provider contracts at various SWK shelters throughout the subsequent three years without any record of her complaining about any reallocation of contracts. *See* Compl. ¶¶ 129, 139, 142, 171 (listing shelter contracts that Garza received during this period, including renewal contracts for five Houston shelters in year 2020.) In short, Relator has failed to plead that she communicated any concern of fraud to SWK or that SWK took any adverse action against her as a result of any such communication.

## V. Relator's Conclusory Allegations Cannot Survive Any Iteration of Rule 9(b) And Fail to Allege Any Knowledge Attributable to SWK

A plaintiff's argument cannot rest on mere conclusory statements. Relator's Opposition Brief incorrectly asserts that the particularized "who, what, when, where, and how" factors are *not* required to state a claim in the Fifth Circuit under Rule 9(b). Even the case on which Relator relies—*Grubbs*, 565 F.3d at 185—mandates that the particularized details of a scheme must be pled.[6]

[6] Despite Relator's assertions, see Opp'n Br. at p. 11, *Mira Safety LLC v. BTG Int'l, Inc.*, No. 1:24-cv-01363, 2025 WL 1576829, at *1, *2 (W.D. Tex. Mar. 14, 2025) is distinguishable and

*Grubbs* held that a relator must sufficiently place defendants on notice by pleading "both an alleged scheme to submit false claims and details leading to a strong inference that those claims were submitted—**such as dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into…."** *Id.* at 190-191 (emphasis added). Relator's Complaint falls far short of the complaint in *Grubbs,* which met this standard by describing "in detail, including the date, place, and participants, the dinner meeting at which two doctors in his section attempted to bring him into the fold of their on-going fraudulent plot" and "specific dates that each doctor falsely claimed to have provided services to patients . . . ." Moreover, Relator's Opposition Brief relies on case law where the court follows a strict Rule 9(b) pleading standard. *See United States ex rel. Hueseman v. Prof'l Compounding Ctrs. Of Am.,* 664 F. Supp.3d 722, 737-739 (W.D. Tex. 2023) (court reasons that plaintiff must specify the statements contended to be fraudulent, identify the speaker, and state when and where the statements were made.) It is undisputed that Relator's Amended Complaint meets none of those standards.

## CONCLUSION

For the foregoing reasons, and those provided in SWK's Motion to Dismiss (Dkt. No. 89 and 89-1), the Court should dismiss Relator's Amended Complaint in its entirety.

---

holds no weight here as it involved breach of contract claims and was not brought under the False Claims Act.

Dated: September 24, 2025

Respectfully submitted,

*/s/ Mindy B. Pava*

**FELDESMAN LEIFER LLP**
Mindy B. Pava (*pro hac vice*)
Stephen M. Kuperberg (*pro hac vice*)
1129 20th Street NW, Suite 400
Washington, DC 20036
Telephone: (202) 466-8960
Fax: (202) 293-8103
Email: mpava@feldesman.com
skuperberg@feldesman.com

**VENABLE LLP**
Scott S. Sheffler (*pro hac vice*)
600 Massachusetts Avenue, NW
Washington, DC 20001
Phone: (202) 805-1994
Fax: (202) 344-8300
Email: SSSheffler@venable.com

**WOMBLE BOND DICKINSON LLP**
Michael E. Clark (Texas Bar No. 04293200)
717 Texas Avenue, Suite 2100
Houston, TX 77002
Telephone: (346) 998-7807
Email: Michael.clark@wbd-us.com

*Counsel for Defendant Southwest Key Programs, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 24, 2025, I electronically filed the foregoing document with the Clerk of the District Court using its CM/ECF system, which would then electronically notify all parties of record who are CM/ECF participants on this case.

_*/s/ Mindy B. Pava*_______________
Mindy B. Pava